# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KEITH PIERCE,                  )
                                      )
          Plaintiff,         )
                                        )
     v.                       )
                                      )    Civil Action No. 05-1989 (RMU)
                                      )
R. JAMES NICHOLSON, Secretary,  )
U.S. Department of Veterans Affairs,  )
                                      )
         Defendant.       )
_____)

## STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to Fed. R. Evid. 56 and Local Rule 7(h), Defendant submits the following Statement of Material Facts for which there is no genuine issue.

**Background Information:**

1.    Keith B. Pierce ("Plaintiff") is employed by the Department of Veterans Affairs Medical Center ("VA Medical Center" or "VAMC") in Washington, DC.  Deposition of Keith Pierce, June 7, 2006 ("Plff. Depo.") at 7:6-8.  Plaintiff has been with the VA for fourteen years. Id.. at 7:9-10.  Other than his current position, Plaintiff held only two positions at the Medical Center: (1) Inventory Management Specialist and (2) Patient Advocate.  Id. at 14:6-19.

2.    Plaintiff is currently an Education Specialist, GS-12, Step 4.  Plff. Depo. at 7:11-18.  Plaintiff applied for his present position and the GS-13 Director of Patient Advocacy position  almost simultaneously.   Id. at 8:4-10 .  Plaintiff was hired for his present position in July 2004.  Id. at 8:14-9:1.  Thus, Plaintiff was hired during the time period between his panel

interview and his second interview for the Director of Patient Advocacy position.  Id. at 8:19-22.

3.     At the time of the events relevant to this case, Plaintiff was a Patient Advocate, a position  he had held for seven or eight years.   Plff. Depo. at 7:19-8:3.

4.     "[A]nytime that a patient complaint issue[s] a concern, the patient advocate office is responsible for tracking, trending and resolving that complaint."  Plff. Depo. at 9:16-19.

5.     As Patient Advocate, Plaintiff handled the resolution of both internal complaints as well as questions and inquiries from "congressionals."  Plff. Depo. at 9:12-16.   "[W]hen a complaint, issue or concern came into, came into the office," Plaintiff "took the complaint, investigated it and resolved it if it was something that could be taken care of in the office." Id.. at 11:24-12:3.  If resolution of a complaint required a response by a medical service provider, Plaintiff referred the complaint to the provider or to the service or to the department where the complaint arose.  Id. at 12:3-7. The patient advocate tracking package involved the patient advocate's writing up a complaint and sending it to the responsible department which was required to respond within seven days.  Id. at 12:7-13.  In essence, Plaintiff received the complaints and either responded to them himself or made sure that they were responded to by relevant persons.  Id. at 12:14-18.

6.     In 2004, Plaintiff and Mary Beasley  were GS-11 patient advocates and served as team leaders of six GS-9 patient representatives.  Plff. Depo. at  10:5-7.

7.     William Sivley ("Sivley") was hired as Lead Patient Advocate in 1999 or 2000. Plff. Depo. at 12:19-13:2.  He was Plaintiff's direct supervisor.  Id. at 12:22-23.  Plaintiff had been acting Lead Patient Advocate and had applied for that position but Sivley was selected over him.  Id. at 10:10-14.   Sivley served as Lead Patient Advocate for about a year and a half when

he went on active military duty in 2002. Id. at 13:3-6. He was on military duty for over a year.

See Exhibit 1 (Letter, dated January 9, 2004 to William M. Sivley from Sanford M. Garfunkel).

8.      David West was Plaintiff's second line supervisor until Terry Ross ("Ross")

arrived. Plff. Depo. at 13:7-20. Ross was Executive Officer of the Medical Center, GS-14.

Written Affidavit of Terry Ross (hereinafter "Ross Affidavit") at page 3, Answer to Question 11.

In March 2003, Ross came to the VA Medical Center in Washington, D.C. Id at Answer to

Question 12. Ross was Plaintiff's second line supervisor from the time of her arrival until

Plaintiff changed jobs in 2004. Plff. Depo. at 13:1-5.

**Events Giving Rise to Plaintiff's Claims:**

**Job Announcement # 04-23**

9.      On January 9, 2004, Sanford Garfunkel ("Garfunkel"), Director of the DC VA

Medical Center, granted Sivley's request to continue on Leave Without Pay ("LWOP") status

through July 13, 2004 at the Department of Veterans Affairs Medical Center (VAMC) in

Washington, D.C. while he remained on active duty in the military. Exhibit 1 (Letter, dated

January 9, 2004 to William M. Sivley from Sanford M. Garfunkel). Garfunkel stated that Ross

had previously informed Sivley that the VAMC would be "backfilling the position you currently

hold at the Washington VAMC as Lead Patient Advocate (*Position Description*: Program

Specialist, GS-0301-13), effective immediately due to our considerable increase in workload."

Id. Garfunkel reassured Sivley that upon his return to VAMC he would be "reassigned to a

position for which you would be qualified that is of like seniority, status, and rate of pay." Id.

Less than two weeks after this memorandum, Ross submitted an Emergency Position Request for

the establishment of the position entitled Director, Office of Patient Advocacy. Exhibit 2

3

(Emergency Position Request, dated January 21, 2007). Garfunkel granted Ross' request. Id.

10.    In a January 23, 2004 Memorandum to Ross, Plaintiff asked to be detailed into the Lead Advocate Position. Exhibit 3 (Memorandum from Plaintiff to Ross, dated January 23, 2004). On that same day, Ross replied to Plaintiff via e-mail and stated "As I mentioned in our Patient Advocate meeting this week, management has decided to abolish that position [Lead Patient Advocate] and begin recruitment for a Director, Office of Patient Advocacy at the GS-13 level. Exhibit 4 (January 23, 2004 E-mail from Ross to Plaintiff, Subject: Request to be Detailed as Lead Patient Advocate).

11.    Michelle Spivak, Director of the Office of Public Affairs and Community Relations, agreed to continue as Acting Lead Patient Advocate until the position of Director, Office of Patient Advocacy was filled. Exhibit 4.

12.    Also, on January 23, 2004, Ross sent an e-mail to the Patient Advocate's office concerning management's decision to abolish the Lead Patient Advocate position and to create the Director of Patient Advocacy position. Plff. Depo. at 18:17-19:4. Ross also stated that the new position would be announced. Id. at 18:20-21.

13.    On February 11, 2004, Terry Ross submitted a Redescription of Position Duties in order to create a Position Description for the Director, Office of Patient Advocacy. Exhibit 5 (Director, Office of Position Advocacy Position Description).

14.    On March 8, 2004, the position of Program Specialist, GS-301-13 (Job Announcement # MCD 04-23) was issued. Exhibit 6 (Vacancy Announcement # MCD 04-23); Ross Affidavit, at page 4, Answer to Question 17. The Closing Date for this position was March 26, 2004. Id. Only DC VA Medical Center employees could apply for this position. Id.

4

15.     Plaintiff saw the announcement in the Human Resources Department.  Plff. Depo. at 19:5-7.  Plaintiff sent an e-mail to Ross to discuss why the position was being listed as a GS-13 when it had been listed as a GS 12/13 when Sivley was hired.  Id. at 24:18-25:14.  Ross stated that because of the specialized experience, she wanted it to be a straight GS-13.  Id. at 24:21-25:6.  Other than that e-mail, Plaintiff did not have any other contact with Ross about this matter. Id. at 25:15-26:14.

16.     Ross was told that only one person applied for MCD 04-23 and that person did not qualify for the position.  Ross Affidavit, at page 4, Answer to Question 17.

17.     On March 30, 2004, Leacha Barnette, Chief, Resource Management Service sent an e-mail to Garfunkel notifying him that no "qualified eligible" applied for the MCD 04-23. Exhibit 7 (Memorandum, dated March 30, 2004, from Leacha Barnette to Medical Center Director).

18.     On March 31, 2004, Ross sent an e-mail to Garfunkel.  Exhibit 8 (E-mail chain, March 31, 2004).  Ross requested permission to recruit outside of the DC VA Medical Center for position of Director, Office of Patient Advocacy because the recruitment period had closed and there were no qualified applicants.  Id.  Garfunkel granted Ross' request.  Id.

19.     After receiving Garfunkel's approval, Ross sent an e-mail to Gloria McNeill ("McNeill"), Human Resource Specialist (Recruitment/Placement, GS-12-VAMC-Washington, D.C.) on March 31, 2004.  Exhibit 8 (E-mail chain, March 31, 2004).  Ross requested that McNeill please recruit for the Director, Office of Patient Advocacy outside the hospital.  Id.  She also asked that the position be placed on their "vacancy website."  Id.

20.     By memorandum, dated April 1, 2004, McNeill informed Plaintiff that he was not

qualified for MDC 04-23 because he "did not meet the time in grade restrictions."  Exhibit 9 (Memorandum, dated April 1, 2004 to Keith Pierce, Subject: Program Specialist, GS-13 ANN# MCD 04-23).

21.    The Office of Human Resources "makes referral of applicants who meet qualification requirements."  Written Affidavit of Gloria McNeill ("McNeill Affidavit") at page 2, Answer to Question 7.  The Human Resources Office "does not compair [sic] applicants."  Id. If selections are made, the Veterans Administration makes them.  Id. at Answer to Question 6.

22.    Gloria McNeill is African-American and she is older than the Plaintiff (59 years old at the time of her deposition in 2005).  McNeill Affidavit at page 2, Answer to Question 1. She was unaware of Plaintiff's age.  Id. at Answer to Question 2.

23.    Plaintiff admitted "I have no grounds to say that they [Human Resources] discriminated" against him when they determined that he was not qualified for Job Announcement # 04-23.  Plff. Depo. at  32:13-24.  Plaintiff did not file any EEO claim on the basis of this because he did not  believe there to be any discrimination on the basis of Human Resources' actions.  Id. at 33:18-34:5.    Indeed, Plaintiff was working with a Veteran's Representative from the Department of Labor (Id. at 29:15-30:9) and the Representative did not propose filing an EEO action but rather mentioned an action based on misapplication of the law. See Id.at 33:23-25 ("I'm sure it was nothing to do with EEO.  He was going to look at how they applied the statute.").

**Job Announcement # MCD 04-35**

24.    On April 2, 2004, the position of Director, Office of Patient Advocacy was reannounced under Job Announcement 04-35.  Exhibit 10 (Vacancy Announcement, 04-35).  The

position was open to the following applicants: (1) current Federal employees serving under a career or career conditional appointment, (2) former Federal employees with reinstatement eligibility or persons eligible for non-competitive appointment under Special Authorities, and (3) VEOA (Veteran Employment Opportunities Act of 1998) eligibles.  Id.

25.    MCD 04-35 closed on April 23, 2004.  Exhibit 10; Ross Affidavit at page 4, Answer to Question 17.  Human Resources prepared a certificate which contained the list of six qualified eligibles.  Exhibit 11 (Memorandum, dated June 17, 2004 to Chief, Office of Director, from Leacha M. Barnette).  Plaintiff was listed as "eligible for 30% or more VEOA consideration" for the position.  Id.

26.    Ross received this certificate in the middle of June 2004.  Ross Affidavit at page 4, Answer to Question 17.

27.    In July 2004, a rating and ranking panel was convened to review, rate, and perform interviews of the six (6) applicants.  Ross Affidavit at page 4, Answer to Question 17. This panel consisted of five (5) members: (1) Michelle Spivak, Director, Community Relations and Public Affairs and Acting Chief, Office of Patient Advocacy, (2) Brandon Bentley, Chief, Fiscal Service, (3) Marcia Bowens, Nurse Manager, (4) Jennifer Perez, Acting Chief, Social Work Service, (5) Martin Wiseman, Acting Chief, Business Office.  Id.; Exhibit 12 (Memorandum, dated July 26, 2004, to Terry Ross, Subject: Report of Chief, Office of Patient Advocacy Interview Panel).

28.    Once the rating panel had interviewed, ranked, and rated the candidates, they submitted their ratings to Ross.  Exhibit 12.  The panel ranked the top two candidates as follows:
 (1) Nancy Benjamin ("Benjamin"), Coordinator, Spinal Cord Injury & Disease Clinic, VA

Western New York Healthcare System (174 points) and (2) Plaintiff (150 points).  Id.

29.    The panel also provided comments about the candidates.  Exhibit 12.  It noted that Benjamin "was able to describe program and team development, evaluations, and resulting changes based on team input.  She had a clear understanding of the responsibilities of the role and VA policies. . . . She has management experience."  Id.   While noting that Plaintiff had "a good understanding of the role of Patient Advocate . . . [H]e seems to have, for the most part provided services as opposed to managing them."  Id.  The panel found it difficult to "ascertain his management potential, due to his tendency to concentrate on his personal roles and achievements.  It was also unclear as to whether he recognized his tendency to reflect more on the 'me' as opposed to the 'we.'."  Id.  Although the panel noted that Plaintiff was "quite knowledgable about patient advocacy and customer service initiatives," it stated that "true insight into his contributions and teamwork seemed to be lacking."  Id.

30.    The panel indicated that Plaintiff and Benjamin be given a second interview with the selecting official.  Exhibit 12; Ross Affidavit at page 4-5, Answer to Question 17.

31.    Plaintiff did not believe that anyone on the panel or the panel as a whole discriminated against him.  Plff. Depo. at 36:24-37:3.

32.    Ross was the selecting official.  Ross Affidavit at page 5, Answer to Question 17; (Deposition of Terry Ross, January 17, 2007, ("Ross Depo.") at 15:3-4) .  She interviewed both Plaintiff and Benjamin.  Ross Affidavit at page 5, Answer to Question 17; Ross Depo. at 15:11-12.  Ross asked both persons the same questions.  Ross Depo. at 15:15-16; Exhibit 13 (Ross' Notes from her interviews with Plaintiff and Benjamin).

33.    Plaintiff 's interview with Ross lasted for about a half an hour.  Plff. Depo. at

41:13-15. Plaintiff could not remember the exact questions asked by Ross but he did state that she appeared to have a structured list of questions that she asked. Id. at 39:19-23.

34.     Ross asked Plaintiff a question that involved his ability to do graphs. Plff. Depo. at 40:7-13. Plaintiff responded that he could do graphs but that he had not done them in a while. Id. at 40:15-17. He stated that the patient advocates trending package does graphs for you. Id. at 40:16-18. He would just use an ad hoc menu and the trending package would sort the data for him. Id. at 40:18-20. Plaintiff stated that "nowhere anyone asked that." Id. at 40:19-20.

35.     After her interview with Plaintiff, Ross concluded Plaintiff failed to show either that he had significant experience in leading a program or that he had significant experience in using graphs and charts to present data. Ross Affidavit at page 5, Answer to Question 17. Both of these qualifications were "imperative" to the position of Director, Office of Patient Advocacy. Id.

36.     After her interview with Benjamin, Ross concluded that she was "far more qualified for the position" than Plaintiff. Ross Affidavit at page 5, Answer to Question 17. "Ms. Benjamin was clearly able to demonstrate how she has run a program, and provided detailed explanations of her experience in using charts and graphs to present data." Id.

37.     During the interview, Ross said nothing to Plaintiff that indicated that she was influenced by his age, race, or alleged disability. Plff. Depo. at 61:2-11. Ross did not mention Plaintiff's prior EEO activity. Id. at 61:12-14. Plaintiff did not mention his prior EEO activity to Ross. Id. at 61:15-17.

38.     Garfunkel also interviewed both Plaintiff and Benjamin. Deposition of Sanford Garfunkel, June 1, 2005 ("Garfunkel 2005 Depo.") at 7:14-17; Ross Affidavit at page 5, Answer

9

to Question 17.  Garfunkel was not the selecting official.  Garfunkel 2005 Depo. at 6:13-15;

Deposition of Sanford Garfunkel, January 17, 2007 ("Garfunkel 2007 Depo.") at 11:19 .

39.    Garfunkel described his interview with Plaintiff:  "I have to tell you honestly that

it was not a good interview at all.  From what he would do if he got the job to what issues there

are with the program to what he would do to make it better for patients, he really did not have a

satisfactory answer to me to any question or to most questions."  Garfunkel 2005 Depo. at 8:8-

13; 14:23-15:1.  Garfunkel did not think that Plaintiff's "answers to the questions really showed

insight into the program or how the program could grow or how he would be a successful leader

in the program."  Garfunkel 2007 Depo. at 12:12-15.  Mr. Garfunkel stated that "after

interviewing Mr. Pierce, I did not think he was the candidate that I would want in that job."  Id. at

12:9-10.  Based on his interview of both candidates, Benjamin seemed to have a better approach

to the position than Mr. Pierce.  Id. at 11:19-22.

40.    During the interview, Garfunkel did not say anything to indicate that he was

influenced by Plaintiff's age, race or alleged disability.  Plff. Depo. at 61:18-25.  Garfunkel did

not say anything during the interview to indicate that he was making the determination based on

Plaintiff's prior EEO activity.  Id. at 62:1-2.  Garfunkel was aware that Plaintiff had filed and

won a case (a settlement) but he was not aware of how it was resolved.  Garfunkel 2007 Depo. at

6:17-19.

41.    After the interviews had taken place, Garfunkel discussed the interviews of

Plaintiff and Benjamin with Ross.  Garfunkel 2007 Depo. at 16:4-5.  While Garfunkel did not

remember the exact details of the conversation, "she was not happy with Mr. Pierce's

performance or did not feel that he would make a successful lead advocate director."  Id. at

16:12-14.  Ross told Garfunkel that Keith Pierce showed no evidence of running a major

program and that he showed no evidence of using any kind of graphs or charts while Benjamin

showed evidence of both.  Ross Depo. at 16:10-21.  Ross and Garfunkel concluded that

Benjamin should be offered the position of Director, Office of Patient Advocacy.  Ross Affidavit

at page 5, Answer to Question 17; Garfunkel 2005 Depo. at 8:13.

42.    On August 16, 2004, Ross selected Benjamin for the position of Director, Office

of Patient Advocacy.  Exhibit 11.

43.    On August 26, 2004, Benjamin declined the offer of the position of Director,

Office of Patient Advocacy.  Exhibit 11.

44.    Ross did not offer that position to Plaintiff because he was not qualified as "he did

not show any evidence at all of running a major program, nor did he show any evidence of being

able to use graphs and charts."  Ross Depo. at 24:19-22.  Even though the rating panel could

recommend two candidates, Ross could not give the job to Plaintiff after Benjamin refused

because  Ross and the panel had different criteria for evaluating candidates.  Ross Depo. at 27:22

(The rating panel "established their own criteria"); 28:19-29:3 ("I had different or additional

questions other than what the rating and ranking panel used.  I had my own questions and used

them on both candidates.  Once they were recommended, the two were recommended to me, I

then had my own questions and  asked them both the same questions so that I could further

delineate.").

45.    On August 30, 2004, Plaintiff sent an e-mail to Ross asking "when will the

selection process for the Director, Patient Advocate be completed."  Exhibit 14 (E-mail chain

between Plaintiff and Ross, August 30, 2004).  On that same day, Ross replied "We turned in the

cert last week to HR for further processing.  Feel free to contact HR to see where they are in the process." Id.

**Job Announcment MCD 04-35A:**

46.     Ross did not believe that Plaintiff was qualified so she advertised the position again.  Ross Depo. at 29:18-22.

47.     The Position Description for Vacancy Announcement MCD 04-35A differed significantly from the Position Description for the Lead Patient Advocate Position.  The Lead Patient Advocate Position listed Special Projects as 100% of the duties.  Exhibit 15 (Position Description of Lead Advocate Position, Position 74820-0).  In contrast, the Director, Office of Patient Advocacy Position lists four major duties (each comprises 25%): (1) Development of Programs, Policies, and Procedures, (2) Development of Criteria, (3) Program Implementation, and (4) Studies and Special Projects.  Exhibit 16 (Vacancy Announcement MCD 04-35A with attached Position Description of Director, Patient Advocacy).  The Lead Patient Advocate did not run a major program.  Ross Depo. at 18:20-19:3.  The lead advocate was not involved in charts and graphs and providing analysis for patient satisfaction.  Id. at 18:20-19:8.  Even Plaintiff acknowledges that the duties described in the Director, Office of Patient Advocacy "put more weight on certain things."  Plff. Depo. at 167:1-3, 169:19-22 ("[T]hey're weighted different.").

48.     On September 9, 2004, Plaintiff learned from Human Resources that the position of Director, Office of Patient Advocacy had been reannounced.  Exhibit 17 ( September 9, 2004 e-mail Chain between Plaintiff and Lawan Houston (Human Resources)).  Plaintiff did not need to reapply for the position because he would receive automatic consideration.  Id.  The position's closing date was September 13, 2004.  Id.     Only Human Resources could officially tell Plaintiff

that the position had been reannounced.  See Plff. Depo. at 77:12-14 ("I didn't do anything until I heard something from HR for this.  By law that's official.  Ms. Ross cannot officially say that.").

49.    On September 14, 2004, Plaintiff sent an e-mail to Ross regarding the reannouncement of the Director, Office of Patient Advocacy position.  Exhibit 18 ( E-mail between Plaintiff and Ross, September 14, 2004).  Plaintiff stated "What I would really like to know is, are you looking for someone with experience I don't possess, and if so, what am I lacking.  It is very frustrating for me to continue applying for a position when the selecting official is looking for someone with particular traits or attributes."  Id.

50.    On September 14, 2004, Ross replied to Plaintiff's e-mail regarding the reannouncement.  Exhibit 18.  She stated "I have asked to have this position reannounced to have a larger pool of individuals to have the opportunity to apply.  I'm hoping that a larger pool will apply so that we may have a greater comparision of individuals."  Id.

51.    Even though VAMC decided to abolish the Lead Patient Advocate position on January 23, 2004,  that position was never abolished even though VAMC began recruitment for Director of Patient Advocacy.  Ross Depo. 37:5-6; 38:1-21.  William Sivley, GS-13, remained in the Lead Advocate position during all times relevant to this action.  Ross Depo. 38:32-39:6; Ross Affidavit, page 4, Answer to Question 15 ("The Lead Patient Advocate position was already an occupied position, and we were not recruiting for that position.  This [Director of the Patient Advocate Office ] was an entirely different position.").

52.    When Sivley returned from active duty, he "indicated he would be just as happy trying something else, so we [VAMC] tried him in something else."  Garfunkel 2007 Depo. at 19:18-21.  Specifically, Sivley requested to go on detail in the Fiscal service (Ross Depo. at 10:2-

5) and VAMC detailed Sively (Ross Depo. at 10:7-8).  After a while Sivley "didn't seem that happy in that new position" and VAMC still didn't have a head of the patient advocacy program" so VAMC management and Sivley mutually agreed that he would resume his old position as Lead Patient Advocate.  Garfunkel 2007 Depo. at 20:1-4; 32:22-33:1 ("He [Sivley] was interested in the position. We put him in."); Garfunkel 2005 Depo. at 9:1-4 ("Anyway by the time we announce it the 3rd time, he [Sivley] had indicated, well, he would really like to go back being the patient advocate."); Ross Depo. at 30:6-13 ((Sivley) "decided that he no longer wanted to be detailed to fiscal services and wanted to come back and work full-time in the patient advocate office and wanted to broaden his horizons by starting to do charts and graphs that we needed to be done.").  Sivley got the position because he was already Lead Patient Advocate and just assumed the responsibilities.  Ross Depo. at 37:1-4.

53.    When Sivley decided that he wanted to work full-time in the Patient Advocate Office, the position of Director, Office of Patient Advocacy, Job Announcement MCD 04-35A was cancelled and the VAMC just decided to maintain the Lead Advocate Position.  Ross Depo. at 30:6-11; 34:7-11; McNeill Affidavit, page 3, Answer to Question 21.

54.    Sivley had some previous experience doing charts and graphs.  Ross Depo. at 32:17-33:1-3.  Sivley wanted some additional experience in graphs and charts. Id. at 32:17-21. Sivley  wanted something other than what he had originally been doing as Lead Patient Advocate.  Id. at 33:1-3.  As of Garfunkel's June 1, 2005 deposition, Sivley was "doing an outstanding job."  Garfunkel 2005 Depo. at 14:7-8.

55.    Plaintiff unequivocally acknowledged Sivley's unique and superior skill with graphs.  Presently, Bill Sivley is doing "his own type of graph" that is different from the patient

14

tracking graph. Plff. Depo. at 44:4-7. Plaintiff admitted that he could not do the type of graphs

that Sivley does. Id. at 45:20-21-46:20-25. Bill Sivley had told Plaintiff that in his college days,

he was a statistician. Id. at 45:19-20. Plaintiff testified "I did not do statistics. I've done graphs

and charts based on what was needed." Id. at 45:20-21. Based on information that he received

as a member of the Board of Directors for Society for Healthcare Consumer Advocacy, Plaintiff

stated that about 80% of the patient advocates across the nation cannot do the graphs that Sivley

does. Id. at 46:20-25.

56.    When Sivley was selected as Lead Advocate in or around 2000, Plaintiff did not

think that any discrimination had occurred. Plff. Depo. at 98:23-99:15. Sivley had been

Plaintiff's supervisor for a year and a half. Plff. Depo. at 84:10-13. Plaintiff and Sivley did not

have any problems with one another. Id. at 84:14-16. Plaintiff had no concerns about Sivley's

competence as a supervisor. Id. at 84:17-19.

57.    Ross did not know that the only person who applied for MCD 04-35A was

Plaintiff. Ross Depo. at 34:12-16.

58.    On October 21, 2004, Plaintiff sent an e-mail to Leacha M. Barnette and Lawan C.

Houston, both members of the Human Resources Department. Exhibit 19 (E-mail Chain

between Plaintiff and Leacha M. Barnette, October 21, 2004 and October 27, 2004). In this e-

mail, Plaintiff stated that he recently learned that Sivley had been placed in the reannounced

position. Id. Plaintiff asked whether Sivley had been detailed into the position until the selection

was made or whether he had been selected for the position. Id.

59.    On October 27, 2004, Leacha M. Barnette replied to Plaintiff's E-mail. Exhibit

19. She stated "Bill Sivley is returning to his position of record on a permanent basis. Bill was

on detail to Fiscal when he returned from the military and he just returned back to his position

from the detail, which was his official position of record." Id.

### Procedural History of the Present Case: EEO Case Number 2004-0688-2005100735

60.    On December 6, 2004, Plaintiff contacted an EEO counselor regarding his non-

selection for Vacancy Announcement MCD 04-35A.  Exhibit 20 (EEO Counselor's Report, Case

Number, 2004-0688-2005100735).

61.    Plaintiff filed a Complaint of Discrimination on January 5, 2005.  Exhibit 21

(Notice of Receipt of Complaint of Discrimination").  Plaintiff attached a three page

memorandum to his Complaint of Discrimination detailing his claims.  Exhibit 22 (Complaint of

Discrimination).  The bases for all of his claims were: (1) reprisal; (2) race; (3) age; and (4)

disability.  Exhibit 22 at page 1.  The claims included (1) denial of Plaintiff's request to be

detailed to the Lead Patient Advocate Position in the absence of Bill Sivley, who held that

position but was absent due to extended military duty; (2) non-selections for the positions with

job announcement numbers of  MCD 04-23, MCD 04-35, and MCD 04-35A; and (3) harassment.

Exhibit 22, pages 1-4; Exhibit 23 (Letter from Waltrunette M. Gardner, Regional EEO Officer to

Plaintiff, dated April 14, 2005, Subject: Partial Acceptance of your EEO Complaint Case No.

2004-0688-2005100735) at pages 1-2.

62.    On April 14, 2005, ORM dismissed all of Plaintiff's claims except for his claim

regarding non-selection for MCD 04-035A.  Exhibit 23, pages 2-3.  Plaintiff's other claims were

dismissed under 29 C.F.R. 1614.105(a)(2) because he did not seek counseling for those claims

within 45 days of the alleged incident.  Id.

63.    On October 26, 2005, the Department of Veteran Affairs Office of Employment

16

Discrimination Complaint Adjudication (hereinafter "OEDCA") rendered its final decision in this matter based on the investigative record.  Exhibit 24 (Final Agency Decision).  The OEDCA rejected Plaintiff's claim of non-selection for MCD 04-35A.  Id. at 13.

64.    Before the OEDCA rendered its final decision, Plaintiff filed the instant case in this Court on October 7, 2005.  Pierce v. Nicholson, 05-1989 (RMU) Pacer Dkt.# 1; Complaint at ¶ 16 ("Plaintiff exhausted all of his administrative remedies because defendant accepted plaintiff's claims for investigation and over 180 days has passed since the formal investigation began.).

**Plaintiff's Claims of Discrimination and Retaliation**

**A.     Race and Disability**

65.    Plaintiff is an African-American male.  He was born in 1955.  Plff. Affidavit at page 2, Answer to Question 3.

66.    Plaintiff is an 80% Service Connected Veteran.  He sustained injuries while serving on active military duty.  Plff. Affidavit at page 2, Answers to Questions 3 and 4.  His disabilities affect his back, shoulder, knees, and feet.  Id. at Question 3.  Plaintiff is a 10 point v preference veteran.  Id.  Plaintiff receives compensation for those disabilities.  Plff. Depo. at 115:25-116:1.

67.    Plaintiff's feet and knees prevent any prolonged standing.  Plff. Affidavit at page 3, Answers to Question 8.  Plaintiff has gout attacks once every couple of months.  Plff. Depo.. at 116:9-14.  During these attacks, he can only stand for ten minutes but when he does not have a gout attack, he can stand for an hour.  Id. at 116:6-17.  If Plaintiff stands longer than a hour, it is painful.  Id. at 117:7-9.  Plaintiff can walk for thirty minutes without pain, but beyond thirty

17

minutes he begins to experience pain.  Id. at 116:18-117:6.  Plaintiff takes medication for joint

pain and gout.  Plff. Affidavit at page 3, Answers to Question 9.  Sometimes, he has to use a cane

at work after such a gout attack.  Id. at Answer to Question 10; Plff. Depo. at 120:9-18.

 68. Plaintiff is left-handed.  Plff. Depo. at 118:5. Plaintiff has had three shoulder

surgeries and his range of motion for his left arm has decreased but the range of motion for the

right arm is alright.  Id. at 117:10-22.  Plaintiff can do "pretty much anything that doesn't require

me to elevate my left arm completely above my head."  Id. at 118:2-3.  When Plaintiff reaches

his maximum point with his left arm, he can force it up but not without pain. Id..at 118:11-18.

Plaintiff's shoulder injury prevents him from doing any heavy lifting.  Plff. Affidavit at Answer

to Question 8.

 69. Plaintiff's back acts up when he overexerts himself.   Plff. Depo. at 119:12-20.

Plaintiff's back condition prevents prolonged sitting.  Plff. Affidavit, at page 3, Answer to

Question 8.  He takes antiflammatories when his back and knees act up.  Plff. Depo. at 119:13-

15.   The anti-inflammatories may take a day to work but they do give him relief.  Id. at 119:21-

23.

 70. Plaintiff's injuries do not prevent him from driving or doing household chores.

Plff. Depo. at 120:4-6

 71. There are no essential duties of Plaintiff's job that he is unable to perform because

of his disability.  Plff. Affidavit at page 3, Answer to Question 13.

 72. Plaintiff did not need accommodations because his job did not require "a lot of

walking or a lot of standing or a lot of sitting at any given time."  Plff. Depo. at 121:10-15.

 73. Plaintiff never asked either Terry Ross (Executive Officer to Medical Center

Director) or Sanford Garfunkel (Medical Center Director) to accommodate his disabilities. Plff. Depo. at 121:10-20. Plaintiff never provided Ross, who was the selecting official for the position at issue, with any medical documentation regarding his disabilities. Instead, he only provided her with materials concerning special hiring privileges because of his disabilities. Id. at 121:21-122:1. Plaintiff provided nothing to Ross or Garfunkel that mentioned his injuries or limitations. Id. at 122:2-11. Plaintiff may have mentioned a gout attack to Ross in passing when she would ask him why he was limping. Id. at 122:22-123:4.

_____74.     Plaintiff did not claim that either Ms. Ross or Mr. Garfunkel failed to give him the position because he was disabled. Plff. Depo. at 125:21-24. Instead he merely states "I was not given or nowhere I have seen yet that they gave me consideration as a disabled veteran." Id. at 124:13-15.

### B.     Age Discrimination

75.     Plaintiff has only two bases for maintaining that Ross knew his age: (1) Plaintiff submitted an application packet that contained Date of Birth (Plff. Affidavit at page 6, Answer to Question 24) and (2) Ross had access to Plaintiff's Personnel file even though he does not know if she read the file (Plff. Depo. at 113:1-5). Ross stated that she was not aware of Plaintiff's age. Ross Affidavit at page 2, Answer to Question 2.

76.     Nancy Benjamin, the selectee for MCD 04-35, was born in 1952. Exhibit 25 (Curriculum Vitae of Nancy M. Benjamin, MSW). She is more than two years older than Plaintiff who was born in 1955. (Plff. Affidavit at page 2, Answer to Question 1).

77.     The only evidence of age discrimination regarding Defendant's decision to put William Sivley back in the Lead Patient Advocate position, consists of two facts: (1) Mr. Sivley

19

is younger than Plaintiff and (2) Sivley never "technically" competed for the position for which Plaintiff interviewed.  Plaintiff Depo. at 113:16-22.

> ### C.    Retaliation for Prior EEO Activity.

78.    Plaintiff bases his retaliation claim on his two prior EEO filings against the VAMC.  Plff. Depo. at 92:8-16; Plaintiff Affidavit at page 2, Answer to Question 1.  These filings are explained in greater deal in ¶¶ 80-85 below.

79.    Ross, the selecting official, was not aware of Plaintiff's prior EEO Activity.  Ross Affidavit, at page 4, Answer to Question 14.  Plaintiff has "no idea" whether Terry Ross was aware of his prior complaints.  Plff. Depo. at 98:6-8.  Plaintiff conjectures that since Garfunkel "was listed as the responsible management official [sic] in my previous case and now one of the final interviewing officials for this job, Ms. Ross could have obtained knowledge at that point."  Plff. Affidavit at page 5, Answer to Question 24.

80.    Plaintiff believes that the retaliation is the result of his prior EEO activity based on his comparision between his credentials and Benjamin's credentials.  Plff. Depo. at 101:13-19.  Plaintiff 's assessment was that he was more qualified than Benjamin because he had experience in an office of patient advocacy whereas she ran a Spinal Cord Injury Unit.  Plff. Depo. at 102:22-103:1.

81.    Plaintiff does not claim and has never claimed that he is more qualified than Sivley for the position of Lead Patient Advocate.  Plff. Depo. at 103:7-9; 106:20-25.

82.    Plaintiff alleges that Garfunkel retaliated against him because he was the responsible management official in a prior case.  Plff. Depo. at 106:6-19.

83.    The essence of Plaintiff's retaliation claim is that "putting him [Sivley] back in a

position that was abolished, that's obviously improper, and the fact that he [Sivley] was there the entire time the interview process was going on, that lend -- that led me to question possible intent. And the fact that it wasn't two other individuals of the six; it was me and one other, then they decided to put him back into position and no one ever told me why." Plff. Depo. at 107:14-21.

84.     Plaintiff never asked either Ross or Garfunkel about why he was not selected for this position. Plff. Depo. 108: 2-9. Plaintiff never asled Sivley why there was a time lapse and why he came back into the position. Plff. Depo. 108:10-12. Plaintiff did ask Human Resources about Sivley returning to his prior position and they said they chose to put Sivley back in his position because he was coming back from active duty. Plff. Depo. 108:13-23.

### Plaintiff's First EEO Activity: EEO Case Number 99-4823

85.     On August 31, 1999, Plaintiff Keith Pierce filed a Complaint of Employment Discrimination against Defendant Secretary of Veterans Affairs with the Department of Veterans Affairs, Office of Resolution Management ("ORM") (Washington, D.C. Field Office). Exhibit 26 (Notice of Receipt of Discrimination Complaint- Case Number 99-4823).

86.     After failing to prevail at the administrative level, Plaintiff filed suit against Defendant in the U.S. District Court for the District of Columbia on October 27, 2000. Pierce v. West, Civ. No. 00-2605 (TFH) Pacer Dkt. # 1. He alleged that he was discriminated against on the basis of race and color (African American) in violation of Title VII when he applied for the position of Health System Specialist (GS 12/13) (announced on or about March 1999) and was not selected. Pierce v. West, Civ. No. 00-2605 (TFH). Exhibit 27, Complaint at ¶¶ 6, 10, 17. This position was in the Radiology Department and a white male was selected instead of

Plaintiff.  Plff. Depo. at 88:16-88:18.

87.    Plaintiff and Defendant settled the case for $75,000 in May, 2002.  <u>Pierce v. West</u>,
Civ. No. 00-2605, Pacer Dkt. #41; Exhibit 28.

### Plaintiff's Second EEO Activity:  EEO Case Number 2004-0688-2001300419

88.    Plaintiff's second EEO activity consists of two separate Complaints of
Discrimination filed with the ORM.   Plaintiff filed a Complaint of Discrimination dated October
26, 2001 in which he set out a claim for retaliation based on his prior EEO activity.  Exhibit 29
(Complaint of Discrimination, dated October 26, 2001).  Plaintiff then filed a Complaint of
Discrimination dated April 5, 2002 in which he claimed reprisal and race based discrimination.
Exhibit 30 (Complaint of Discrimination, dated April 5, 2002).  Pursuant to 29 C.F.R. Section
1614.606 both of these claims were consolidated on or about May 8, 2002.  Exhibit 31 (Letter
from Peggy Joyner, Regional Officer, Department of Veterans Affairs, Office of Resolution
Management).  The claims were given a case number of 2004-0688-2001300419, the case
number originally assigned to the Complaint of Discrimination dated October 26, 2001.  Exhibit
31.

89.    The consolidated case presented two claims that ORM accepted for processing:
(1) whether Defendant retaliated against Plaintiff based on his prior EEO activity when
Defendant did not select Plaintiff for the position of Health Systems Specialist, GS 12/13,
Announcement Number 01-20 on August 2, 2001 and (2) whether Defendant discriminated
against Plaintiff (based on race) and retaliated against him (based on prior EEO activity) when
the Director of the Veterans Administration Medical Center ("VA Medical Center") informed
Plaintiff on January 28, 2002 that the Director had hired someone in the Community Relations

Position in the Director's Office.  Exhibit 31.  Specifically, this claim involved Plaintiff's non-selection for a position of Acting Lead Patient Advocate.  Plff. Depo. at  93:18-94:4.  Michelle Spivak was selected as Acting Lead Patient Advocate.  Id. at 93:21-94:4

      90.    On April 28, 2003, Administrative Judge Rebecca L. Dickinson, Equal Opportunity  entered a Closure Order remanding the case for final decision within 60 days. Exhibit 30 (EEO Closure Order, April 28, 2003).  The case was dismissed due to Plaintiff's failure to prosecute his case at the hearing stage.  Id.  Plaintiff settled this case informally with the Medical Center.  (Written Affidavit of Keith Pierce ("Plff. Affidavit") at page 2, Answer to Question 1.

Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, DC Bar #489610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney


_____/s/_____
ALEXANDER D. SHOAIBI, DC Bar # 423587
Assistant United States Attorney
Judiciary Center Building – Civil Division
555 Fourth Street, N.W. -- Room E-4218
Washington, D.C. 20530
(202) 514-7236

Counsel for the Defendant

**CERTIFICATE OF SERVICE**_____

I hereby certify that on this 9th day of April, 2007, I caused the foregoing Defendant's

Motion for Summary Judgment, Statement of Material Facts as to Which There Is No Genuine

Issue, and proposed order by the Electronic Case Filing system or, if this means fails, then by

mail, postage prepaid, addressed as follows:

**Jimmy A. Bell, Esq.**
**Law Office of Jimmy A. Bell, Esq.**
**9610 Marlboro Pike**
**Upper Marlboro, Maryland 20772**
**Telephone: (301)599-7620**
**Fax: (301)599-7623**
**Bar # MD14639**

_____/s/_____
ALEXANDER D. SHOAIBI,  DC Bar # 423587
Assistant United States Attorney
Judiciary Center Building – Civil Division
555 Fourth Street, N.W. -- Room E-4218
Washington, D.C. 20530
(202) 514-7236