COPY

1

1    UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF COLUMBIA

3

4    - - - - - - - - - - - - - x

5    KEITH PIERCE,                    :

6              Plaintiff,            :

7    vs.                              :    Case No: 1:OSCV019989

8    HON. B. JAMES NICHOLSON,         :

9              Defendant             :

10   - - - - - - - - - - - - - x

11                              Washington, D.C.

12                              Wednesday, June 7, 2006

13

14

15   Whereupon,

16                    KEITH PIERCE

17   the Witness, called for examination by counsel for the

18   Defendant, pursuant to notice and agreement of counsel as to

19   time and place, at 501 Third Street, N.W., Washington, DC,

20   before Heather Kilbourne, a Notary Public in and for the

21   District of Columbia.

22

23

24

25

```
 1  APPEARANCES:

 2            On Behalf of the Plaintiff:

 3            JIMMY A. BELL, Esquire

 4            9610 Upper Marlboro Pike

 5            Upper Marlboro, Maryland  20772

 6            301-599-7620

 7

 8            On Behalf of the Defendant:

 9            KATHLEEN KONOPKA, Esquire

10            555 4th Street, NW

11            Washington, DC  20001

12            202-514-7566

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                 P R O C E E D I N G S

2                                              (12:05 p.m.)

3          COURT REPORTER:  On the record at 12:05 p.m.

4   Whereupon,

5                      KEITH PIERCE,

6   was called as a witness and after having been first duly

7   sworn, was examined and testified as follows:)

8                   DIRECT EXAMINATION

9          BY MS. KONOPKA:

10     Q    Good morning, Mr. Pierce.  I think we met outside

11  briefly but my name is Kathleen Konopka and I'm an Assistant

12  U.S. attorney and it's my job to represent the agency, the

13  Department of Veteran Affairs and your case against them.

14  We're going to be taking your deposition today.  The court

15  reporter has just administered the oath and there's just a

16  couple of ground rules that I wanted to go through first

17  before we started.

18          First is that since everything is being taken down

19  by tape, everything needs to be in oral, audible response.  We

20  can't have nodding head and shaking heads and things like that

21  because that won't be picked up by the tape.  Do you

22  understand that?

23     A    Yes, I understand.

24     Q    Okay.  The other thing is that it's difficult for

25  the tape to pick it up if we both speak at the same time.  So

1  can you state your full name for the record?

2      A    Yes.  My name is Keith B. Pierce.

3      Q    Okay.  And Mr. Pierce, where do you live?

4      A    I live at 4603 Mimsey Road and that's in Upper

5  Marlboro, Maryland.  The zip code is 20772.

6      Q    Okay.  And who is your present employer?

7      A    I'm employed with the Department of Veterans Affairs

8  Medical Center here in Washington, DC.

9      Q    Okay.  And how long have you been with the VA?

10     A    I guess this is going on my 14th year.

11     Q    Okay.  What is your current position?  What is the

12  title of your current position?

13     A    The title of my current position is Health Education

14  Specialist.

15     Q    And what is your grade?

16     A    I'm a GS-12.

17     Q    And step?

18     A    Step 4, I think.

19     Q    And now, is this the same or a different position

20  than you held at the time of the selection that's at issue in

21  this case?

22     A    It's a different position.

23     Q    Okay.  And what was the position that you held at

24  the time of the events relevant to this case?

25     A    I was actually a patient advocate.

1    Q    Okay.  And how long had you been a patient advocate

2 at that time?

3    A    I think seven or eight years.

4    Q    When did you apply for the current position that you

5 hold now, the GS-12?

6    A    Actually, it was almost simultaneously when I

7 applied for the GS-13 position which was the Director of

8 Patient Advocacy.

9    Q    Okay.  So around the same time frame?

10    A    Yes.

11    Q    And when did you learn that you had received your

12 current position, that you had an offer for your current

13 position?

14    A    Actually I was offered this position after I had

15 conducted the interview for the Director of Patient Advocacy

16 and it was just before my second interview which was with Ms.

17 Terry Ross and the Medical Center Director, Mr. Stanford

18 Garfunkel.

19    Q    Okay.  So between the panel interview and the second

20 interview in regards to the Director of Patient Advocacy

21 position?

22    A    Yes.

23    Q    Okay.  And do you have any memory about months?  I

24 assume we're talking 2004?

25    A    Yes, I think it was July of 2004, if I'm not

1  mistaken was when I went into this position.

2      Q    Okay.  And what is the advancement capacity of your

3  current position?

4      A    None.

5      Q    Okay.  So it's just a GS-12?

6      A    Yes.

7      Q    Okay.  And when you were a patient advocate, what

8  grade were you at that point?

9      A    GS-11.

10     Q    Can you tell us what your duties were as a patient

11 advocate?

12     A    Yes.  The duty and the role of the patient advocate

13 is essentially to resolve -- I actually handled complaint

14 resolutions and in handling complaint resolutions, that's not

15 only just internal but that's also answering questions or

16 inquiries that may be congressionals.  But the bottom line is,

17 anytime that a patient complaint issue a concern, the patient

18 advocate office is responsible for tracking, trending and

19 resolving that complaint.

20     Q    Okay.  And the office of patient advocacy has these,

21 these roles as far as you said, the, the trending of the

22 complaint and the resolution of the complaint.  Where did you

23 fit into that?  How big was the staff and what was your role

24 in those missions?

25     A    Well, now I think they've got five patient advocates

1 but at the time when I was there, there was myself and Mary

2 Beasley (phonetic.)  We were the GS-11s and we had six patient

3 representatives and now they're down to five, but they're GS-

4 9s and then it was titled the Lead Patient Advocate.  He was a

5 GS-13.  When they GS-9s came on board, myself and Mary

6 Beasley, the two GS-11s, essentially act or served as team

7 leaders and we pretty much mentored the GS-9s.

8     Q    Okay.  And when did those GS-9s come on board?

9     A    Actually, they came on board.  I can't remember the

10 exact date but it was during the time period, shortly after

11 Bill Sivley who is now in the current position.  Once he came

12 on board I was the acting lead patient advocate and actually

13 applied for the position with Bill Sivley and he was selected

14 over me.  So the GS-9s came on board.  I actually wrote their

15 core competencies and actually wrote their position

16 descriptions and trained them, the GS-9s, when they came on

17 board and I also gave some training to Bill Sivley.

18     Q    Okay.  And in mentoring these GS-9s, I mean, what,

19 what is your actual duty?  Do you actually speak to the

20 patients that have concerns?  Do you speak to other people who

21 have concerns?  What would be your exact role as the GS-11

22 person?

23     A    Well actually, the GS-11 person is essentially the

24 person or the point of contact with the most experience.

25 That's why we were essentially unofficially titled as team

1  leaders.  We, myself and Mary Beasley, had more tenure there

2  in the patient advocate office.  We had been there several

3  years and we essentially did the same job except Mary and I

4  were responsible when Bill wasn't there, Bill Sivley wasn't

5  there.  We would take turns, rotate, or in many cases when she

6  was out on maternity leave and I took over as lead patient

7  advocate when he was on military leave, I actually did the

8  reports and the reports were the complaints that came into the

9  office and we correlated reports, got them to the responsible

10 department and then the report went to management.

11     Q    Okay.  So that was what you did when you were acting

12 lead patient advocate, you did the reports?

13     A    I did the reports as acting.  Everything else was

14 when Bill Sivley was there, then we just did do the report,

15 the report that went to management.

16     Q    All right.  But I still don't quite understand.  You

17 said that you were, you and Ms. Beasley had more experience

18 than the GS-9s which I can understand, but I don't understand

19 exactly what you were working, doing.  Were you speaking to

20 the patients?  Were you speaking to other people?  What

21 exactly were you doing as a patient advocate?

22     A    Okay, I'm sorry.  Then let me go back and clarify.

23     Q    Okay.

24     A    My role when I was in that position, when a

25 complaint, issue or concern came into, came into the office,

1  then I took the complaint.  I investigated the complaint and

2  if it was something that could be handled within my office, I

3  took care of the complaint resolution there.  If it was

4  something that required a provider, a medical provider in

5  which I could now, then I referred the complaint to the

6  provider or to the service or to the department where the

7  complaint arose.  Doing this we utilized what was called or

8  what is called the patient advocate tracking package.

9           The complaint would come in.  We would write it up,

10 send it to the responsible department and we gave them -- they

11 had seven days in turn to respond to that complaint, issue or

12 concern, and many times it was done within a matter of the

13 same day.

14      Q    All right.  So that was, that was what you did as a

15 GS-11, was you would get these complaints in and you would

16 make sure that they were responded, either by yourself or by

17 the relevant people?

18      A    Yes.

19      Q    Okay, all right.  Now you, you've referred to the

20 fact that Bill Sivley was your supervisor at one point.

21      A    Yes.

22      Q    And that would have been your direct supervisor?

23      A    Yes.

24      Q    Okay.  Do you recall when that was, what period of

25 time?

13

1    A    I think Bill Sivley came on board in maybe 1999 or

2  2000.

3    Q    Okay.  And how long was he there before he went on

4  active duty?

5    A    I think he was there for about a year, year and a

6  half.

7    Q    And who would have been your second line supervisor

8  then?

9    A    Then it was, I think at that time it was Mr. David

10  Wess (phonetic) who is now the Associate Medical Center

11  Director, but the position that this -- well actually Bill

12  Sivley -- I take that back.  At one point in time Bill Sivley

13  reported or patient advocate office reported directly to the

14  medical center director and when Mr. Wess took over as the

15  executive officer, then the patient advocate office, along

16  with the public affairs, reported directly to him, so Mr. Wess

17  would have been the next line supervisor.

18    Q    All right.  Was Terry Ross ever your second line

19  supervisor?

20    A    Yes.

21    Q    And what time frame was that?

22    A    I guess she had been there two years so maybe when

23  2002 -- when she arrived she came to the medical center as the

24  executive officer.

25    Q    Okay.

14

1      A     So I think I may have had two years under Ms. Ross

2   before I changed jobs.

3      Q     So whenever she arrived, that's when she would have

4   begun her tenure as your second line supervisor?

5      A     Yes.

6      Q     What positions did you hold prior to your patient

7   advocate position?

8      A     Well, prior to the patient advocates position --

9   well, doing that I need to make sure it's on record that I was

10  the acting lead patient advocate in between Mr. Earl Newsome

11  (phonetic) and Bill Sivley, but prior to the patient advocates

12  office, I was an Inventory Management Specialist with the

13  Supply Distribution Processing Department, SPD, in the medical

14  center, and that position was actually a supervisory Inventory

15  Management Specialist position which was essentially the

16  assistant chief and that was the position that I held when I

17  first came in and those were the only positions that I've had

18  since I've been there other than the one that I'm currently

19  in.

20     Q     Okay.  And when you say that your first position you

21  said was the supervisory --

22     A     Inventory Management Specialist.

23     Q     Okay.  And does that mean that you were supervising

24  people or you were supervising things or --

25     A     Yes.  I was -- yes, I'm sorry.  I was supervising.

1   Director of Office of Patient Advocacy position?

2        A    Okay.  This is the position -- the position had been

3   -- this was the second time, actually, that it had been

4   announced.

5        Q    Okay.  Well, let's go back to the first.  I want to

6   know how you --

7        A    Okay, okay.  Well let me start from the beginning.

8        Q    Okay.  That's where we want to start.

9        A    In December -- well, in January 23rd of 2000 -- and

10  I'm going --

11       Q    Okay.  Well we're, we're going to get to -- let's

12  start with the actual position, okay?

13       A    Okay.

14       Q    And then if we need to work our way backwards we'll

15  work our way backwards.

16       A    Okay, that's fine.

17       Q    Okay.  So let's start with when you first learned

18  about the Director of Office of Patient Advocacy position.

19       A    Well, see, and that's why I went to this because in

20  January, Ms. Terry Ross, said to the Patient Advocate's office

21  that that position would be announced and this is her e-mail

22  where she said they had decided to abolish the Lead Patient

23  Advocate position and create the Director of Patient Advocacy.

24       Q    Okay.

25       A    That's when I first learned --

1     Q    So you first learned about that in an e-mail?

2     A    Yes, dated January the 23rd, 2004.

3     Q    And that was from Ms. Ross?

4     A    Yes.

5     Q    Okay.  Did you eventually see an actual announcement

6 for that position?

7     A    Yes, I did.

8     Q    Okay.

9     MS. KONOPKA:  And if I can get this marked.

10     (Pierce Deposition Exhibit Number 3 marked for

11 identification.)

12     MS. KONOPKA:  Thank you.

13     BY MS. KONOPKA:

14     Q    Mr. Pierce, I'm now showing you what is marked as

15 Exhibit Number 3 for identification in these proceedings.  If

16 you can take a look at this.  Is this the announcement that

17 you first saw for this Director position?  You can go through

18 the whole thing if you want.  It's several pages long.

19     A    No, this is not the one.  This is the copy.  This is

20 the actual copy and the reason I did that was when the

21 investigative report came, I had applied for this position.

22 It was in-house.  I was the only one to apply and I had

23 applied.  That's highlighted as a over 30% disabled veteran

24 under Special Hiring Authorities.

25     Q    Okay.

```
 1              (Pause.)

 2              THE WITNESS:  Looks like there were some things out

 3    of order but I think I saw KSOAs those there.

 4              (Long pause.)

 5              THE WITNESS:  Yes, this looks like the very same

 6    packet.

 7              BY MS. KONOPKA:

 8       Q    Okay, good.  Now let me ask you, when you applied

 9    for this vacancy announcement 04-23, did you discuss your

10    decision to apply with Ms. Ross?

11       A    Yes, I did.

12       Q    Okay.

13       A    And the -- when I spoke with Ms. Ross and on her e-

14    mail dated January the 23rd, that's when she told me they were

15    going to, that's when she told me they were going to actually

16    announce the job and they were going to announce it in-house

17    which that was the first announcement.

18       Q    Okay.  But did you speak with her about your

19    intention to apply for it?

20       A    Yes.

21       Q    And when did that conversation take place?

22       A    Well, I can -- well, it looks like, on the e-mail

23    trail, March 5th, Ms. Ross had said she wasn't sure what I was

24    concerned about management because I had a concern about it

25    was a GS-13 instead of a 12/13 --
```

1    Q    Okay.

2    A    -- which it was initially when I had applied for it

3 the first time with Bill Sivley, two years prior.

4    Q    Uh-huh.

5    A    And that's when she said because of the specialized

6 experience she wanted it to be a straight GS-13.

7    Q    Okay.

8    A    And that was on her Friday, March 5th e-mail --

9    Q    Okay.

10    A    -- 2004.

11    Q    All right.  So the conversation that you had with

12 her about applying for this position was the difference of a

13 12/13 versus a straight 13?

14    A    Yes, after I told her my intent.

15    Q    Okay.  Any other conversation with her about

16 applying for this first vacancy announcement?

17    A    Well, again, I would just have to refer back to the

18 e-mail messages where I asked her, I said I guess my question

19 is what is management's reason for making it a straight 13

20 when it was initially -- and I had applied and interviewed

21 with Bill Sivley as a GS 12/13, and she said you could

22 certainly be a contender if it was a level GS-12, but it's

23 not.  It's a 13.

24    Q    Okay.  So the only "conversation," and I'll put that

25 in quotes, that you had with Ms. Ross was what's contained in

1    the e-mail traffic?  You didn't have any person-to-person, sit

2    down conversation with her about your intention to apply for

3    04-23?

4        A    Well, I think we spoke once because here she said

5    that she'd be willing to sit down with me.  She said, "I'd be

6    willing to have a speak with you about opportunities in the

7    VA," -- but it wasn't really about -- it was upward mobility

8    about something else.  She really wouldn't talk to me and that

9    was on her March 5th e-mail also.

10       Q    Okay.  But you had a sit down conversation with her?

11       A    Not about this position --

12       Q    Okay.

13       A    -- as she --

14       Q    All right.

15       A    -- stated everything pretty much in her e-mail.

16       Q    Okay.  That is fine then.  Okay.  Now I know you've

17   wanted to get to the notification about the --

18       A    I'm sorry.

19       Q    We're going to get there now.  Let me pull it out so

20   that we can mark it.

21            (Pierce Deposition Exhibit Number 5 marked for

22   identification.)

23            MR. BELL:  Do you guys have a coke machine on this

24   floor?

25            MS. KONOPKA:  I don't think we have one on this

1  if you have the experience and the qualifications, you are

2  automatically eligible as an over 30% service connected

3  disabled veteran under special hiring authority, so that

4  wasn't even considered.

5      Q    Okay.  Now, you -- let me understand what regulation

6  you're talking about, okay?  You had attached something to

7  your application packet and now we're looking at Exhibit 4,

8  and let me show you this page and tell me if that's the

9  regulation you're referring to or if you're referring to a

10  different regulation when you say the regulation says?

11      A    No, that's the regulation I was referring to.

12      Q    Okay.  And you're saying that this regulation, and

13  you -- did you underline this part or did somebody else

14  underline this part?

15      A    I may have.  I'm not sure.  I can't -- I was in, I

16  was in consultation with my -- when I say consultation, I was

17  actually working with the Veterans guy, the Veterans

18  representative from the Department of Labor.

19      Q    Okay.

20      A    I wanted to make sure that I was in turn saying the

21  right thing.

22      Q    And what was that person's name?

23      A    I can't remember his name.  As a matter of fact, he

24  was the one that said -- asked me did I want to file a claim

25  at that time based on this, the notice that I did not qualify,

30

```
 1  and he --
 2        Q     I'm sorry.  When you say Veterans representative, do
 3  you mean someone who specifically deals with veterans affairs
 4  or --
 5        A     Yes.
 6        Q     -- someone who deals with EEO affairs?
 7        A     No.
 8        Q     Okay.
 9        A     Veterans affairs.
10        Q     Okay, all right.
11        A     Yeah, this was just veterans but I was actually
12  trying to find out what my rights were at this time.  That's
13  why I didn't file any type of EEO activity or anything on this
14  announcement.
15        Q     Okay.  And this is the regulation that you're
16  referring to when you say you think you should have been
17  considered as having enough -- beyond time in grade?
18        A     To my understanding, based on the conversation with
19  the veterans representative from the Department of Labor, I
20  did not have to meet time in grade restrictions and that's
21  what was indicated here.
22        Q     Okay.
23        A     And --
24        Q     And this is the regulation that you're relying on?
25        A     Yes.
```

1  A  Okay.

2  Q  I understand that you think this doesn't comport

3 with the regulation that's in your application packet.  I got

4 that.

5  A  Okay.

6  Q  My question -- and then we've -- you've told me that

7 personnel is the person, or Human Resources I think was the

8 word you used, was the entity who made this decision that you

9 believe is an error?

10  A  That is, that is to the best of my knowledge.

11  Q  Okay.

12  A  I'm assuming that the specialist did that.

13  Q  Okay.  And my question is, is your belief or your

14 contention that personnel in making this decision made an

15 innocent error or that they -- that someone in the personnel

16 department was discriminating against you?

17    MR. BELL:  Objection to the form.  You can answer.

18    THE WITNESS:  I actually I never looked at someone

19 from the Human Resources Department discriminating.  I had --

20 I looked at several things.  I looked at the fact that maybe

21 someone in the staffing department maybe was told, you know,

22 that no one should have been qualified here.  I don't know.  I

23 have no grounds to say that they discriminated so I guess

24 that's your question.

25    BY MS. KONOPKA:

1     Q    Okay, all right.  Okay.  And then you had indicated

2 that you didn't seek any kind of EEO counseling on the basis

3 of this form?

4     A    Correct.

5     Q    And why didn't you do that?

6     A    Based on a conversation with the veterans

7 representative from the Department of Labor, he gave me two

8 options that I mentioned earlier.  He said we could start -- I

9 could start an action based on this or I could just wait which

10 would be the wise thing to do since they had already said they

11 were going to announce it again nationwide and apply the same

12 way, utilizing the same regulation and which I did.

13     Q    Okay.  And now when this veterans representative,

14 you said he's a man.

15     A    Yes.

16     Q    But you don't recall his name?

17     A    No.

18     Q    When you had this conversation with him and he had

19 indicated, well, you can start an action or you can wait, was

20 the action he was talking about a discrimination action or

21 something about that they had misapplied the veterans

22 statutes?

23     A    Yeah, I think it was more -- well, I'm sure it was

24 nothing to do with EEO.  He was going to look at how they

25 applied the statute.

1      Q     Okay, I understand that.  And so, why -- you didn't

2  file any EEO claim on the basis of this because you didn't

3  believe there to be any discrimination on the basis of this.

4  Is that a correct statement?

5      A     I think that is a correct statement.

6      Q     I gotcha.  Okay.  And I think you've now indicated

7  in some of your prior statements that you did reapply for this

8  position under a different vacancy announcement?

9      A     Yes.

10         MS. KONOPKA:  Okay, let's get that out if we have

11  it.  We're up to 6?

12         COURT REPORTER:  Uh-huh.

13         MS. KONOPKA:  Is that right?

14         (Pierce Deposition Exhibit Number 6 marked for

15  identification.)

16         BY MS. KONOPKA:

17      Q     Okay.  I'm now showing you what has been marked for

18  identification as Exhibit 6, and that, at the top of it has

19  the heading Vacancy Announcement Number MCD 04-35.  Is that

20  the vacancy announcement that you applied under next?

21      A     Yes.

22      Q     All right.  And can you tell me why you applied

23  under that if you had received the notice that you had been

24  deemed unqualified for the first announcement?

25      A     Well, again, in conversation with the veterans

1  panel.

2      Q     Okay.  And what questions were you asked by the

3  panel?

4      A     Well, actually, I can't, right off the top of my

5  head, but the questions were, I can tell you, were in the

6  performance based interview format and those questions were

7  pertaining to areas within the patient advocacy realm.

8      Q     Okay.  And do you recall how you responded, what

9  types of things you told them?

10      A     Well, I gave scenarios because the good part is that

11  I had been in there a number of years and I had worked with

12  everyone except the Chief of Fiscal at that time on patient

13  issues and concerns.

14      Q     Uh-huh.

15      A     And so they knew of my ability and they knew of my,

16  actually of my credentials.

17      Q     Okay.  And when you say you gave scenarios --

18      A     Yes.

19      Q     -- you provided stories of things you had done in

20  the past?  Is that what you mean or --

21      A     Yes.

22      Q     Okay.  Did you ask any questions of the panel?

23      A     I can't remember at this time if I did or didn't.

24      Q     All right.  Now, do you believe that the -- that

25  anyone on the panel or the panel as a whole discriminated

1  against you during their interview?

2      A    No, I do not.

3      Q    Okay.

4           MS. KONOPKA:  We are now at 7.  I finally have

5  caught up.  I was one behind.

6           (Pierce Deposition Exhibit Number 7 marked for

7  identification.)

8           BY MS. KONOPKA:

9      Q    All right.  Mr. Pierce, I'm now showing you

10 something that's been marked for identification as Exhibit 7,

11 and if you can take a look at that.

12     A    It looks like the rating from the evaluation.

13     Q    Okay.  Did I give you an extra sheet?

14     A    Yes.

15     Q    Was that yours?  Oh, give that to you later.  Okay.

16 And that appears to be the rating from the panel?

17     A    That's what it appears.  I don't know if any of the

18 applicants or the interview personnel or whatever was given --

19 we were never given this format but I assume that's what,

20 that's what this is.

21     Q    Okay.  And is that what it indicates it is at the

22 top?

23     A    Is it -- yes, it -- Report of Chief Office of

24 Patient Advocacy Interview Panel.

25     Q    Okay.

1  advocate, one with no experience, could actually do better

2  than or a higher score.  So I think that was all just

3  subjective.

4          MS. KONOPKA:  Maybe we should go off the record for

5  just a second.

6          MR. BELL:  No problem.

7          COURT REPORTER:  Off the record at 1:05.

8          (Off the record; on the record.)

9          COURT REPORTER:  Back on the record at 1:07.

10          MS. KONOPKA:  Okay.

11          BY MS. KONOPKA:

12      Q    Mr. Pierce, we had discussed the fact that you were

13  interviewed by a panel in the first case and did you have

14  subsequent interviews after that?

15      A    Yes, I did.

16      Q    With whom?

17      A    It was with Ms. Terry Ross and Mr. Sanford

18  Garfunkel, the Medical Center Director.

19      Q    Okay.  And what questions did Ms. Ross ask you?

20      A    I don't remember the questions right off the top of

21  my head but she did have, it appeared to be, a structured list

22  of questions that she asked and they were pertaining to the

23  Patient Advocate's Office.

24      Q    Okay.  Do you recall how you responded to her

25  questions?

1    A    I thought I responded appropriately. I know I

2    answered all the questions that she had asked. I pretty much

3    felt that with my tenure and time there at the VA, in the

4    Patient Advocate's Office, that I was technically one of two

5    of the resident experts there in patient advocacy so I had

6    assumed that I had answered her questions satisfactorily.

7    Q    Okay. Now when you -- I just want to follow up with

8    two little things actually. One, you had said that she seemed

9    to have a structured list of questions that she went through

10   and asked you. Did any of those questions seem inappropriate

11   or not germane to the interview?

12   A    I think the only question that I can remember was

13   she just asked one question as far as can you do graphs.

14   Q    Okay.

15   A    And I think I responded to her and told her, yes, I

16   can. I had not done them in a while but the patient advocates

17   trending package does graphs for you. It tracks and trends for

18   you. All you have to do is use and ad hoc menu and it will

19   sort the data for you, and I think that was the only thing

20   because I know nowhere anyone asked that.

21   Q    Okay. Was anyone else present at the interview?

22   A    The one with Ms. Ross, no.

23   Q    All right. And when you had indicated, in a prior

24   response you said that you had felt that you and someone else

25   were resident experts on patient advocacy. Who was the other

1    person that you were talking about?

2        A    Mary Beasley, the other GS-11 who was in the Patient

3    Advocate's Office.  She was actually there one year prior to

4    me, to me getting there.

5        Q    Okay.  And when you, when you make that indication,

6    that's based on the time that you've spent in the office?  Is

7    that what you said?

8        A    The time that I was in that position with the

9    experience that I gained in that position.

10        Q    All right.  Did you ask any questions of Ms. Ross?

11        A    I can't remember if I asked her any questions at the

12    end.

13        Q    How long was the interview?

14        A    Maybe a half an hour.  I'm not sure.  I can't quite

15    remember.

16        Q    All right.

17        A    Now I, I don't know.  Did you want me to explain

18    both interviews, the one with her and the one with Mr.

19    Garfunkel?

20        Q    We're going to get to the one with Mr. Garfunkel in

21    a second.

22        A    Oh, okay.

23        Q    I need to finish up the one with Ms. Ross.

24            MS. KONOPKA:  This is Number 8.

25            (Pierce Deposition Exhibit Number 8 marked for

1   don't know if she was reading from some prepared script that

2   he didn't have the opportunity to do.  I don't know so we'll

3   object to that.

4          MS. KONOPKA:  Okay, all notes.

5          MR. BELL:  Thank you.

6          BY MS. KONOPKA:

7   Q     Okay.  So we're now back with the, the position

8   description, okay.  Did, did Ms. Ross ask you about your

9   ability to -- you said something about the ability to use

10  graphs.

11  A     I think she briefly asked and it was just one

12  question, can you do graphs, and I answered that and when I

13  told her that I had not done them in a while because as a

14  young captain, last position was with the Pentagon, we did

15  graphs.  That was PowerPoint.  The military gone pretty much

16  to PowerPoint and Excel.

17  Q     Uh-huh.

18  A     And thus, she didn't really, I don't think, give me

19  a chance to elaborate the patient advocate tracking packet

20  because I taught that also to the new patient advocates that

21  came on board.  It came equipped with they key or the ability

22  to track and trend the data, so what they're doing now is

23  something that's pretty much done through Excel using the

24  ticker scores.  But the information that Bill Sivley used when

25  he first got there, that Earl Newsome (phonetic) used when he

1   was there before Bill and that I used when I was acting was

2   information that was sorted straight from the patient advocate

3   tracking package.

4        Q    Okay.  But you said they're using something

5   different now?

6        A    Yes.  I think Bill Sivley is doing his own type

7   graph now.

8        Q    All right.  And did you have any experience in doing

9   the type of things that Bill Sivley is doing now, based on

10  your knowledge?

11       A    Well, some of the things that he's doing now, and

12  Bill and I --

13       Q    And let's say in the statistical graph, well, right

14  now.

15       A    Yes.

16            MR. BELL:  Okay.

17            THE WITNESS:  And that was one of the things that I

18  did want to, to mention.  Bill Sivley had even mentioned that

19  in his, well, they was his collegiate days, but he was a

20  statistician and he did statistics.  I did not do statistics.

21  I've done graphs and charts based on what was needed.  And

22  when Bill and I even had a conversation, I had mentioned to

23  him, since we're talking about, could I do the graphs that he

24  does.  About 80% of the patient advocates across the nation

25  can't do that and that's based on the information I received

1  as a Board of Director.

2           BY MS. KONOPKA:

3      Q     Did you say can or can't?

4      A     Cannot.

5      Q     Okay.

6      A     I personally received a thumb drive with samples.

7  This is from Press Gainy (phonetic.)  As a Board of Director -

8  -

9      Q     Right.

10     A     -- under the Maryland Hospital Association, they go

11  in the hospitals and actually do what Bill Sivley does now for

12  hospitals which is to do the nice statistical graphs.  Well,

13  one of my initiatives as a Board of Director, speaking for not

14  just VA but non-VA advocates across the nation, was to get

15  them to the same quality of report and Press Gainy was one of

16  those companies that did that.  They also had a conference

17  call with the VA national patient advocates, Press Gainy, to

18  give them an idea -- what they can offer for those who do not

19  have that type of statistical capabilities.

20           So did I have the statistical ability that Bill

21  Sivley has?  No, I don't, and sitting on the Board of

22  Directors under the American Hospital Association, half of

23  those folks don't either and they call utilize something like

24  Press Gainy or Integrity or any of those -- some of those

25  other statistical organizations.

```
 1     A     No.

 2     Q     All right.  Did -- let's -- let me not ask a

 3  compound question.  Did, did Ms. Ross say anything to you in

 4  your interview with her that indicated to you that she was

 5  impacted by your race?

 6     A     No.

 7     Q     Did she say anything to you that indicated she was

 8  impacted by your age?

 9     A     No.

10     Q     Your disability?

11     A     No.

12     Q     Okay.  Did she mention your prior EEO activity in

13  any way?

14     A     No.

15     Q     Did you mention your prior EEO activity to her in

16  any way?

17     A     No.

18     Q     Did Mr. Garfunkel say anything to you during the

19  interview that indicated to you that he was making

20  determinations based on race?

21     A     No.

22     Q     Age?

23     A     No.

24     Q     Alleged disability?

25     A     No.
```

1    Q    Prior EEO activity?

2    A    Not in that session, however, in a previous

3    statement made by Mr. Garfunkel in an earlier case, because I

4    had prior EEO activity obviously, he -- I specifically

5    remember him stating when they  asked him the question about

6    was he aware of my EEO activity he said, "Yes, I know he's

7    filed and he also" -- he said, "Yes, he files all the time,"

8    or something like that, "and he wins," and that was almost

9    like the quote, which to me came across like exercising my

10   rights, my civil rights was wrong.

11   Q    Okay.

12   A    And that was -- like I say, and going into that,

13   that did -- after the, after the interview was over, of

14   course, that came back to mind that maybe that had something

15   to do, my prior EEO activity, especially with the tone that he

16   had with that previous EEO investigator and then investigative

17   report, so did he actually say anything?  No, but I guess --

18   which is your question, but in my mind, I felt and I truly

19   felt that based on my background, based on my experience,

20   based on my evaluations, that I just didn't understand the

21   selection process.

22   Q    Okay.  Well, those are two kind of different issues

23   so let me --

24   A    Okay.

25   Q    -- split that up a little bit.  You had indicated

1  believe her, that that was what she had commanded to be done?

2      A    Well --

3           MR. BELL:  Objection to the form.

4           BY MS. KONOPKA:

5      Q    Did you believe that -- did you believe her

6  statements here?

7      A    Well, I assumed that she was telling me facts, but

8  again, everything -- all the correspondence with all the e-

9  mails were referring me from HR to Ms. Ross and Ms. Ross back

10 to HR.

11     Q    Okay.

12     A    And I didn't do anything until I heard something

13 from HR for this.  By law that's official.  Ms. Ross cannot

14 officially say that.

15     Q    Okay.  So you only wanted the official notification?

16     A    Yes.

17     Q    I got it.  Let's see, okay.

18          MS. KONOPKA:  Now, actually I thought we had

19 previously had this marked but I don't see a sticker on it.  I

20 hope it didn't come off, but let's mark it.

21          (Pierce Deposition Exhibit Number 14 marked for

22 identification.)

23          BY MS. KONOPKA:

24     Q    Mr. Pierce, I'm now showing you what we've marked as

25 Exhibit 14.  Hopefully we didn't mark it as something else

84

1    A    It was yes, I've been placed back in that office,

2  and at that point that's when I was upset and that's when I

3  started looking at all the avenues that I could take because

4  at this point, and you can look at the e-mails, I had been

5  inquiring, tell me what's happening, tell me what's happening,

6  tell me what's happening, and again, I know you don't want to

7  see it, but that's when Bill Sivley was actually one of my

8  references five months prior.  Why wouldn't you put him back

9  in the job five months ago?

10    Q    Okay, all right.  All right, I think we've already

11  covered some of this.  You said that Bill had been your

12  supervisor for about a year, year and a half, correct?

13    A    Yes.

14    Q    All right.  Did the two of you have any problems

15  with one another?

16    A    No.

17    Q    Okay.  Did you have any concerns about his

18  competence as your supervisor?

19    A    No.

20    Q    Did he express any concerns about your competence?

21    A    No, that's why he agreed here to be --

22    Q    A reference.

23    A    -- one of my references for the job.

24    Q    All right.

25          MS. KONOPKA:  Go ahead and mark that 18.  Are we up

1    A    She came on board, yes.

2    Q    Okay.  And how long was that time frame?

3    A    I can't remember.  It was a few months.  It wasn't

4    within -- it was within a few months.

5    Q    Okay.  And then Michelle came in and she was made

6    acting at that point?

7    A    Well, to be specific, what we were told was because

8    she was a temp employee and a contractor she would not

9    supervise us but she would assist, and eventually, I don't

10   know how it happened because she did one of my evaluations.

11   She became the Acting Lead Patient Advocate.

12   Q    Okay.  Who told you that she wouldn't actually

13   supervise, that she would just assist?

14   A    That was in one of our staff meetings.  I think that

15   was with Mr. West when she first came on board.

16   Q    Okay.  All right.  I want to get into your prior EEO

17   activity a bit.

18   A    Okay.

19   Q    Because you have indicated reprisal or retaliation

20   as part of your claim here.

21   A    Yes.

22   Q    Okay.  First I want to understand what prior

23   protected activity forms the basis of your retaliation claim?

24   A    Well, it was on the basis of, of my race.

25   Q    Well, now what, what prior ---

1   activity that is based on and you've told us that it's based

2   on this complaint that was filed in '99.

3       A   Yes.

4       Q   All right.

5       A   Now, I just wanted to make sure I was --

6       Q   Okay.

7       A   -- correct with that.

8       Q   All right.  So your reprisal or retaliation claim in

9   this case is based on your '99 filing?

10       A   It's based on all the activities that happened from

11   '99 forward, because remember, the second one was with Ms.

12   Spivak when they brought her in versus allowing me to serve as

13   Acting Lead Patient Advocate.  That was my second, the one

14   that we mentioned briefly that was global.

15       Q   Right.  So is your retaliation claim in this case

16   based on both the complaints or only one of the complaints?

17       A   No, I'm saying that it's from when I initially

18   started my first EEO activity that I've seen, I've noticed

19   that I have not gotten fair treatment since I initially filed.

20   I'm being treated now differently than I did -- than I was

21   before 1999.

22       Q   All right, okay.  So we have the 1999 filing and

23   that was based on your race, correct?

24       A   Yes.

25       Q   That was a non-selection based on race?

1     A    Yes.

2     Q    Okay.  There wasn't a claim of disability or age?

3     A    I'm not sure if I had disability or age because I

4 was over 40 years old, so I can't remember the basis of my

5 discrimination but I know the number one priority of that file

6 was that I was a black male and he was a white male and --

7     Q    Okay, all right.

8     MS. KONOPKA:  Let's mark this.  Are we up to 19?

9     COURT REPORTER:  Uh-huh.

10     MS. KONOPKA:  All right.

11     (Pierce Deposition Exhibit Number 19 marked for

12 identification.)

13     BY MS. KONOPKA:

14     Q    This is Exhibit 19, and this should be your

15 -- the EEO counseling report from 1999 in regard to your non-

16 selection in the Office of Radiology.

17     A    Okay, so it was race.

18     Q    Okay.  And now you said that you had that one filing

19 in '99, and then we talked about a second one in 2000.

20     A    Yes.

21     Q    Okay.  And in your affidavit you indicated that that

22 was a non-selection for a position in the Office of the

23 Director where a female got the job.  Is that the one that

24 you're referring to as Michelle Spivak?

25     A    Yes.

1    Q    Okay, all right.  And let me understand what

2  happened there.  Your allegation there was what?

3    A    Was Michelle Spivak was brought in and actually

4  served as Acting Lead Patient Advocate.

5    Q    Okay.

6    A    And she was a non-government -- actually, according

7  to, I guess Mr. Garfunkel's testimony, she came from I think

8  the Veteran -- well, one of the VSOs.  He met her.  Someone

9  told --

10   Q    I'm sorry, VSO?

11   A    Veteran Service Organization.

12   Q    Okay.

13   A    I'm sorry.

14   Q    No, that's fine.

15   A    And he was told in conversation with someone in that

16  organization that she would be an asset to the medical center

17  and because she was with Community Services with that

18  organization, he said that she would fit in with patient

19  advocacy.

20   Q    Okay.

21   A    Which I didn't see the logic and that was the

22  rationale.

23   Q    Okay.  And that was the product -- that was the

24  subject of your 2000 complaint?

25   A    Yes.

1  there?

2      A      Mr. Garfunkel.  He was one of the individuals that

3  was involved in the interview process.

4      Q      Okay.  So you're referring to Mr. Garfunkel there?

5      A      Yes.

6      Q      Okay.  Was Terry Ross aware of your prior

7  complaints?

8      A      I can't say she was or she was not.  I have no idea.

9      Q      Okay.  All right.  Now, what evidence do you have

10  that your failure to obtain this particular position, and by

11  this position I mean the Director, Office of Patient Advocacy,

12  just so we're not getting confused.

13      A      All right.

14      Q      That that, the failure for you to obtain that

15  position is linked to your prior activity in '99 and 2000?

16      A      Well, I guess I have to start from the beginning.

17      Q      Okay.

18      A      Well --

19      Q      As much as you need to go into but --

20      A      Well, as much as I need to go into, again, we're

21  talking about credentials.  We're talking about experience.

22      Q      Okay.

23      A      The fact that when Bill Sivley got the position, I

24  had applied for the position with Bill and I was in the top

25  three candidates after interviewing.  I never -- and Mr. Earl

1    Newsome was the previous Lead Patient Advocate and he actually

2    sat on the panel and I think he even told the EEO investigator

3    that he -- that after the selection was made I had no concerns

4    about that.  My goal was to make myself the best qualified

5    candidate for future selections.

6        Q    Let me just stop you for one second.  You said you

7    had no concerns about the selection process.  You mean the

8    selection process when Bill was selected?

9        A    With Bill Sivley.

10       Q    Okay.  So you had a -- you had no concerns that

11   there was any discrimination in the process by which Bill was

12   selected originally?  Is that what you mean?

13       A    Yes.

14       Q    Okay.  And that's back in 2000?

15       A    That's 2000, I think.  I think it was 2000.

16       Q    Okay.

17       A    Well, now at the same time I was doing everything

18   that I could do to include gaining experience to be the best

19   qualified if and when this position became available again

20   which it did.  During that interim I've got documentation

21   where Terry Ross had identified me to handle difficult

22   patients because of my experience, my time in grade there, and

23   my involvement with the professional organization which is the

24   Society for Healthcare Consumer Advocacy of the American

25   Hospital Association.

1     A    And also I was only the third person in history from

2  the VA to be elected in this position.  With those

3  credentials, along with a letter from Secretary Nicholson

4  applauding me for that, I felt that I should have been highly

5  considered, and I've got Secretary Nicholson's letter here

6  somewhere.  I'm going to show you that too.

7     Q    All right.

8     A    That I should have been selected for that position.

9  You wanted to know why --

10     Q    Okay.  So your, so your, your assessment is that you

11  should have been highly considered for this position?

12     A    Yes.

13     Q    Okay.  I understand that.  But what I'm trying to

14  understand is from that position that you've just explained,

15  where do you go to assessing that your failure to get this

16  position is based on your prior EEO activity?

17     A    Well, I guess that goes back to when I did

18  a comparison of my credentials and Ms. Benjamin's because I

19  did receive a copy of the EEO investigative report.

20     Q    Uh-huh.

21     A    And in that report Ms. Benjamin did state to Ms.

22  Ross -- I guess they were conferring -- that she had, she had

23  no experience in the Patient Advocates Office and that she was

24  a nurse -- well, she was a social worker and I guess she was a

25  nurse but social worker on the Spinal Cord Unit in her

1  hospital in New York.

2      Q     And this is -- I'm sorry, is this based on her

3  application that you saw in the report of investigation --

4      A     Yes.

5      Q     -- or you said some kind of conversation?

6      A     Well, in the, in the investigative report it looks

7  like her packet was forwarded to Ms. Ross because they had a

8  cover letter on it.

9      Q     Okay.  So it's her application packet?

10     A     Yes, her application packet.

11     Q     Okay.

12     A     And in her application packet she indicated to Ms.

13 Ross that she had no experience in the Patient Advocates

14 Office, how she had dealt with complaints at the Spinal Cord

15 Unit.  Well, at that point I was not looking at comparing

16 myself with another patient advocate.  I looked at myself,

17 comparing myself with a person who had no experience in

18 patient advocacy, a person who had no idea how to even go into

19 the patient advocate tracking package and how to even give

20 advice to the GS-9s, or myself, if I had an issue or concern

21 that could not be resolved.

22     Q     Okay.  So your assessment was that you were more

23 qualified than Ms. Benjamin because you had experience in an

24 office of patient advocacy as opposed to the program she ran

25 which was the Spinal Cord --

1    A    Yes.

2    Q    -- Injury Unit?

3    A    Yes.

4    Q    All right.  But Bill was the person who was placed

5  back in the job, correct?

6    A    That is correct.

7    Q    Okay.  Are you making a claim that you're more

8  qualified than Bill for this position?

9    A    No, I never made that claim.

10    Q    Okay.

11    A    My claim was Ms. Benjamin and I were the two people

12  that were the candidates to be selected for that position.

13    Q    Uh-huh.

14    A    Those two, us, her and I, are the two candidates

15  where all of our credentials should have been placed side by

16  side and the selection should have been made to include the

17  fact that I am a 10 point preference, Veterans preference,

18  which means there are certain rules and regulations that apply

19  as a service connected, over 30% preference.  When Ms.

20  Benjamin was offered the job I had no idea that she was even

21  offered the job.

22       The next thing I heard, while waiting for actions to

23  be taken because they said they're going to re-announce it, I

24  saw, in an e-mail that Bill Sivley had taken over.  Well, that

25  was kind of strange, the fact that I had served as Lead

1      A    Yes.

2      Q    And we understand all that.  And now where we're at

3  is what evidence do you have that your failure to obtain this

4  position and Bill being placed back in the position is based

5  on retaliation or reprisal or based on your prior complaints?

6      A    Okay.  Looking at my experience, looking at my

7  history and looking at the involvement I have with my

8  professional organization for patient advocates, the only

9  conclusion that I could come to is that one of the individuals

10 that was involved in the selection process was once a

11 responsible management official in a prior EEO case.

12     Q    Okay.  And that was?

13     A    Mr. Garfunkel.

14     Q    Okay.  So your allegation is that Mr. Garfunkel

15 retaliated against you --

16     A    Yes.

17     Q    -- based on this prior activity?

18     A    Yes, that he was one of the responsible management

19 officials, yes.

20     Q    All right.  Okay.  And you had indicated that you

21 weren't making a claim and had never made a claim that you

22 were more qualified than Bill?

23     A    No.

24     Q    All right, okay.  If you haven't made that claim

25 that you're more qualified than Bill for this position, why do

1   you think that the VA's cancelling of the vacancy announcement

2   and placing him back in his prior position was improper?

3        A    Well, as I stated earlier and I'll be brief --

4        Q    Okay.

5        A    -- this time, the fact that Bill Sivley was there in

6   place back in April, March or April, if they had intentions of

7   giving Bill the position, they would have never announced it

8   or they would have never had interviews, and Mr. Garfunkel,

9   even in a letter that he wrote to Bill which is in the

10  investigative report, he clearly stated to Bill, "Your

11  position will be back filled."

12       Q    Uh-huh.  So the time lapse makes it improper? Is

13  that what you're saying?

14       A    Well, what I'm saying is, first of all, putting him

15  back in a position that was abolished, that's obviously

16  improper, and the fact that he was there the entire time the

17  interview process was going on, that lend -- that led me to

18  question possible intent.  And the fact that it wasn't two

19  other individuals of the six; it was me and one other, then

20  they decided to put him back into position and no one ever

21  told me why.

22       Q    All right.  Did you ever ask anyone why?

23       A    Well, in all of my e-mails, and of course, according

24  to regulations, when I apply as a, as a -- under special

25  hiring authority, the medical center has an obligation to

1    provide me why I was not selected.

2        Q    Okay.  Let me ask you about that for a second but

3    let's finish the question that we had started and then we'll

4    go on to that one.  Did you ever ask Ms. Ross -- let's start

5    with her.  Did you ever ask Ms. Ross why you weren't selected

6    and Bill was placed back in the position?

7        A    I don't recall speaking to her about that.

8        Q    Okay.  Did you ever ask Mr. Garfunkel about that?

9        A    No.

10       Q    Did you ever ask Bill why there was the time lapse

11   and now he's back in the position?

12       A    No.

13       Q    Okay.  Ever ask anybody else that I didn't mention

14   about this, about why he was placed back in the position?

15       A    No.  All I went by was the information, other than

16   the last e-mail that I had to HR and I asked why -- I'm sorry,

17   so I did ask someone.  There was an e-mail I sent to HR.

18       Q    Okay.

19       A    And asked -- told them that I had heard that Bill

20   Sivley had been put back in the position, what happened?  And

21   that's when they said that they chose to put him back in his

22   position because he was coming back from active duty, and I

23   think that was in an e-mail.

24       Q    Okay.  Now let me move onto something that you had

25   said during one of your answers.  You had indicated that your

1    Q    Okay.  She had access to your personnel folder?

2    A    Yes, she should have.

3    Q    Do you have any knowledge that she read your

4    personnel folder?

5    A    No, I don't.

6    Q    All right.  Any other basis that you would have for

7    thinking she knew your age?

8    A    No.

9    Q    All right.  Did Mr. Garfunkel know your age?

10    A    Other than -- the same.

11    Q    -- he had access to your personnel file?

12    A    Yes.

13    Q    But you don't have any knowledge that he read the

14    personnel file?

15    A    No.

16    Q    All right.  Okay.  What evidence do you have, if

17    any, that the decision to put Mr. Sivley back in his position,

18    back in the Lead Patient Advocate position, was motivated by

19    your age?

20    A    Other than the fact that Bill Sivley is younger and

21    he never competed for it, technically the position that was --

22    that I interviewed for and that was that.

23    Q    Okay.  All right, moving on.  Well actually, let me

24    just ask you one thing.  You had indicated that you had the

25    opportunity to look at Ms. Benjamin's application material in

1       Q    Can you read it for us?

2       A    Yes, October the 5th, 1952.

3       Q    Okay.  So is she older than you or younger than you?

4       A    Older.

5       Q    Okay.

6            MS. KONOPKA:  Can we just keep this aside because

7       it's not stapled so I don't want to get it messed up.

8            BY MS. KONOPKA:

9       Q    All right, let's move onto you also have alleged in

10      your complaint disability discrimination.

11      A    Yes.

12      Q    Who allegedly discriminated against you on this

13      basis?

14      A    Well, essentially I was looking at Ms. Ross and Mr.

15      Garfunkel.

16      Q    Okay.  And can you tell us how you're disabled?

17      A    Well, I've got 80%, I'm 80% service connected.  I've

18      got a bad back, bad shoulder, bad knees and bad feet, in the

19      military jumping out of airplanes.

20      Q    Okay.  And how do -- how does that affect you,

21      having bad back, bad shoulder, bad knees and bad feet?  Are

22      those -- is that a diagnosis, like what are --

23      A    Yes.

24      Q    Okay.

25      A    Yes, that -- those are the 80% disabilities that I'm

1  currently compensated for.

2      Q    Okay.  And what effects do those injuries have on

3  you?

4      A    Well, limited standing and limited walking and some

5  limited reaching.

6      Q    Okay.  When you say limited standing, how --

7      A    Prolonged, just prolonged standing.

8      Q    Like prolonged for how long?

9      A    Sometimes it's because I also suffer from gout.

10  Sometimes if a gout attack, then I can't stand for more than

11  10 or 15 minutes at a time when -- with a gout attack.

12      Q    How often do those happen?

13      A    Somewhere between maybe once or twice -- once every

14  couple of months, every month or two.

15      Q    Okay.  And if you don't have a gout attack, how long

16  can you stand for?

17      A    Probably at least an hour.

18      Q    What about walking?

19      A    Probably about the same I would, I -- well, let's

20  say 30 minutes constant because I guess as I've gotten older

21  I'm not required to do a lot of walking, so --

22      Q    Okay.

23      A    -- I would say around 30 minutes.

24      Q    So you could walk for about 30 minutes?

25      A    I would say so.

```
 1      Q    But not beyond that?  Okay.

 2      A    Without pain.

 3      Q    Without pain.

 4      A    Yes.

 5      Q    Okay.  So you could do it but it would be painful?

 6      A    Yes.

 7      Q    All right.  And is that he same for the standing,

 8   you could do it for longer but it would be painful?

 9      A    Yes.

10      Q    All right.  And then you had said limited reaching?

11      A    Yes.

12      Q    Okay.

13      A    I had three shoulder surgeries.

14      Q    All right.  And so, what is --

15      A    My range of --

16      Q    How limited?

17      A    Well, my range of motion has been decreased.

18      Q    All right.  So for my left arm.

19      Q    From your left arm?

20      A    Yes.

21      Q    Okay.  So your right arm is okay?

22      A    Yes.

23      Q    All right.  And so just so I have some sense, like

24   what would be something you could do with your left arm and

25   what would be something you couldn't do with your left arm?
```

1  Give me two examples.

2      A    Well, I could do pretty much anything that doesn't

3  require me to elevate my left arm completely above my head.

4      Q    Okay.  So elevating your left arm -- this is my

5  right but I'm left handed --

6      A    Yes.

7      Q    -- completely above your head is a problem?

8      A    Yes.

9      Q    But anything short of that is okay?

10     A    Yes.

11     Q    All right.  And as with the walking and the

12  standing, can you lift your arm above your head?  Can you

13  physically do it but it's painful to do it or you can't

14  physically do it?

15     A    Yes, I can do it but at a point when it stops, when

16  the motion -- when I've reached my max motion, then yes, I can

17  force it to go up, but yes, it's with, with pain.

18     Q    Okay, all right.  And do you take medication for

19  these conditions?

20     A    Yes, for the gout I do and I've got

21  antiinflammatories for when my knees and back act up.

22     Q    All right.  And clearly you take the gout medication

23  when you have --

24     A    Daily.  Well --

25     Q    Oh, you take it daily?  Okay.

1          A      Now they, now they've got me taking it daily.

2          Q      Okay.  And so does that -- is that supposed to

3     prevent an attack as well as deal with it when you have the

4     attack?

5          A      Well, right now it's more of maintenance and so I

6     still have breakthrough attacks but they're not as frequent as

7     if I didn't take the medication.

8          Q      Okay.  When is the last time you had a gout attack?

9          A      I think it was maybe about three or four weeks ago

10    but it was minor.  About two months ago I had one that was

11    major where they had to go back in and inject me in the knee.

12         Q      Okay, all right.  Any other -- you said that you use

13    the gout medication.  You said you have antiinflammatories

14    when your back is acting up?

15         A      Yes.

16         Q      All right.  And how often do you take those?

17         A      Just when the back acts up, when I start having back

18    pain.

19         Q      Okay.  And about how often is that?

20         A      When I overexert.

21         Q      Okay, all right.  And do those antiinflammatories,

22    do they alleviate the pain that you have?

23         A      Yes.  It usually takes a day or so but yes.

24         Q      Okay.  And then after a day or so the pain is fairly

25    cleared up?

1    A    Yes.

2    Q    All right.  How do you get to work?

3    A    I drive.

4    Q    Okay.  And you don't have any problems driving with

5 your injuries?

6    A    No.

7    Q    All right.  Do your injuries prevent you from coming

8 to work?

9    A    I have had days when I've had gout attacks when I

10 couldn't come to work because I couldn't stand.

11    Q    All right.  And how long does that last, usually?

12    A    Usually I'll take maybe a day.  It will be mainly a

13 day and then I've also gone with the assistance of a cane.

14    Q    Okay.

15    A    I have a cane.

16    Q    All right.  So sometimes when you have a gout attack

17 you use a cane?

18    A    Yes.

19    Q    And that allows you to stand and walk?

20    A    Yes.

21    Q    Okay.  Do your injuries prevent you from your

22 typical running your household?

23    A    No.

24    Q    Okay.  So you're able to maintain your home and do

25 whatever you would need to do around your house?

1    A    Pretty much, yes.

2    Q    Okay.  Shop or --

3    A    Yes.

4    Q    -- whatever, and I don't know what the division of

5    duties in your house are, but --

6    A    Right.

7    Q    -- any kind of requirements that you would need to

8    do in your household chores?

9    A    Yes.

10   Q    All right.  Have you ever asked Ms. Ross for

11   accommodation for these problems?

12   A    No.  I think within the scope of the job, my

13   accommodations are already there because it's not required --

14   it's not a requirement for a lot of walking or a lot of

15   standing or a lot of sitting at any given time.

16   Q    Okay.  So there's never been a need to ask Ms. Ross

17   for any kind of accommodation?

18   A    No.

19   Q    Okay.  What about Mr. Garfunkel?

20   A    No.

21   Q    Okay.  Have you ever provided them with any medical

22   documentation regarding your limitations?

23   A    No medical.  The only thing that I've ever provided

24   Ms. Ross pertaining to my disabilities was the fact that I do

25   have hiring, special hiring privileges because of my

```
 1 | disabilities.
 2 |      Q     All right.  And was that in your application?
 3 |      A     Yes, that was on my --
 4 |      Q     Well, let's see the application.
 5 |      A     -- read it.  It was the one, it was the same one
 6 | that, that you've been referring to.
 7 |      Q     Oh, that hiring authority?
 8 |      A     Yes, and that's for persons with disabilities over
 9 | 30%.
10 |      Q     Okay.  But this document doesn't indicate what your
11 | disabilities are?
12 |      A     Correct.
13 |      Q     Or any limitations stemming therefrom?
14 |      A     Correct.
15 |      Q     All right.  Anything else that you've provided Ms.
16 | Ross that gives those, either your injuries or your
17 | limitations thereof?
18 |      A     I can't think of any.
19 |      Q     Okay.  What about Mr. Garfunkel?
20 |      A     And I don't think so.
21 |      Q     All right.  Have you otherwise discussed your
22 | limitations or problems with them, meaning Ms. Ross and Mr.
23 | Garfunkel?
24 |      A     I may have discussed with Ms. Ross when I've had a
25 | gout attack or something out of concern when she may have
```

1  asked why am I limping or something like that.

2      Q    Okay.  But just in passing that this is something

3  that --

4      A    Yes.

5      Q    -- is a temporary thing for while you have an

6  attack?

7      A    Yes.

8      Q    All right.  Okay.  What evidence do you have, if

9  any, that the decision to place Bill back in his position was

10  motivated by your alleged disability?

11      A    I have no documentation.  I mean I have no, I have

12  no theory --

13      Q    Oh, okay.

14      A    -- other than when I use my disabilities, and I

15  guess maybe that should be clarified in this, there are rights

16  that I have as a disabled person under the Handicaps

17  Disabilities Act.

18      Q    Uh-huh.

19      A    And I'm, I'm not sure if you're referring to did I

20  have disabilities that allowed Bill --

21      Q    No.

22      A    Maybe I misunderstood it.

23      Q    No, what I'm trying to understand is you've alleged

24  disability discrimination.

25      A    Yes.

1     Q     Which means that you have alleged that the reason

2  you didn't get this position is based, at least in part, on

3  your disability and I'm trying to understand what evidence you

4  have of that.

5     A     Actually --

6     Q     That's my only question.

7     A     Actually, what I was basing it on was the fact that

8  I have hiring, special hiring authorities and each time I use

9  -- even when you look at what that's attached to, that's

10  saying that because I do have disabilities over 30%, then I

11  should have consideration for job placement.  And when you

12  look at the job announcement or what we're talking about now

13  as far as with this position, I was not given or nowhere I

14  have seen yet that they gave me consideration as a disabled

15  veteran.

16     Q     Okay.  Well, it seems like those are two different

17  issues so let's clarify what your claim is, okay, because we

18  talked about the special hiring authority.

19     A     Right.

20     Q     And the fact that you had some concerns that that

21  was misapplied or not applied to the extent that it should

22  have been.

23     A     Correct.

24     Q     But that you told me earlier that that, in your

25  opinion, was not discriminatory.  They just might have messed

1   up.  They didn't do it right.

2       A    I said I didn't apply for -- I didn't act on that

3   for discrimination because they did not apply that particular

4   Act which is the Disability Act, and hopefully that didn't get

5   twisted around.  What I'm trying to clarify is, I didn't say

6   that the basis for discrimination which was disability was

7   because they did not accommodate my disabilities and I think

8   that's what you're trying --

9       Q    Well, I mean there, there are two forms of

10  discrimination based on disability, but my understanding from

11  your complaint, and maybe this claim is not here anymore, but

12  my understanding is that you were claiming that you did not

13  receive this position because of your disability.  Is that an

14  accurate assessment or an inaccurate assessment?

15      A    I don't know if that's totally accurate.  My

16  disabilities had something to do with it as far as the hiring

17  authority, but I don't think that I've even alluded that they

18  didn't accommodate my disabilities as a problem.

19      Q    Not accommodation.  My question is, are you --

20      A    Or considered.

21      Q    Are you claiming that Ms. Ross failed to give you

22  the position because you are disabled?

23      A    I can't say that, no.  I can't say that she did

24  that.

25      Q    Okay.  Do you -- are you claiming in any way that

1          MR. BELL:  They don't say lead.

2          BY MS. KONOPKA:

3     Q    But underneath it indicates, "The incumbent will

4  function as the Lead Patient Advocate," and this says, "The

5  incumbent will function as the Director, Office of Patient

6  Advocacy."  Do you see where each one of those are?

7     A    Yes.

8     Q    Okay.  Have you seen both of these before?

9     A    I know I've seen this one.

10    Q    Okay.

11    A    And I think I may have seen that one.  I'm not sure.

12    Q    Okay.  And what we're addressing are what percentage

13 of your duties are different things and we've indicated this

14 one says what percentage of your duties are special projects.

15    A    Let me -- from what I know about core competencies,

16 these are -- for core competencies.

17    Q    Okay.  Well, let's answer my question first.  Are

18 these two descriptions of major duties the same or different?

19         MR. BELL:  Well, that's what he was trying to say.

20         THE WITNESS:  What I was trying to say, I think the,

21 from what I'm seeing, the duties are essentially the same but

22 they've assigned different weights.

23         BY MS. KONOPKA:

24    Q    Okay.  So you're saying that there are now certain

25 duties that are weighted more?

1    A    It looks like they've brought -- they've broken them

2 out a little bit.  Looks like here it's more -- everything was

3 combined.

4    Q    Okay.

5    A    And it looks like here, because I was doing the same

6 thing.  As Acting Lead Patient Advocate, I can tell you, I did

7 the very same duties that are in here that was in there, and

8 obviously HR --

9    Q    But you're saying that Bill is now doing other

10 things.  That's what you told us earlier,

11 right?

12    A    No, I said Bill is in the Acting Lead -- well, he's

13 in the Lead Patient Advocate position.

14    Q    Uh-huh, okay.

15    A    And my contention was I just was thrown off because

16 that position -- this one was supposedly abolished.

17    Q    Uh-huh, when they created this one?

18    A    When they created that one.

19    Q    And are these position descriptions identical?

20    A    I think they pretty much cover the same thing, you

21 start looking at content, but as far as weight, they're

22 weighted different.

23    Q    Okay.  So different duties have been accorded

24 different weights?

25    A    Yes.

173

1          CERTIFICATE

2      I, Heather Kilbourne, a Shorthand Reporter and a Notary

3  Public, do hereby certify that the foregoing witness,

4  KEITH PIERCE, was duly sworn on the date indicated, and

5  that the foregoing is a true and accurate transcription of

6  my stenographic notes and is a true record of the testimony

7  given by the foregoing witness.

8      I further certify that I am not employed by or related to

9  any party to this action by blood or marriage and that I am in

10 no way interested in the outcome of this matter.

11      In witness whereof, I have hereunto set my hand this

12 26th day of June, 2006.

13

14

15      ---------/S/-------------

16      Heather Kilbourne, Reporter

17      Notary Public in and for

18      the District of Columbia

19

20

21 My Commission Expires:

22 February 28, 2011

23

24

25

FREE STATE REPORTING, INC.
Court Reporting    Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947