1

<pre>
 1              UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF COLUMBIA

 3   -------------------------------x
                                    :         COPY
 4   KEITH PIERCE                   :
                                    :
 5                    Plaintiff     :
                                    :
 6           v.                     :    Civil Action No.
                                    :
 7   R. JAMES NICHOLSON, Secretary, :    05-1989 (RMU)
                                    :
 8   U.S. Department of Veterans    :
                                    :
 9   Affairs                        :
                                    :
10                    Defendant     :
                                    :
11   -------------------------------x
12          30(b)(6) Deposition of TERRY ROSS
13                  Washington, D.C.
14           Wednesday, January 17, 2007
15                    12:10 p.m.
16   Job No:  1-95097
17   Pages 1 - 40
18   Reported by:  Donna Q. Buckhaults
19
20
21
22
</pre>



L.A.D. REPORTING & DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean,

DEPOSITION OF TERRY ROSS
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

2

1          30(b)(6) Deposition of TERRY ROSS, held at

2     the offices of:

3

4          VA MEDICAL CENTER

5          50 Irving Street, Northwest

6          Room 1B105

7          Washington, D.C.  20422

8          (202) 745-8000

9

10

11          Pursuant to agreement, before Donna Q.

12     Buckhaults, Registered Professional Reporter and

13     Notary Public of the District of Columbia.

14

15

16

17

18

19

20

21

22

DEPOSITION OF TERRY ROSS
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

3

```
 1              A P P E A R A N C E S

 2      ON BEHALF OF THE PLAINTIFF:

 3              JIMMY A. BELL, ESQUIRE

 4              LAW OFFICE OF JIMMY A. BELL, P.C.

 5              9610 Marlboro Pike

 6              Upper Marlboro, Maryland  20772

 7              (301) 599-7620

 8

 9      ON BEHALF OF THE DEFENDANT:

10              ALEXANDER D. SHOAIBI, ESQUIRE

11              U.S. ATTORNEY'S OFFICE

12              555 Fourth Street, Northwest

13              Washington, D.C.  20001

14              (202) 514-7236

15

16              CAROL BORDEN, ESQUIRE

17              U.S. DEPARTMENT OF VETERANS AFFAIRS

18              1722 I Street, Northwest

19              Washington, D.C.  20421

20              (202) 412-0080

21

22      ALSO PRESENT:  Keith Pierce
```

DEPOSITION OF TERRY ROSS
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

5

```
 1              P R O C E E D I N G S

 2                   TERRY ROSS

 3      having been duly sworn, testified as follows:

 4         EXAMINATION BY COUNSEL FOR THE PLAINTIFF

 5    BY MR. BELL:

 6         Q.   Have you ever had your deposition taken

 7    before?

 8         A.   Not a formal deposition, no.

 9         Q.   I'm just going to let you know a couple of

10    ground rules.  Sometimes I'll ask a question and you

11    may believe that you know what the question is going

12    to be, but I ask that you let me finish the question

13    before you answer because the court reporter can't

14    take down two things at one time.

15              Anytime you need a break, as long as a

16    question is not pending on the table, just let counsel

17    know and we'll take a break.  Okay?

18         A.   Does he know about my time constraints?

19         MR. SHOAIBI:  I told him already.

20    BY MR. BELL:

21         Q.   We won't be long.  We'll be out before one.

22         A.   Okay.
```

DEPOSITION OF TERRY ROSS
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

10

1    she started in that.

2        Q.    What happened when Bill Sivley came back

3    from the military?

4        A.    He requested to go on detail in fiscal

5    service.

6        Q.    Now, when he left, was his position as lead

7    patient advocate, was it terminated?

8        A.    No.

9        Q.    When you say that he came back and he

10   requested to go on a detail, was that request in

11   writing?

12       A.    I don't recall.

13       Q.    Was there paperwork that had to happen in

14   order for him to be detailed?

15       A.    I don't recall.

16       Q.    Do you remember signing any paperwork for

17   him to be detailed?

18       A.    I don't recall.

19       Q.    Is it your understanding as a manager that

20   in order to detail one of your subordinate employees,

21   that you have to sign paperwork to have them detailed?

22       A.    I don't know.

DEPOSITION OF TERRY ROSS
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

15

1      Q.    Were you on that panel?

2      A.    No.

3      Q.    Were you the selecting official?

4      A.    Yes.

5      Q.    So how many people made it to the second

6   interview phase?

7      A.    Two.

8      Q.    And who were those persons?

9      A.    One was Keith Pierce and the other one was a

10  woman from the Buffalo VA Medical Center.

11     Q.    Did you interview both those individuals?

12     A.    I did.

13     Q.    Were the questions written down?

14     A.    Yes, they were.

15     Q.    Were they asked the same questions?

16     A.    Yes, they were.

17     Q.    None of the questions were different?

18     A.    Not that I recall.

19     Q.    Did you write down the answers that they

20  wrote?

21     A.    I did.  Not that they wrote.  That they

22  spoke, that they talked about.

DEPOSITION OF TERRY ROSS
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

16

1     Q.    What did you write it on?

2     A.    On the piece of paper that I had the

3 questions.

4     Q.    Did you also use a notepad?

5     A.    No.

6     Q.    Did you have a conversation with the

7 candidates -- about your thoughts of the candidates

8 with anyone after the interview process?

9     A.    I don't recall.

10    Q.    Did you ever speak with Mr. Garfunkel?

11    A.    About what?

12    Q.    About the candidates and your thoughts.

13    A.    Yes.

14    Q.    Tell me about that conversation.

15    A.    He asked me what I thought about the

16 interviews during my interviews, and I told him that I

17 felt that Keith Pierce did not show any evidence of

18 running a major program, nor did he show any evidence

19 to me of using any kind of graphs and charts, and I

20 also explained that the other person who we

21 interviewed showed evidence of both.

22    Q.    Did you read his application?

DEPOSITION OF TERRY ROSS
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

18

1      A.    I interviewed two people.

2      Q.    How many people besides you were actually

3  asking questions?

4      A.    Nobody.

5      Q.    Mr. Garfunkel wasn't asking questions?

6      A.    He wasn't in my interview, no.

7      Q.    He interviewed them separately himself?

8      A.    Correct.

9      Q.    Who else interviewed them?

10      A.    No one that I know of except for the rating

11  and ranking panel.

12      Q.    Did you give them a numeric number?

13      A.    No.

14      Q.    So what was your -- how were you able to

15  rate the other person superior to Mr. Pierce?

16      A.    I felt that the other person had shown

17  evidence, clear evidence of running a major program

18  and showed clear evidence of working with graphs and

19  charts.

20      Q.    What was the difference between -- or from

21  the position description between a lead advocate

22  position and this newly created director of Office of

DEPOSITION OF TERRY ROSS
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

19

1    Patient Advocacy position?

2        A.    One, to my knowledge a lead patient advocate

3    did not run a major program, nor were they involved,

4    at least not while I was there, were they involved in

5    creating graphs and charts and providing analysis for

6    patient satisfaction, and that was why I wanted to

7    create this director of patient advocate office so

8    that they would have more of that kind of experience.

9        Q.    Maybe you didn't understand my question.

10    I'll have her read it back to you.

11            (Record read by reporter as follows:

12    Question:  What was the difference between -- or from

13    the position description between a lead advocate

14    position and this newly created director of Office of

15    Patient Advocacy position?)

16            MR. SHOAIBI:  Objection, asked and answered.

17        She can answer it again if you want.

18            MR. BELL:  I want to make sure I'm

19        clarifying.

20    BY MR. BELL:

21        Q.    So the position descriptions will delineate

22    what you just said for the new director of advocacy

DEPOSITION OF TERRY ROSS
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

24

1    selected?  Did they take the position?

2        A.    Tell me when you're talking about.  When are

3    you talking about?

4        Q.    You said that you selected the person --

5    there were two people that were interviewed.

6        A.    You're talking about for the second posting.

7        Q.    That's correct.

8        A.    Okay.

9        Q.    We haven't got to the third yet.

10       A.    Okay.

11       Q.    You selected that other person over my

12   client; is that correct?

13       A.    That's correct.

14       Q.    Did that person take the position?

15       A.    No.

16       Q.    Was that position then offered to my client?

17       A.    No.

18       Q.    Why not?

19       A.    He was not qualified in my mind because of

20   the fact that he did not show any evidence at all of

21   running a major program, nor did he show any evidence

22   of being able to use graphs and charts.

DEPOSITION OF TERRY ROSS
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

27

1      A.   Correct.

2      Q.   Did the Human Resources office miss

3   something about him not being qualified?  Did they

4   miss something?

5           MR. SHOAIBI:  Objection, speculative.

6      A.   I don't know.

7      Q.   When you sent down the vacancy announcement,

8   was there some -- let me ask it this way.

9           When you sent down the vacancy announcement,

10  did you have a criteria of what the people needed in

11  order to be qualified for the position?

12     A.   I provided to Human Resources criteria, yes.

13     Q.   And based on the criteria you provided, my

14  client made that certification list; correct?

15     A.   Yes, that's correct.

16     Q.   Who provided the criteria for this panel?

17  Did you impanel the people?

18     A.   I had the -- I appointed the chair of the

19  rating and ranking panel and she chose the panelists.

20     Q.   And did you give them criteria on what they

21  needed to look for?

22     A.   They established their own criteria.  I mean

DEPOSITION OF TERRY ROSS
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

28

1    they based it off of the position description and what

2    is just the -- I don't remember what they're called,

3    whatever, I guess functional statements or something

4    like that for HR.   They did read the position

5    description.

6         Q.    Okay.   And the information that you provided

7    initially to --

8         A.    HR.

9         Q.    -- HR.

10        A.    Correct.

11        Q.    So I'm confused.   If the information that

12   both places evaluated the clients on -- excuse me --

13   the applicants on was the information you provided, it

14   gets down to two candidates.

15        A.    Right.

16        Q.    One candidate decides they don't want to

17   take the position, how do you decide that the other

18   candidate is not qualified?

19        A.    Because I had different or additional

20   questions other than what the rating and ranking panel

21   used.   I had my own questions and used them on both

22   candidates.   Once they were recommended, the two were

DEPOSITION OF TERRY ROSS
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

29

1   recommended to me, I then had my own questions and

2   asked them both the same questions so that I could

3   further delineate.

4       Q.   Were you aware of my client's prior

5   performance evaluations?

6       A.   No.

7       Q.   You didn't look at them in the packet?

8       A.   His --

9       Q.   His performance evaluations.

10      A.   Whatever was in his packet I was familiar

11  with.

12      Q.   Were you familiar with whether or not he had

13  an outstanding?

14      A.   I don't recall.

15      Q.   Would it surprise you that he had an

16  outstanding performance evaluation?

17      A.   No, it would not surprise me.

18      Q.   Let's go to the third position.  So you

19  didn't want my client, you didn't believe he was

20  qualified, so you readvertised the position again.  Is

21  that correct?

22      A.   That's correct.

DEPOSITION OF TERRY ROSS
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

30

1      Q.   Okay.  And how many people applied for this

2  position?

3      A.   We cancelled the position before any

4  applicants that I know of submitted any.  And if there

5  were any, HR did not inform me about it.

6      Q.   Why did you cancel the position?

7      A.   Because the person who was in the lead

8  patient advocate position decided that he no longer

9  wanted to be detailed to fiscal service and wanted to

10  come back and work full-time in the patient advocate

11  office and wanted to broaden his horizons and start

12  doing some graphs and charts that we needed to be

13  done.

14      Q.   So start doing some graphs and charts.

15      A.   Right.

16      Q.   So he was going to learn to do them?

17      A.   Correct.  Apply his current knowledge and

18  then go onward and forward.

19      Q.   So it's not something he had done in the

20  past.

21      A.   Correct.

22      Q.   Okay.  Why wasn't my client given this same

DEPOSITION OF TERRY ROSS
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

32

1    job.  Am I correct?

2        A.    That's correct.

3        Q.    Instead of selecting my client you

4    reannounce the position.

5        A.    That's correct.

6        Q.    Do you know whether or not my client applied

7    for the other position?

8        A.    No, I don't.

9        Q.    At what point did you decide to cancel the

10   other position, the third position?

11       A.    It was -- I believe that it was a couple of

12   weeks or less than a couple of weeks after it was

13   posted.

14       Q.    Was that before the closing of the

15   announcement or after the closing of the announcement?

16       A.    Before the closing.

17       Q.    You said that Bill Sivley, you wanted to

18   give him the opportunity to gain some experience in

19   graphs and charts?

20       A.    Some additional experience in graphs and

21   charts, yes.

22       Q.    Because he hadn't done it before?

DEPOSITION OF TERRY ROSS
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

33

1    A.    No, because he had experience in doing it

2    and he wanted to have something other than what he had

3    been doing originally as lead patient advocate.

4    Q.    Then why couldn't he have just applied for

5    the position like everyone else?

6    A.    I don't know whether he applied for it or

7    not.

8    Q.    What's his race?

9    A.    Whose?

10    Q.    Bill Sivley.

11    A.    He's Caucasian.

12    Q.    Is there any reason to believe that he

13    wouldn't have made the certification?

14    A.    I have no idea.

15    Q.    But if you wanted the best qualified person,

16    wouldn't the most prudent thing would have been to let

17    everybody apply and then get the best qualified person

18    based on the interviews?

19    A.    Absolutely.

20    Q.    You didn't do that.

21    A.    I'm not sure I understand.

22    Q.    You didn't do that, though; right?

DEPOSITION OF TERRY ROSS
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

34

1    A.    I didn't do what?

2    Q.    You did not let the process open itself up

3  for all the qualified candidates like you did the

4  previous two times and then pick the best candidate

5  based on the whole interview process and things that

6  you did like for the second position?

7    A.    No, I didn't need to because we opted to

8  decide to cancel that position, director of patient

9  advocate office, and just maintain the lead patient

10  advocate and not establish, not go forward with

11  establishing the director of patient advocate office.

12    Q.    So you never became aware that the only

13  person that applied for that position the third time

14  was my client?

15    A.    I have no idea who applied for that

16  position.

17    Q.    Going back to the second position, and by

18  second position I mean the second position that we

19  talked about.  The female candidate that was selected

20  for that position, did you ever speak to her prior to

21  the interview?

22    A.    I don't recall.

DEPOSITION OF TERRY ROSS
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

37

1      Q.   How did he get that position?

2      A.   Bill was already in an encumbered position

3  called the lead patient advocate position and he just

4  assumed his responsibilities.

5      Q.   Was that position ever abolished?

6      A.   No.

7           MR. BELL:  We can go off for a minute.

8           (Off the record.)

9           (Ross Exhibit Number 1 was marked for

10  identification and was attached to the transcript.)

11  BY MR. BELL:

12      Q.   You've just been handed a copy of what we've

13  marked as Ross 1.  Can you take a look at that

14  document and tell me if you've ever seen that document

15  before.

16      A.   Yes, I've seen this document.

17      Q.   Can you tell for the record what that

18  document is?

19      A.   This is an e-mail that I sent to Keith

20  Pierce with a cc to his supervisor, Michelle Spivak,

21  on January 23, 2004, entitled "Request to be Detailed

22  as Lead Patient Advocate."

DEPOSITION OF TERRY ROSS
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

38

1      Q.   Can you tell me what you mean in the

2  second -- can you read the second sentence for me?

3      A.   (Reading):  As I mentioned in our patient

4  advocate meeting this week, management has decided to

5  abolish that position and begin recruitment for a

6  Director, Office of Patient Advocacy, at the GS-13

7  level.

8      Q.   So was that position abolished?

9      A.   No, it was not.

10      Q.   Why did you tell my client that management

11  decided to abolish that position?

12      A.   Because that's what we decided to do.

13      Q.   When did you decide?

14      A.   As of January 23rd we made that decision.

15      Q.   To abolish the position?

16      A.   To abolish the position.

17      Q.   Okay.

18      A.   It never occurred.

19      Q.   But you began recruitment for the director

20  of Office of Patient Advocacy.

21      A.   That's correct.

22      Q.   What position did Bill Sivley -- what was he

DEPOSITION OF TERRY ROSS
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

39

1    placed in?

2         A.    Bill Sivley was already in the lead patient

3    advocate position, encumbered that position.

4         Q.    Was that a 12/13 position?

5         A.    No, it was not to my knowledge.    Bill Sivley

6    was a GS-13.

7         Q.    What was the position on the position

8    description ranked as?

9         A.    The position description that I had was a

10   GS-13.

11        Q.    For a lead advocate --

12        A.    For his lead advocate position, yes.

13        Q.    I have nothing further.

14             MR. SHOAIBI:  We'll waive.

15             (Signature having been waived, the

16   deposition of TERRY ROSS was concluded at 12:55 p.m.)

17

18

19

20

21

22

DEPOSITION OF TERRY ROSS
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

40

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2         I, Donna Q. Buckhaults, Registered

3    Professional Reporter, the officer before whom the

4    foregoing proceedings were taken, do hereby certify

5    that the foregoing transcript is a true and correct

6    record of the proceedings; that said proceedings were

7    taken by me stenographically and thereafter reduced to

8    typewriting under my supervision; and that I am

9    neither counsel for, related to, nor employed by any

10   of the parties to this case and have no interest,

11   financial or otherwise, in its outcome.

12        IN WITNESS WHEREOF, I have hereunto set my

13   hand and affixed my notarial seal this 23rd day of

14   January, 2007.

15

16   My commission expires:

17   October 14, 2008

18

19   _____

20   NOTARY PUBLIC IN AND FOR THE

21   DISTRICT OF COLUMBIA

22