**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**PIERCE**                                    :
                                              :
                                              :
Plaintiff                                     :          **Civil Action No.** 05-01989
v.                                            :
                                              :
                                              :
**NICHOLSON.,**                               :
                                              :
                                              :
         Defendants                           :

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

COMES NOW, the Plaintiff, by and through his undersigned counsel, Jimmy A. Bell,

Esq. and the Law Office of Jimmy A. Bell, P.C., and respectfully moves in opposition to

Defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56(b), to deny

Defendant's Motion for Summary Judgment on all counts of Plaintiff Ritchie's Complaint.  In

support thereof, the Plaintiff states as follows:

**STATEMENT OF MATERIAL FACTS IN DISPUTE**

1.      Defendant was aware of  Plaintiff had participated in EEO activity.  Plaintiff's

        supervisors knew about Plaintiff's prior EEO activity. (Exhibit 2, page 18)


2.      On January 23, 2004, Plaintiff requested, through Terry Ross ("Ross"), Executive Officer

        to the Medical Director, to be detailed into the Lead Patient Advocate position (GS-

        12/13) in the absence of Bill Sivley who was away on extended military duty (see Exhibit

        Deposition of Terry Ross.)  In the request letter, Plaintiff listed his extensive credentials

        and accomplishments.  In addition, since Mr. Sivley was a GS-13 and Plaintiff was a GS-

11, Plaintiff enclosed a copy of the of the regulation which stated that, as an over 30%

disability service connected veteran, Plaintiff had no time-in grade restrictions.  (See

Exhibit 3, annexed hereto).

3.      In response to Plaintiff's request described in paragraph 2, Ross sent correspondence to

Plaintiff stating, "Management had made a decision to abolish the Lead Patient Advocate

position" and that they were instead recruiting for the position of "Director, Office of

Patient Advocacy at the GS-13 level."  (See Depo  of Terry Ross and Exhibit 3, annexed

hereto).  Ross's correspondence also denied Plaintiff's request described in paragraph 2.

(See Exhibit 3, annexed hereto).

4.      On March 8, 2004, Plaintiff asked Ross why Management had decided to make the

position GS-13 rather than GS-12/13.  In response, Ross denied that Management made

any such decision and claimed that it was her decision.  (See Exhibit 3, annexed hereto).

5.      In her correspondence described in paragraph 3, Ross also indicated that the new hiring

criteria included skills and experience in analyzing and strategizing major medical center

programs. (See Exhibit 3, annexed hereto)  In response, Plaintiff contrasted the previous

position description of Lead Patient Advocate (See Exhibit 3, annexed hereto) with the

new position description for Director, Office of Patient Advocacy (See Exhibit 3,

annexed hereto).  Plaintiff also indicated to Ross that he had extensive major medical

center experience.  Plaintiff had experience and had been detailed in this position

previously. (See Exhibit 3, annexed hereto)

6.      At the conclusion of interviews, the position of Lead Patient Advocate was re-
        established. Bill Sivley was selected to that position without applying for the positon so
        her could get experience in graphs and charts(See Deposition of Terry Ross),

7.      On March 8, 2004, a new position was posted for an in-house job for a Program
        Specialist.  (See Exhibit 11, annexed hereto).  Plaintiff was the only person to apply for
        this position.  Since the position was GS-13, Plaintiff applied using his special hiring
        authority as a 30% disabled veteran. (Exhibit 3)  Plaintiff was rejected for this position.
        (See Exhibit 3, annexed hereto). Plaintiff was informed that he did not meet the time in-
        grade restrictions. (See Exhibit 3, annexed hereto).  However, the announcement
        indicated that persons with special hiring authority would be eligible for the position.
        (See exhibit 10, annexed hereto).  The position was subsequently cancelled.

8.      After the position was cancelled, it was re-established in or about July 2004, announced,
        and opened to outside candidates.  (See Exhibit 12, annexed hereto)  Plaintiff was eligible
        and applied for this position.  (See Exhibit 13, annexed hereto).

9.      After he submitted his application, Ross approached Plaintiff and told him "you made the
        list [of eligible candidates], but I must be honest with you – the other five candidates are
        very well qualified and I feel it will be difficult for you."  Plaintiff believed that Ross was
        trying to discourage him from seeking the position.  (See Exhibit Depo of Terry Ross,
        annexed hereto). Ross made a similar remark on July 12, 2004 in front of Michelle

3

Spivak.  (See Exhibit 3, annexed hereto).

10.    When Plaintiff was selected as one of the top two (2) candidates for the position

       described in paragraph 8, Ross scheduled a second interview with Plaintiff and the

       Medical Center Director. (See Exhibit 3, annexed hereto).  Plaintiff continued to follow

       up on the position.  (See Exhibit3, annexed hereto).

11.    In the meantime, Ross lobbied to have the position re-announced to a larger candidate

       pool, (See Exhibit 3, annexed hereto) notwithstanding the fact that Ross had sent out

       correspondence five (5) months earlier to all the Patient Advocates, Social Workers, and

       Public Affairs employees in the Department of Veterans Affairs nationwide for the

       purposes of soliciting applications. (See Exhibit 3, annexed hereto).  Garfunkel retaliated

       against plaintiff because plaintiff had filed EEO complaints ( Ross Affidavit Exhibit 2)

       Ross intentionally and purposefully did not want to select Plaintiff for this position

12.    Plaintiff was well-qualified for the positions described in paragraphs 2, 7-8.  Not only did

       Plaintiff have extensive experience in the required fields and meet all of the criteria, he

       was also elected to the Board of Directors of the Society for Healthcare Consumer

       Advocacy of the American Hospital Association where he represented Patient Advocates

       and Directors of Patient Advocacy. ( See Exhibit 3 and Depo of Terry Ross)

13.    It its Answer to the Complaint, Defendant claims that it did not have knowledge of

       Plaintiff's disability and denies that Plaintiff had any disability whatsoever.  (Answer ¶ 5,

                                              4

12.).  However, Plaintiff submitted proof of his 80% disability with his applications for

the positions described in paragraphs 2 and 7, *supra*.  As a result, Defendant can deny

neither Plaintiff's disability nor Defendant's actual knowledge of Plaintiff's disability.

14.    Defendant admittedly has insufficient knowledge as to whether Plaintiff's supervisors

had actual knowledge of Plaintiff's prior EEOC activity.  (Answer ¶ 8-10).  Plaintiff can

show that Plaintiff's supervisors had actual knowledge of Plaintiff's prior EEOC activity.

15.    Defendant states that the vacancy announcements under which Plaintiff applied were

withdrawn and an employee who had previously held the position prior to going on active

duty with the military was placed back in the position upon his return and indication that

he was amenable to the placement.  (Answer ¶ 8-10).  Plaintiff can show that Defendant's

characterization of the Lead Patient Advocate described in paragraph 2 as one held open

for a person on military duty until his return is pretext.  Plaintiff can show that the

position was vacant and open to any applicant.  Plaintiff can also show that the position

was thereafter abolished in favor of the position of Director, Office of Patient Advocacy.

Plaintiff can finally show that, after conducting interviews for the position of Director,

Office of Patient Advocacy, that position was suddenly cancelled in favor of the original

Lead Patient Advocate position, to which Bill Sivley was appointed without any

interview process or open application period. (Depo of Terry Ross and Depo of Standford

Garfunkel)

16.    Defendant states that the vacancy announcements under which Plaintiff applied were

5

withdrawn and an employee who had previously held the position prior to going on active duty with the military was placed back in the position upon his return and indication that he was amenable to the placement.  (Answer ¶ 8-10).  Plaintiff can show that the position described in paragraph 7 was cancelled and was not filled by any individual.

17.    Defendant states that the vacancy announcements under which Plaintiff applied were withdrawn and an employee who had previously held the position prior to going on active duty with the military was placed back in the position upon his return and indication that he was amenable to the placement.  (Answer ¶ 8-10).  Plaintiff can show that the position described in paragraph 8 was a new position and not filled by an individual who previously held the position before going on active military duty.

18.    Defendant does not and can not deny that Plaintiff was well qualified for all of the positions described in paragraphs 2, 7-8. ( See Exhibits, 3, 4, 5)

## ARGUMENT

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

It is well known that summary judgment is granted by this court "if pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Diamond v, Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  The

nonmoving party cannot merely rest upon the allegations included in the complaint, and instead, must identify the specific facts which demonstrate that there is a genuine issue for trial. *Anderson*, 477 U.S. at 248.  The burden is upon the nonmoving party to demonstrate that there are material facts in dispute.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  There is a genuine issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  Material facts are in dispute if they are capable of affecting the outcome of the suit under governing law.  *Id*.  In considering a motion for summary judgment, all evidence and inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indust. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962).  The "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor."  *Anderson*, 477 U.S. at 255; *see also Bayer v. United States Dept. of Treasury*, 956 F.2d 330, 333 (D.C. Cir. 1992).

The court has also held that because proof of discrimination may be difficult for a plaintiff to establish, "the court should view summary judgment motions in such cases with special caution."  *Childers v. Slater*, 44 F. Supp. 2d 8, 15 (D.D.C. 1999) (citing *Aka v. Washington Hosp. Ctr.,* 116 F.3d 876, 879 (D.C. Cir. 1997)); *Johnson v. Digital Equip. Corp.,* 836 F. Supp. 14, 18 (D.D.C. 1993).  Nevertheless the nonmoving party "must do more than simply show that there is some metaphysical doubt as to he material acts."  *Matsushita*, 475 U.S. at 586.  Rather, she must come forward with "specific facts showing that there is a genuine issue for trial."  *Matsushita*, 475 U.S. at 587; Fed. R. Civ. P. 56(e).

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny established the tripartite framework, which governs the allocation of the burden of production in cases in which

discrimination is based on disparate treatment. To satisfy the first element of the *McDonnell Douglas* framework, the plaintiff must prove a *prima facie* case by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802. Generally, to establish a prima facie case of disparate treatment discrimination, a plaintiff must show that he or she (1) belongs to a protected class; (2) suffered an adverse employment action; and (3) that the unfavorable action gives rise to an interference of discrimination. *E.g., Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999) (citing *McKenna*, 729 F.2d at 789). To raise an inference of disparate treatment in a Title VII case, the plaintiff "must prove that all the relevant aspects of [his] employment situation are 'nearly identical' to those of the employees who [he] alleges were treated more favorably." *Childers v. Slater*, 44 F.Supp. 2d at 24; *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995).

If plaintiff succeeds in proving his or her *prima facie* case, a presumption that the employer unlawfully discriminated against the employer arises, *e.g., Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981), and the burden shifts to the defendant "to articulate some legitimate nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802.

Finally, if the defendant successfully carries this burden, then the presumption of discrimination disappears, and the plaintiff "must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination." *Burdine,* 450 U.S. at 253 (citing *McDonell Douglas, 411 U.S. at 804); see also St. Mary's Honor Ctr. V. Hicks,* 509 U.S. 502, 511 (1993). At this point, plaintiff's ultimate burden of proving intentional discrimination merges with her burden of demonstrating pretext. *Burdine*, 450 U.S. at 256. At all times plaintiff retains the

8

ultimate burden of persuading the trier of fact that defendant intentionally discriminated against the plaintiff.  *Id.* at 253.

## AS A MATTER OF LAW, THE DEFENDANT CANNOT OFFER A LEGITIMATE NONDISCRIMINATORY REASON FOR ITS CONDUCT

Once a plaintiff has established a *prima facie* case of discrimination, the defendant is afforded the opportunity to articulate a legitimated, non-discriminatory reason for its conduct. *Price Waterhouses, 490 U.S. at 239-41; Mcdonnell-Douglas, 411 U.S. at 802; Milliner, 932 F. Supp. At 351.*  If the defendant satisfies this "burden of production," the burden shifts to the plaintiff to prove that the employer's alleged non-discriminatory reason was merely a pretext, and that the true reason for the conduct was pregnancy discrimination.  *Id.*

To prove that the District's conduct was a pretext, the Supreme Court that the plaintiff must prove the following: (1) the articulated justification is pretextual, and (2) the real reason for the action was unlawful discrimination.  *St. Mary's Honor Ctr. V. Hicks*, 509 U.S. 502, 515 (1993) ("[A] reason be proved to be a discrimination" unless it is shown both that the reason was false and that the discrimination was the real reason."); *Stewart v. Ashcroft*, 211 F. Supp. 2d 166, 177 (D.C.C. 2002).

The exhibits Depositions of Sandford Garfunkel and Terry Ross an the show that a reasonable Trier of fact could make a finding of discrimination.

### Deposition of Sanford Garfunkel

```
        16          Can you state your name for the record?
        17    A.    Sanford M. Garfunkel.
        18    Q.    Can you state your job title?
        19    A.    Medical Center Director, VA Medical Center,
        20  Washington, D.C.
        21    Q.    How long have you been in that position?
        22    A.    1995.  I want to say April 1995. (p. 5)
0006
         1    Q.    What position did you hold prior to that?
         2    A.    I was the Associate Chief Medical Director
```

9

         3    for Operations for the VA.
         4         Q.    And how long were you in that position?
         5         A.    Four years.
         6         Q.    What position did you hold before that?
         7         A.    I was the Medical Center Director at the VA
         8    in New York City.
         9         Q.    How long have you known my client,
        10    Mr. Pierce?
        11         A.    I guess as long as I'm here.  I can't swear
        12    he was here when I got here, but whenever he got here.
        13    It's been years.
        14         Q.    Prior to this EEO case that we're here to
        15    deal with today, did you ever become aware of any
        16    prior EEO complaints that he had made?
        17         A.    Yes.  I'm aware that he had won a case, a
        18    settlement.  I don't even know how it was resolved,
        19    but I'm aware he had filed and won a case.
        20         Q.    How did you become aware of that?
        21         A.    I'm the director.  I know what goes on in
        22    the Medical Center.  It's my job. (p. 6)
------------------
         9              MR. BELL:  Can you read back the question?
        10              (Record read by reporter as follows:
        11    Question:  Did you take any role whatsoever in the
        12    selection of the positions that my client applied
        13    for?)
        14         A.    I did at some point interview Mr. Pierce.
        15         Q.    And why was Mr. Pierce interviewed?
        16         A.    He was a candidate for the job.
        17         Q.    Did you ask Mr. Pierce the same questions
        18    that you asked the other interviewees?
        19         A.    I'm sure I did.  I don't recall.  You know,
        20    I don't recall.  I generally do because it's good form
        21    to do that.  In Mr. Pierce's case he was an inside
        22    candidate, the other was an outside candidate,

0009
         1    might have asked a little bit different because he was
         2    familiar with how that section worked and how the
         3    hospital worked.  But I generally try to ask the same
         4    questions.
         5         Q.    You said he was more familiar with how the
         6    hospital worked.  Can you explain what you mean by
         7    that?
         8         A.    Well, if I'm interviewing -- take this case.
         9    I'm interviewing somebody from outside the Medical
        10    Center, so I'm not going to say to them -- and I don't
        11    remember what I asked Mr. Pierce, but I'm not going to
        12    say to them how do you think our patient advocacy
        13    program is working because they would have no idea if
        14    they don't work here.  I might say to Mr. Pierce how
        15    do you think our patient advocacy program is working
        16    because he's a patient advocate at that time.

                                    10

17     Q.    How could you evaluate them both equally if
18     you're not asking them the same questions?
19     A.    When I interview somebody, I'm trying to get
20     an idea of what they would do if they were in the
21     position, how they would function, whether I think
22     they would be successful or not.  When somebody has a (p 9)

0010
1     working knowledge of the organization as opposed to
2     somebody who doesn't work here, I'd never get to that
3     result if I said, Well, I won't ask -- I mean I don't
4     know how I could ask exactly the same questions.  I
5     mean I try to ask -- if they were all -- I try to ask
6     the same questions, but I'm sure I need to modify them
7     a little bit when someone's an inside candidate and
8     knows how it works.  I still can evaluate whether I
9     think they'll be successful or not.
10     Q.    How can you evaluate the answers if they're
11     not given the same questions?
12     A.    That's why I get paid.  Because I can.
                                        (page 10)
----------
3     Q.   This person was from the outside.  Am I
4     correct?
5     A.    Outside this hospital, yes.
6     Q.    So tell me how she was a better qualified --
7     A.    Oh, I don't remember.  I don't remember.
8     What I do remember is, to be honest with you, that
9     after interviewing Mr. Pierce, I did not think he was
10     the candidate that I would want in that job.
11     Q.    Why not?
12     A.    Because I didn't think his answers to the
13     questions really showed insight into the program or
14     how the program could grow or how he would be a
15     successful leader in the program.
16     Q.    Did you ask her those questions, the outside
17     candidate?
18     A.    I'm sure I did.
19     Q.    But how could she know about a program that
20     she never worked at?
21     A.    Well, she would know in general about a
22     patient advocacy program.  So I could certainly say if
1     you took over the program next month, how would you
2     approach it, the same question I asked Mr. Pierce.
3     Q.    Hadn't Mr. Pierce served in an acting
4     capacity in that position?
5     A.    I don't remember if he had, to tell you the
6     truth.  I don't remember.
7     Q.    Wouldn't the best way to judge whether or
8     not he could be successful in that program would be to
9     look at how he did in the program when he was in the
10     acting position?

11

```
11      A.   Well, that wasn't -- again, I wasn't the
12 selecting official.  I was interviewing the candidates
13 and I was asking them questions and getting their
14 answers.
15      Q.   Did you even consider the fact that he had
16 been in the acting position in that capacity?
17      A.   I wasn't the selecting official.
18      Q.   But you stated under oath already that you
19 believe this other person was the best candidate --
20      A.   Right.
21      Q.   -- based on what she told you and how she
22 answered your questions; is that correct?
```

0014

```
1      A.   Yes.  But again, number one, I wasn't the
2 selecting official.
3           Number two, the person who oversaw that
4 program felt that Mr. Pierce in his acting role maybe
5 wasn't the best candidate for the program, so she made
6 the selection.
```

```
17     Q.   What I'm asking you, and I'm trying to be
18 real specific about this, in your evaluation of the
19 candidates, did you consider his tenure in the acting
20 position?
21     A.   I don't remember. (p. 14)
```

```
1      Q.   What conversation did you have with Ms. Ross
2 about the two candidates, my client and the outside
3 candidate?
4      A.   After the interviews I discussed the
5 interviews with her.
6      Q.   You stated earlier in part of your answer
7 that the selecting official who you've now identified
8 as Ms. Ross considered his tenure in the acting
9 capacity; is that correct?
10     A.   I'm not sure I said that.  I said I'm sure
11 she did, but I mean I know -- and I'm just trying to
12 think from memory.  I know that she was not happy with
13 Mr. Pierce's performance or did not feel that he would
14 make a successful lead advocate director, whatever
15 position title it was, and after the interview I
16 chatted with her about my interviews.
17     Q.   What exactly did she tell you as it relates
18 to the evaluation of my client?
19     A.   I don't remember exactly.  I know she had
20 concern that he was -- that he would be the right
21 person for the position.  I don't remember any details
22 about it.
```

p. 16

```
       Q.   Did he apply for the position?
6      A.   I don't remember how it was done.
7      Q.   If there's a vacancy announcement, doesn't a
```

12

       8  person have to apply for the position in order to be
       9  considered?
      10      A.   I'm sure it was done legally.  I don't
      11  remember whether we reannounced and he applied or we
      12  just moved him back in or he was at that grade and had
      13  been in there.  I think under those circumstances we
      14  probably have authority to just move him back in, but
      15  I honestly don't remember how it was.
      16      Q.   Who was the person who actually moved him
      17  back in?  Were you the person that made that decision?
      18      A.   I made the ultimate decision to move him
      19  back in, yeah, but it was at the recommendation of,
      20  I'm sure, Terry and David West, my associate, and
      21  people felt this would be a good move now. P. 20


   Q.   For the third position you were the final --
       6  you were the selecting official for the third
       7  position?
       8      A.   I don't know if I was the selecting
       9  official.  Probably not the selecting official.  But I
      10  certainly knew what was going on and said that's okay
      11  with me if we go ahead and do that.
      12      Q.   So to place Mr. Sivley in that position?
      13      A.   Or in this case Mr. Sivley in that position,
      14  right.
      15      Q.   Excuse me.  Mr. Sivley in the position?
      16      A.   Right.
(P. 32)

---

## Deposition of Terry Ross

       2      Q.   What happened when Bill Sivley came back
       3  from the military?
       4      A.   He requested to go on detail in fiscal
       5  service.
       6      Q.   Now, when he left, was his position as lead
       7  patient advocate, was it terminated?
       8      A.   No.
       9      Q.   When you say that he came back and he
      10  requested to go on a detail, was that request in
      11  writing?
      12      A.   I don't recall.
      13      Q.   Was there paperwork that had to happen in
      14  order for him to be detailed?
      15      A.   I don't recall.
      16      Q.   Do you remember signing any paperwork for
      17  him to be detailed?
      18      A.   I don't recall.
      19      Q.   Is it your understanding as a manager that
      20  in order to detail one of your subordinate employees,

13

```
        21      that you have to sign paperwork to have them detailed?
        22          A.   I don't know.
                                  (p.10)
0011
        1           Q.   Then how do you know he was detailed?
        2           A.   Because he did request it.
        3           Q.   Did you ever see any paperwork?
        4           A.   I don't recall.
        5           Q.   So if you don't recall seeing paperwork, how
        6       do you know for a fact that he was, in fact, detailed?
        7           A.   Because when he came back from military
        8       leave, he was detailed to fiscal service.
        9           Q.   Who detailed him?
        10          A.   The Medical Center.  He was detailed.
        11          Q.   Who was his supervisor?
        12          A.   I was his supervisor.
        13          Q.   And you don't remember signing any paperwork
        14      to detail him?
        15          A.   I don't recall.
        16          Q.   How long was the detail supposed to be for?
        17          A.   I don't recall.
        18          Q.   At some point that lead advocate position,
        19      it changed, didn't it?
        20          A.   No, not that I'm aware of.
        21          Q.   They didn't call it something else?
        22          A.   No.

0012
        1           Q.   Was there a job announcement?
        2           A.   For?
        3           Q.   For the lead advocate position.
        4           A.   No.
        5           Q.   Did you ever send an e-mail stating
        6       management had made a decision to abolish the lead
        7       advocate patient position?
        8           A.   I don't recall.
        9           Q.   Do you ever remember that position being
        10      changed from lead advocate patient position to a
        11      director of Office of Patient Advocacy?
        12          A.   No.
        13          Q.   Do you remember sending an e-mail regarding
        14      that?
        15          A.   Regarding what?
        16          Q.   That management had made a decision to
        17      abolish the lead patient advocate position and you
        18      were to recruit for director of patient office
        19      advocacy at the GS-13 level?
        20          A.   Yes, I do recall that.
        21          Q.   Who did you mean by management?
        22          A.   The Medical Center leadership.
0013
        1           Q.   So that position of lead patient advocate
        2       was abolished?
```

14

```
 3          A.    No, it was not.
 4          Q.    Was the director of Office of Patient
 5    Advocacy, was there a position opened up for that
 6    position?
 7          A.    We did establish a position for that.  Yes,
 8    it was classified.
 9          Q.    Okay.  Now, let's talk about the first time
10    that it was advertised.  What involvement did you have
11    in the first time that that position was advertised?
12          A.    What position?
13          Q.    The director of Office of Patient Advocacy.
14          A.    I requested that it be advertised.
15          Q.    Did anyone apply for it?
16          A.    I was told by Human Resources that they did
17    receive an application and the person who applied did
18    not qualify.  I never received a certification on it,
19    a cert, whatever you call it.
20          Q.    Did they tell you why he didn't qualify?
21          A.    They didn't tell me who it was or why the
22    person didn't qualify.
```

```
------------------
8      Q.    Okay.  So after you were told that the
       9     person didn't qualify, what happened then?  Did you
       10    readvertise the position?
       11        A.    We readvertised the position.
       12        Q.    Okay.  Did you get applications for that
       13    second position?
       14        A.    There were six qualified applicants and I
       15    received the cert for those six qualified applicants.
       16        Q.    Did my client make the cert?
       17        A.    Yes.
       18        Q.    And was there an interview process that took
       19    place for those six applicants?
       20        A.    There was a rating and ranking panel that
       21    was devised, and they did do an interviewing process
       22    and made recommendations for a second interview.
0015
       1         Q.    Were you on that panel?
       2         A.    No.
       3         Q.    Were you the selecting official?
       4         A.    Yes.
       5         Q.    So how many people made it to the second
       6     interview phase?
       7         A.    Two.
       8         Q.    And who were those persons?
       9         A.    One was Keith Pierce and the other one was a
       10    woman from the Buffalo VA Medical Center.
       11        Q.    Did you interview both those individuals?
       12        A.    I did.
```

```
0016
       1         Q.    What did you write it on?
       2         A.    On the piece of paper that I had the
       3     questions.
       4         Q.    Did you also use a notepad?
       5         A.    No.
       6         Q.    Did you have a conversation with the
       7     candidates -- about your thoughts of the candidates
       8     with anyone after the interview process?
       9         A.    I don't recall.
       10        Q.    Did you ever speak with Mr. Garfunkel?
       11        A.    About what?
       12        Q.    About the candidates and your thoughts.
       13        A.    Yes.
       14        Q.    Tell me about that conversation.
       15        A.    He asked me what I thought about the
       16    interviews during my interviews, and I told him that I
       17    felt that Keith Pierce did not show any evidence of
       18    running a major program, nor did he show any evidence
       19    to me of using any kind of graphs and charts, and I
       20    also explained that the other person who we
```

16

```
        21      interviewed showed evidence of both.
        22          Q.    Did you read his application?
0017
         1          A.    His application for?
         2          Q.    His application for the position.
         3          A.    Absolutely.
         4          Q.    Were you aware that he held this position
         5      before?
         6          A.    What position is that?
         7          Q.    That he held an acting lead advocate
         8      position before?
         9          A.    This wasn't a position for an acting lead
        10      patient advocate.
        11          Q.    My question is simple.  Were you aware that
        12      he had held an acting lead advocate position before?
        13          A.    No.
        14          Q.    So you don't remember reading that in his
        15      application?
        16          A.    I don't recall.
```

```
19          Q.    Do you ever remember seeing any
        20      documentation that my client was entitled to veteran's
        21      preference?
        22          A.    Yes.
0023
         1          Q.    10-point veteran preference?
         2          A.    I don't remember what the point is.
         3          Q.    Was the other person a veteran?
         4          A.    I don't recall.
         5          Q.    At some point you were given a certificate
         6      of eligible candidates for the position.  Do you
         7      remember receiving that?
         8          A.    The second time that it was posted, yes.
         9          Q.    Did you ever notice my client's name on that
        10      list?
        11          A.    It was.
        12          Q.    Did you ever make any comments to him
        13      regarding him being on the list?
        14          A.    I don't recall.
        15          Q.    Do you recall whether or not you told him
        16      that it would be very difficult for him to get the
        17      position because of the other candidates?
        18          A.    I don't recall.
        19          Q.    Does that mean you might have said it, you
        20      just don't remember at this time?
        21          A.    It means I don't recall.
```

```
22          Q.    What happened when the other person was
```

17

0024
```
      1   selected?  Did they take the position?
      2        A.    Tell me when you're talking about.  When are
      3   you talking about?
      4        Q.    You said that you selected the person --
      5   there were two people that were interviewed.
      6        A.    You're talking about for the second posting.
      7        Q.    That's correct.
      8        A.    Okay.
      9        Q.    We haven't got to the third yet.
     10        A.    Okay.
     11        Q.    You selected that other person over my
     12   client; is that correct?
     13        A.    That's correct.
     14        Q.    Did that person take the position?
     15        A.    No.
     16        Q.    Was that position then offered to my client?
     17        A.    No.
     18        Q.    Why not?
     19        A.    He was not qualified in my mind because of
     20   the fact that he did not show any evidence at all of
     21   running a major program, nor did he show any evidence
     22   of being able to use graphs and charts.

      5        Q.   Were you aware that he was on the national
      6   board of patient advocates that's a national
      7   organization?  Were you aware of that?
      8        A.    Yes.
      9        Q.    Were you aware that he was a national
     10   speaker regarding patient advocacy across the country
     11   during this same time period?
     12        A.    I was aware that he made a speech at a
     13   conference, yes.
     14        Q.    You stated earlier that there was a list of
     15   eligible candidates and they got whittled down to two
     16   people; correct?
     17        A.    There was a cert that was provided to me.
     18   It was six candidates, qualified candidates, and a
     19   rating and ranking panel evaluated them and
     20   recommended two people.
     21        Q.    Okay.  So let me make sure I've got this
     22   straight in layman's terms.  A person, a group of
```

18

0026
```
 1    individuals applies for this second position.
 2    Personnel or Human Resources made an evaluation of who
 3    made the certification list to say they were qualified
 4    for the position.  Am I correct so far?
 5         A.   Yes.
 6         Q.   You were given a list of the six people who
 7    made the certification list.  Am I correct?
 8         A.   Correct.
 9         Q.   Some other panel that you didn't sit on
10    looked at these individuals and made a recommendation
11    for two candidates from that list to be interviewed;
12    is that correct?
13         A.   They did evaluate the six candidates and
14    they recommended two candidates for second interviews,
15    yes.
16         Q.   You chose one of these two candidates who
17    was not my client; correct?
18         A.   Yes.
19         Q.   This person turned down the position?
20         A.   Yes.
21         Q.   And you didn't hire my client for the
22    position because he wasn't qualified?
```
0027
```
 1         A.   Correct.
 2         Q.   Did the Human Resources office miss
 3    something about him not being qualified?  Did they
 4    miss something?
 5              MR. SHOAIBI:  Objection, speculative.
 6         A.   I don't know.
 7         Q.   When you sent down the vacancy announcement,
 8    was there some -- let me ask it this way.
 9              When you sent down the vacancy announcement,
10    did you have a criteria of what the people needed in
11    order to be qualified for the position?
12         A.   I provided to Human Resources criteria, yes.
13         Q.   And based on the criteria you provided, my
14    client made that certification list; correct?
15         A.   Yes, that's correct.
16         Q.   Who provided the criteria for this panel?
17    Did you impanel the people?
18         A.   I had the -- I appointed the chair of the
19    rating and ranking panel and she chose the panelists.
20         Q.   And did you give them criteria on what they
21    needed to look for?
22         A.   They established their own criteria.  I mean
```

19

0028
```
 1   they based it off of the position description and what
 2   is just the -- I don't remember what they're called,
 3   whatever, I guess functional statements or something
 4   like that for HR.  They did read the position
 5   description.
 6        Q.   Okay.  And the information that you provided
 7   initially to --
 8        A.   HR.
 9        Q.   -- HR.
10        A.   Correct.
```

p.28
```
 4        Q.   Were you aware of my client's prior
 5   performance evaluations?
 6        A.   No.
 7        Q.   You didn't look at them in the packet?
 8        A.   His --
 9        Q.   His performance evaluations.
10        A.   Whatever was in his packet I was familiar
11   with.
12        Q.   Were you familiar with whether or not he had
13   an outstanding?
14        A.   I don't recall.
15        Q.   Would it surprise you that he had an
16   outstanding performance evaluation?
17        A.   No, it would not surprise me.
18        Q.   Let's go to the third position.  So you
19   didn't want my client, you didn't believe he was
20   qualified, so you readvertised the position again.  Is
21   that correct?
22        A.   That's correct.
```

P 29
```
 1   Q.   Okay.  And how many people applied for this
 2   position?
 3        A.   We cancelled the position before any
 4   applicants that I know of submitted any.  And if there
 5   were any, HR did not inform me about it.
 6        Q.   Why did you cancel the position?
 7        A.   Because the person who was in the lead
 8   patient advocate position decided that he no longer
 9   wanted to be detailed to fiscal service and wanted to
10   come back and work full-time in the patient advocate
11   office and wanted to broaden his horizons and start
12   doing some graphs and charts that we needed to be
13   done.
14        Q.   So start doing some graphs and charts.
15        A.   Right.
16        Q.   So he was going to learn to do them?
```
20

```
        17        A.   Correct.  Apply his current knowledge and
        18   then go onward and forward.
        19        Q.   So it's not something he had done in the
        20   past.
        21        A.   Correct.
        22        Q.   Okay.  Why wasn't my client given this same
0031
         1   opportunity to do these more graphs and charts?
         2        A.   There wasn't a need for it.
         3        Q.   Wait a minute.  I want to make sure I've got
         4   this clear on the record.  You stated two things.  Let
         5   me make sure I've got it correctly.  You said that the
         6   lead patient advocate position didn't have anything to
         7   do with this director position.  Do you remember
         8   saying that?
         9        A.   I do remember saying that they have nothing
        10   to do with each other.  That's correct.
        11        Q.   Okay.  Do you also remember stating that
        12   what you were looking for, for this director position
        13   was a person that could do graphs and charts and that
        14   was the reason that you selected the other person over
        15   my client?
        16        A.   That was one of the reasons.  That was one
        17   of the reasons that I wanted to have that position
        18   filled.  That's correct.
        19        Q.   Okay.  So you don't select my client.
        20   Strike that.  Let me make sure if I've got this
        21   correct.
        22             You select another person.  They decline the
0032
         1   job.  Am I correct?
         2        A.   That's correct.
         3        Q.   Instead of selecting my client you
         4   reannounce the position.
         5        A.   That's correct.

        17        Q.   Going back to the second position, and by
        18   second position I mean the second position that we
        19   talked about.  The female candidate that was selected
        20   for that position, did you ever speak to her prior to
        21   the interview?
        22        A.   I don't recall. (p.34)

         1        Q.   Did you receive a copy of her packet from
         2   her prior to it going to HR?
         3        A.   I don't recall. (p.35)

         5        Q.   Going back to the second position, what
         6   patient advocate experience did the person that you
         7   selected for that position, what patient advocacy
         8   experience did she have?
         9        A.   I don't recall.
        10        Q.   Do you ever recall receiving a letter from
```

21

```
11   her stating that she has no patient advocacy
12   experience?
13        A.   No, I don't recall. (p.36)
```

```
1    Q.   How did he get that position?
2         A.   Bill was already in an encumbered position
3    called the lead patient advocate position and he just
4    assumed his responsibilities.
5         Q.   Was that position ever abolished?
6         A.   No.
7              MR. BELL:  We can go off for a minute.
8              (Off the record.)
9              (Ross Exhibit Number 1 was marked for
10   identification and was attached to the transcript.)
11   BY MR. BELL:
12        Q.   You've just been handed a copy of what we've
13   marked as Ross 1.  Can you take a look at that
14   document and tell me if you've ever seen that document
15   before.
16        A.   Yes, I've seen this document.
17        Q.   Can you tell for the record what that
18   document is?
19        A.   This is an e-mail that I sent to Keith
20   Pierce with a cc to his supervisor, Michelle Spivak,
21   on January 23, 2004, entitled "Request to be Detailed
```

```
0038
1         Q.   Can you tell me what you mean in the
2    second -- can you read the second sentence for me?
3         A.   (Reading):  As I mentioned in our patient
4    advocate meeting this week, management has decided to
5    abolish that position and begin recruitment for a
6    Director, Office of Patient Advocacy, at the GS-13
7    level.
8         Q.   So was that position abolished?
9         A.   No, it was not.
10        Q.   Why did you tell my client that management
11   decided to abolish that position?
12        A.   Because that's what we decided to do.
13        Q.   When did you decide?
14        A.   As of January 23rd we made that decision.
15        Q.   To abolish the position?
16        A.   To abolish the position.
17        Q.   Okay.
18        A.   It never occurred.
19        Q.   But you began recruitment for the director
20   of Office of Patient Advocacy.
21        A.   That's correct.
```

Additionally, if the employer articulates a legitimate, nondiscriminatory reason for the adverse employment action, then the burden of proof shifts to the plaintiff to prove that employer's reason was merely pretext for discrimination. *Milliner v. District of Columbia*, 932 F.Supp. 345, 351 (D.D.C.,1996).  If the defendant satisfies this burden of production, the burden of proof rests on plaintiff to prove that the employer's reason was merely a pretext for discrimination. *Id.*  However, once if plaintiff produced evidence that the defendant's articulated non-discriminatory reason is a pretext, discrimination is founded.

## CONCLUSION

For all of the compelling aforementioned reasons and under the controlling precedent governing the causes of action outlined in complaint, Plaintiff respectfully asks this Honorable Court to deny Defendant  Motion for Summary Judgment.

Respectfully Submitted,

_____
Jimmy A. Bell, Esq.
Law Office of Jimmy A. Bell, P.C.
9610 Marlboro Pike
Upper Marlboro, Maryland 20772
Telephone: (301) 599-7620
Fax: (301) 599-7623
Bar # MD 14639