0001

```
 1                  UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF COLUMBIA
 3      -------------------------------x
                                       :
 4      KEITH PIERCE                   :
                                       :
 5                      Plaintiff      :
                                       :
 6            v.                       :    Civil Action No.
                                       :
 7      R. JAMES NICHOLSON, Secretary, :    05-1989 (RMU)
                                       :
 8      U.S. Department of Veterans    :
                                       :
 9      Affairs                        :
                                       :
10                      Defendant      :
                                       :
11      -------------------------------x
12            30(b)(6) Deposition of SANFORD GARFUNKEL
13                      Washington, D.C.
14             Wednesday, January 17, 2007
15                      11:30 a.m.
16      Job No:  1-95097
17      Pages 1 - 38
18      Reported by:  Donna Q. Buckhaults
19
20
21
22
```

0002

```
 1                30(b)(6) Deposition of SANFORD GARFUNKEL,
 2          held at the offices of:
 3
 4                VA MEDICAL CENTER
 5                50 Irving Street, Northwest
 6                Room 1B105
 7                Washington, D.C.  20422
 8                (202) 745-8000
 9
10
11                Pursuant to agreement, before Donna Q.
12          Buckhaults, Registered Professional Reporter and
13          Notary Public of the District of Columbia.
14
15
16
17
18
19
20
21
22
```

0003
```
  1                    A P P E A R A N C E S
  2      ON BEHALF OF THE PLAINTIFF:
  3           JIMMY A. BELL, ESQUIRE
  4           LAW OFFICE OF JIMMY A. BELL, P.C.
  5           9610 Marlboro Pike
  6           Upper Marlboro, Maryland  20772
  7           (301) 599-7620
  8
  9      ON BEHALF OF THE DEFENDANT:
 10           ALEXANDER D. SHOAIBI, ESQUIRE
 11           U.S. ATTORNEY'S OFFICE
 12           555 Fourth Street, Northwest
 13           Washington, D.C.  20001
 14           (202) 514-7236
 15
 16           CAROL BORDEN, ESQUIRE
 17           U.S. DEPARTMENT OF VETERANS AFFAIRS
 18           1722 I Street, Northwest
 19           Washington, D.C.  20421
 20           (202) 412-0080
 21
 22        ALSO PRESENT:  Keith Pierce
```

0004
```
 1                   C O N T E N T S
 2   EXAMINATION OF SANFORD GARFUNKEL              PAGE
 3        By Mr. Bell                                5
 4
 5
 6                   E X H I B I T S
 7                      (None)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

```
0005
           1                    P R O C E E D I N G S
           2                    SANFORD GARFUNKEL
           3          having been duly sworn, testified as follows:
           4              EXAMINATION BY COUNSEL FOR THE PLAINTIFF
           5     BY MR. BELL:
           6          Q.    Good morning.
           7          A.    Good morning.
           8          Q.    Have you ever had your deposition taken
           9     before?
          10          A.    Yes.
          11          Q.    I just want to remind you of a couple of
          12     rules.  We try not to talk over each other.  Sometimes
          13     I may ask a question that you may think that you know
          14     what I'm trying to ask, but just let me get the
          15     question out.
          16                Can you state your name for the record?
          17          A.    Sanford M. Garfunkel.
          18          Q.    Can you state your job title?
          19          A.    Medical Center Director, VA Medical Center,
          20     Washington, D.C.
          21          Q.    How long have you been in that position?
          22          A.    1995.  I want to say April 1995.
```

0006

```
 1        Q.    What position did you hold prior to that?
 2        A.    I was the Associate Chief Medical Director
 3  for Operations for the VA.
 4        Q.    And how long were you in that position?
 5        A.    Four years.
 6        Q.    What position did you hold before that?
 7        A.    I was the Medical Center Director at the VA
 8  in New York City.
 9        Q.    How long have you known my client,
10  Mr. Pierce?
11        A.    I guess as long as I'm here.  I can't swear
12  he was here when I got here, but whenever he got here.
13  It's been years.
14        Q.    Prior to this EEO case that we're here to
15  deal with today, did you ever become aware of any
16  prior EEO complaints that he had made?
17        A.    Yes.  I'm aware that he had won a case, a
18  settlement.  I don't even know how it was resolved,
19  but I'm aware he had filed and won a case.
20        Q.    How did you become aware of that?
21        A.    I'm the director.  I know what goes on in
22  the Medical Center.  It's my job.
```

0007
```
 1          Q.    Do you know what the circumstances was
 2    regarding that case?
 3          A.    I'm sure at some point I did, but I honestly
 4    have absolutely no recollection of it right now.
 5          Q.    What role did you take place -- strike that.
 6                Did you take any role whatsoever in the
 7    selection of the positions that my client applied for?
 8                MR. SHOAIBI:  Objection.  Which position?
 9          Maybe I misheard your question.
10                MR. BELL:  I said did you take -- any of the
11          positions.
12                MR. SHOAIBI:  Any of the positions.
13                MR. BELL:  Yes.
14                MR. SHOAIBI:  During what period?
15                MR. BELL:  There was only three positions as
16          far as at least the 30(b)(6) was concerned.  At
17          least that's my understanding.  Am I correct?
18                MR. SHOAIBI:  I never saw a 30(b)(6) notice.
19          Was there one?
20                MR. BELL:  When we spoke about it --
21                MR. SHOAIBI:  Okay.
22                MR. BELL:  -- and you guys produced this
```

0008
```
 1        person and the next person we're going to take a
 2        deposition of as a result of those conversations.
 3             MR. SHOAIBI:  I want to clarify your
 4        question.  The question is, the three positions
 5        that he applied for with regard to this lawsuit?
 6             MR. BELL:  That's correct.
 7             MR. SHOAIBI:  Go ahead.
 8    A.   What's the question?
 9             MR. BELL:  Can you read back the question?
10             (Record read by reporter as follows:
11    Question:  Did you take any role whatsoever in the
12    selection of the positions that my client applied
13    for?)
14    A.   I did at some point interview Mr. Pierce.
15    Q.   And why was Mr. Pierce interviewed?
16    A.   He was a candidate for the job.
17    Q.   Did you ask Mr. Pierce the same questions
18    that you asked the other interviewees?
19    A.   I'm sure I did.  I don't recall.  You know,
20    I don't recall.  I generally do because it's good form
21    to do that.  In Mr. Pierce's case he was an inside
22    candidate, the other was an outside candidate, so I
```

0009
```
 1  might have asked a little bit different because he was
 2  familiar with how that section worked and how the
 3  hospital worked.  But I generally try to ask the same
 4  questions.
 5      Q.   You said he was more familiar with how the
 6  hospital worked.  Can you explain what you mean by
 7  that?
 8      A.   Well, if I'm interviewing -- take this case.
 9  I'm interviewing somebody from outside the Medical
10  Center, so I'm not going to say to them -- and I don't
11  remember what I asked Mr. Pierce, but I'm not going to
12  say to them how do you think our patient advocacy
13  program is working because they would have no idea if
14  they don't work here.  I might say to Mr. Pierce how
15  do you think our patient advocacy program is working
16  because he's a patient advocate at that time.
17      Q.   How could you evaluate them both equally if
18  you're not asking them the same questions?
19      A.   When I interview somebody, I'm trying to get
20  an idea of what they would do if they were in the
21  position, how they would function, whether I think
22  they would be successful or not.  When somebody has a
```

0010

```
 1   working knowledge of the organization as opposed to
 2   somebody who doesn't work here, I'd never get to that
 3   result if I said, Well, I won't ask -- I mean I don't
 4   know how I could ask exactly the same questions.  I
 5   mean I try to ask -- if they were all -- I try to ask
 6   the same questions, but I'm sure I need to modify them
 7   a little bit when someone's an inside candidate and
 8   knows how it works.  I still can evaluate whether I
 9   think they'll be successful or not.
10        Q.   How can you evaluate the answers if they're
11   not given the same questions?
12        A.   That's why I get paid.  Because I can.
13        Q.   Tell me on what -- how do you evaluate them?
14   What criteria do you use?
15        A.   I use the criteria of -- the same as I would
16   if I asked them the same questions.  I use the
17   criteria of whether I think their answers would lead
18   to a successful program.
19        Q.   Did you have written questions for --
20        A.   I'm sure I did, yeah.  I'm sure I did.  What
21   I generally will do is have written questions and ask
22   everybody the same questions and then, you know,
```

0011
```
 1   sometimes a couple of others.  But in this case when
 2   there's an inside candidate and an outside candidate,
 3   I mean for me to ask exactly the same questions and
 4   only exactly the same questions to me wouldn't make
 5   sense.
 6        Q.   Who was selected for the position?
 7        A.   Eventually?  Eventually Mr. Sivley was put
 8   in the position.
 9        Q.   You said there was an inside candidate and
10   there was an outside candidate.
11        A.   Oh, I'm sorry.  Well, at that time there was
12   an outside candidate from -- I forget where she was
13   from, but she was selected and then declined the
14   position.
15        Q.   And why was she selected over Mr. Pierce?
16        A.   Because we felt that she was a better
17   candidate for the job.
18        Q.   Based on what?
19        A.   Well, I wasn't the selecting official.  But
20   certainly based on my interview of both candidates,
21   she seemed to have a good approach to the position, a
22   better approach than Mr. Pierce, and so I was
```

0012
```
 1    supportive of the selecting official in saying we
 2    ought to be selecting the other individual.
 3         Q.   This person was from the outside.  Am I
 4    correct?
 5         A.   Outside this hospital, yes.
 6         Q.   So tell me how she was a better qualified --
 7         A.   Oh, I don't remember.  I don't remember.
 8    What I do remember is, to be honest with you, that
 9    after interviewing Mr. Pierce, I did not think he was
10    the candidate that I would want in that job.
11         Q.   Why not?
12         A.   Because I didn't think his answers to the
13    questions really showed insight into the program or
14    how the program could grow or how he would be a
15    successful leader in the program.
16         Q.   Did you ask her those questions, the outside
17    candidate?
18         A.   I'm sure I did.
19         Q.   But how could she know about a program that
20    she never worked at?
21         A.   Well, she would know in general about a
22    patient advocacy program.  So I could certainly say if
```

0013
```
 1    you took over the program next month, how would you
 2    approach it, the same question I asked Mr. Pierce.
 3        Q.   Hadn't Mr. Pierce served in an acting
 4    capacity in that position?
 5        A.   I don't remember if he had, to tell you the
 6    truth.  I don't remember.
 7        Q.   Wouldn't the best way to judge whether or
 8    not he could be successful in that program would be to
 9    look at how he did in the program when he was in the
10    acting position?
11        A.   Well, that wasn't -- again, I wasn't the
12    selecting official.  I was interviewing the candidates
13    and I was asking them questions and getting their
14    answers.
15        Q.   Did you even consider the fact that he had
16    been in the acting position in that capacity?
17        A.   I wasn't the selecting official.
18        Q.   But you stated under oath already that you
19    believe this other person was the best candidate --
20        A.   Right.
21        Q.   -- based on what she told you and how she
22    answered your questions; is that correct?
```

0014

```
 1        A.    Yes.  But again, number one, I wasn't the
 2   selecting official.
 3            Number two, the person who oversaw that
 4   program felt that Mr. Pierce in his acting role maybe
 5   wasn't the best candidate for the program, so she made
 6   the selection.
 7        Q.   What I'm trying to find out is you in your
 8   consideration because you just testified you believe
 9   this person was the best based on the fact that she
10   answered the questions you asked which you've admitted
11   were different than Mr. Pierce's.  Am I correct?
12        A.   Well, they were somewhat modified, I'm sure.
13   But the example I just gave you, you know, which was
14   the key question, what would you do if you took over,
15   was the same.  I would expect to get a good answer to
16   a question like that.
17        Q.   What I'm asking you, and I'm trying to be
18   real specific about this, in your evaluation of the
19   candidates, did you consider his tenure in the acting
20   position?
21        A.   I don't remember.
22            MR. SHOAIBI:  He's already answered the
```

0015

```
 1          question.
 2          A.   I don't remember, and it wasn't -- I mean I
 3     was interviewing the candidates.
 4               MR. SHOAIBI:  You've already answered the
 5          question.
 6               MR. BELL:  Excuse me.  The only objections
 7          you can make is objection to the form.  You
 8          cannot make speaking objections.  In the event
 9          you continue to make speaking objections because
10          I've let them go a couple of times, we can
11          discontinue this and we can file a motion with
12          the Court, if you want, and if you won't comply
13          with the rules.
14               MR. SHOAIBI:  I'll continue to object as
15          I've objected in depositions for twenty years as
16          a lawyer.  And if you want to call the Court, I'm
17          happy to participate in that phone call.  But,
18          you know, all I said was simply asked and
19          answered, go on.
20     BY MR. BELL:
21          Q.   Who was the selecting official?
22          A.   Terry Ross.
```

0016

```
 1        Q.    What conversation did you have with Ms. Ross
 2   about the two candidates, my client and the outside
 3   candidate?
 4        A.    After the interviews I discussed the
 5   interviews with her.
 6        Q.    You stated earlier in part of your answer
 7   that the selecting official who you've now identified
 8   as Ms. Ross considered his tenure in the acting
 9   capacity; is that correct?
10        A.    I'm not sure I said that.  I said I'm sure
11   she did, but I mean I know -- and I'm just trying to
12   think from memory.  I know that she was not happy with
13   Mr. Pierce's performance or did not feel that he would
14   make a successful lead advocate director, whatever
15   position title it was, and after the interview I
16   chatted with her about my interviews.
17        Q.    What exactly did she tell you as it relates
18   to the evaluation of my client?
19        A.    I don't remember exactly.  I know she had
20   concern that he was -- that he would be the right
21   person for the position.  I don't remember any details
22   about it.
```

0017

```
 1          Q.    Let's go back to -- that's the job position
 2    that you actually participated in the interview.  Am I
 3    correct?  There's only one interview process that you
 4    participated in.  Am I correct?
 5          A.    I think so.  I think it was only one, yes.
 6          Q.    Are you familiar with the first time the job
 7    was advertised?
 8          A.    I know there's been three advertisements,
 9    but I don't -- I can't differentiate at this point
10    between which one.  I thought -- I guess I thought, if
11    I remember correctly, the first one Mr. Pierce did not
12    have enough time in grade and the second one is when
13    we had the two candidates.
14          Q.    The first -- let's take them one at a time.
15    The first one you said you didn't believe he had
16    enough time in grade?
17          A.    I think that's my memory.  I may be wrong,
18    but my recollection is he didn't have enough time in
19    grade.  He might have been like the only candidate and
20    didn't have time in grade, so we reannounced it.
21          Q.    Did that position also have a portion that
22    talked about disabilities?
```

0018

```
     1          A.    I don't remember however jobs are announced
     2   that are announced.
     3          Q.    Who would be a better person, Ms. Ross,
     4   regarding the cancellation?
     5          A.    I guess.
     6          Q.    Did you make the cancellation?
     7          A.    Personally?  No.
     8          Q.    Was the cancellation done at your direction?
     9          A.    I don't think so.
    10          Q.    Who would be the best person to tell me that
    11   question?
    12          A.    Terry Ross may know or somebody in Human
    13   Resources may know.
    14          Q.    Do you know why that position, the first
    15   position that was cancelled, why that position was
    16   opened up for a vacancy announcement?
    17          A.    I don't understand the question.
    18          Q.    That first position, there was a reason that
    19   a vacancy announcement came open.  Am I correct?
    20          A.    I guess, yeah.
    21          Q.    Was it because that Bill Sivley --
    22          A.    Sivley.
```

0019

1        Q.    -- Sivley had left?
2        A.    I guess so.  Yeah, that sounds right.  He
3    had gone on active duty.
4        Q.    And this position was terminated.  Am I
5    correct?
6        A.    I don't know what language you're using,
7    terminated.  What do you mean, terminated?
8        Q.    Do you remember any language from Ms. Ross
9    saying that the position had been terminated?
10       A.    No, I don't, but that doesn't mean it didn't
11   happen.  But I don't remember.  Terminated would be a
12   funny word for that position at this point.
13       Q.    Let's go to the third position.  What
14   involvement did you have in the third position?
15       A.    You're talking about where Mr. Sivley was
16   put back in the position?
17       Q.    Yes, that's right.
18       A.    He, as you know, had been on active duty.
19   He came back and we didn't know what we wanted to do.
20   He sort of indicated he would be just as happy trying
21   something else, so we tried him in something else.
22   And then after a while it seemed -- my recollection is

0020

```
 1    he didn't seem that happy in that new position and we
 2    still didn't have a head of the patient advocacy
 3    program, so we mutually said let's put Bill back in
 4    the position.
 5         Q.   Did he apply for the position?
 6         A.   I don't remember how it was done.
 7         Q.   If there's a vacancy announcement, doesn't a
 8    person have to apply for the position in order to be
 9    considered?
10         A.   I'm sure it was done legally.  I don't
11    remember whether we reannounced and he applied or we
12    just moved him back in or he was at that grade and had
13    been in there.  I think under those circumstances we
14    probably have authority to just move him back in, but
15    I honestly don't remember how it was.
16         Q.   Who was the person who actually moved him
17    back in?  Were you the person that made that decision?
18         A.   I made the ultimate decision to move him
19    back in, yeah, but it was at the recommendation of,
20    I'm sure, Terry and David West, my associate, and
21    people felt this would be a good move now.
22         Q.   So you don't recall whether or not he even
```

0021
```
 1    applied for the position?
 2         A.   You mean legally filled out an application?
 3    I don't know.
 4         Q.   Can you apply for a position without filling
 5    out an application?
 6         A.   Well, in this case, again, I think if he
 7    indicated he had a desire to go back in his position,
 8    I think we probably had authority to move him back in
 9    the position, yeah, so I don't know what happened.
10         Q.   Wasn't the position title changed?
11         A.   I don't know.
12         Q.   Wasn't it changed from a lead patient
13    advocate to something else?
14         A.   I don't know.  It may have been, but that
15    would just be a title change.  It wouldn't be a
16    substantive change in the position.
17         Q.   Wasn't there a grade change?
18         A.   I don't know.  I don't honestly know.
19         Q.   Would a grade change be a substantive change
20    in the position?
21         A.   No, not necessarily.  But I don't remember a
22    grade change at all, so I don't know.
```

0022
```
 1        Q.   Did you ever send Mr. Sivley written
 2   communication --
 3        A.   Sivley.
 4        Q.   Excuse me. -- Mr. Sivley written
 5   communication that his position as lead patient
 6   advocate was terminated and the organization would
 7   find him a comparable position when he returned from
 8   active duty?
 9        A.   I don't remember.
10        Q.   Have you ever asked any member of your staff
11   to create a position for a preselected individual?
12             MR. SHOAIBI:  Objection to the form of the
13        question.
14        A.   I don't think I have.  I'm very careful
15   about that.
16        Q.   In the last five years have you ever asked
17   any member of your staff to create a position for a
18   preselected individual?
19             MR. SHOAIBI:  Objection to the form of the
20        question.  What do you mean by a preselected
21        individual?
22             MR. BELL:  There's a question on the table.
```

0023

```
 1              MR. SHOAIBI:  And I'm asking for
 2       clarification of the question as the attorney.
 3              MR. BELL:  There's no clarification.  He can
 4       answer if he knows, if does know.  You can't --
 5       there we go again.  You can't ask a question that
 6       will lead or tend to give an answer to the
 7       deponent.
 8       A.   I don't think I have.  I will tell you
 9  because of our location there are times that I'll get
10  a call from our headquarters, and our headquarters
11  will say we have somebody we want to put out to your
12  Medical Center and we'll give you funding and we'll
13  give you a position, so there are times like that.
14  You know, seldom, but a couple of times where we've
15  had to do something like that.
16       Q.   Are those the only times?
17       A.   To the best of my knowledge, yeah.
18              MR. BELL:  Give me two minutes.  I'm almost
19       done.  Let's go off the record for two minutes.
20              (Brief recess.)
21  BY MR. BELL:
22       Q.   Let's go back to the second job position.
```

0024
```
 1    You said that there was another outside candidate who
 2    was selected for that position.  Was she a veteran?
 3         A.    I don't remember.
 4         Q.    Do you remember whether or not my client's
 5    veteran's preference was considered?
 6         A.    If -- I don't specifically.  If legally it
 7    had to be considered, I'm sure it was considered.
 8         Q.    Is it written down anywhere where his
 9    veteran's preference points were added to the
10    consideration?
11         A.    I don't know.
12         Q.    You stated earlier that you spoke with
13    Ms. Ross regarding my client's job performance.  Am I
14    correct?
15         A.    I think so, yeah.
16         Q.    And would you characterize her rating of my
17    client as less than satisfactory?
18         A.    Oh, I don't remember exactly what she said.
19    I know she had concern about promoting him to be the
20    lead patient advocate.  That's all I remember.
21         Q.    Did you know whether or not my client had an
22    outstanding evaluation?
```

0025

```
 1          A.   I'm sure I did, but I don't remember that.
 2          Q.   I'm trying to make sure I understand.  If
 3     you at the time knew that my client had an outstanding
 4     rating, how could he not be performing his job
 5     satisfactorily?
 6               MR. SHOAIBI:  Objection.  Did he say -- I'm
 7          sorry.  My objection is just to clarify.  I don't
 8          think I heard him say anything about an
 9          outstanding evaluation and you said I don't
10          understand as if he did say that.
11               MR. BELL:  Can you read back the transcript?
12          That will make it easier.
13               (Record read by reporter as follows:
14               Question:  Let's go back to the second job
15     position.  You said that there was another outside
16     candidate who was selected for that position.  Was she
17     a veteran?
18               Answer:  I don't remember.
19               Question:  Do you remember whether or not my
20     client's veteran's preference was considered?
21               Answer:  If -- I don't specifically.  If
22     legally it had to be considered, I'm sure it was
```

0026
```
 1   considered.
 2            Question:  Is it written down anywhere where
 3   his veteran's preference points were added to the
 4   consideration?
 5            Answer:  I don't know.
 6            Question:  You stated earlier that you spoke
 7   with Ms. Ross regarding my client's job performance.
 8   Am I correct?
 9            Answer:  I think so, yeah.
10            Question:  And would you characterize her
11   rating of my client as less than satisfactory?
12            Answer:  Oh, I don't remember exactly what
13   she said.  I know she had concern about promoting him
14   to be the lead patient advocate.  That's all I
15   remember.
16            Question:  Did you know whether or not my
17   client had an outstanding evaluation?
18            Answer:  I'm sure I did, but I don't
19   remember that.
20            Question:  I'm trying to make sure I
21   understand.  If you at the time knew that my client
22   had an outstanding rating, how could he not be
```

0027
```
 1    performing his job satisfactorily?)
 2         MR. SHOAIBI:  That's exactly what I said.
 3      The point that I made was proven by what she just
 4      read.  Thank you.
 5    BY MR. BELL:
 6      Q.   Did you read the evaluation?  Did you read
 7    all the documents that were submitted with the
 8    application process for the selection of the second
 9    position?
10      A.   I don't remember.  I wasn't the selecting
11    official.  And I know I interviewed the candidates and
12    gave my input to Ms. Ross what I thought, and that was
13    it.
14      Q.   But how could you give input without reading
15    all the documentation that they submitted as part of
16    their application process?
17      A.   I interviewed the candidates and gave input
18    what I thought based on the interviews.
19      Q.   So you didn't consider any written
20    documentation?
21      A.   I wasn't the selecting official.
22      Q.   Does that mean you didn't consider any --
```

0028
```
 1        A.   I don't remember exactly.  I remember the
 2   interviews and giving Ms. Ross my feedback on the
 3   interviews.
 4        Q.   Do you remember reading any written
 5   documentation?
 6             MR. SHOAIBI:  Objection, asked and answered.
 7        A.   I don't remember.
 8        Q.   Did you write any notes?
 9        A.   I might have.  I usually do.  But it was
10   years ago, so I'm sure I don't have them now.
11        Q.   Where would those notes be kept?
12        A.   I'm sorry?
13        Q.   Where would those notes usually be kept if
14   you wrote the notes?
15        A.   I keep them on a legal pad and hold on to
16   them usually until some short period of time after a
17   selection is made and then I throw them out.
18        Q.   Do you ever remember turning over those
19   notes to the EEO investigator?
20        A.   Well, I don't think -- I don't even remember
21   meeting the EEO investigator, to tell you the truth,
22   so I don't know.
```

0029
```
 1          Q.   You don't know if you met with the
 2     investigator or you don't know whether you turned --
 3          A.   I don't remember meeting with an EEO
 4     investigator on this.  If you say I did, I'm sure I
 5     did, but I have a busy schedule and I don't remember
 6     everyone I meet with.
 7          Q.   As a director, when someone has made an EEO
 8     complaint, is that something that is serious to you?
 9          A.   Of course.
10          Q.   Is that something that happens every day?
11          A.   No.
12          Q.   How frequently are you asked to be a witness
13     in an EEO case?
14          A.   Not very often.
15          Q.   Do you remember the point when you were
16     first contacted regarding this EEO case?
17          A.   No.
18          Q.   Do you remember if it was a long time after
19     the selection or a short time after the selection?
20          A.   No.
21          Q.   What is the reason that you take notes in
22     the selection process?
```

0030

```
 1          A.   Well, so I can review in my mind.  If I say,
 2    Gee, I don't remember what somebody said, I can take a
 3    look at it as part of the selection process.  Once the
 4    selection is made, I don't have much need for the
 5    notes.
 6          Q.   So you don't put them with the written
 7    questions?
 8          A.   Well, I have the questions.  And usually
 9    what I do is, I have the list of questions and then
10    I'll write the answers right underneath each question
11    and that's how I'll keep it.
12          Q.   And you'll have an additional notepad too?
13          A.   Probably not.  Usually I have it on a piece
14    of paper, a couple of pieces of paper.  Sometimes I'll
15    have a notepad.  It depends.  If I really get
16    prepared, if I have four or five candidates, usually
17    I'll have the questions typed out.  I'll duplicate
18    them so I have the paper for each one.  If it's just a
19    couple of candidates, I might just have the questions
20    written out and just write the answers on a yellow
21    pad.  It depends on how much time I have to prepare
22    and whether -- you know, how involved I am with the
```

0031
```
 1    process.
 2         Q.   In this case did you have the questions
 3    typed out?
 4         A.   I don't remember.  I do not remember.
 5         Q.   Did you have them written out?
 6         A.   I'm sure I had them written out because I
 7    make sure to write out the questions before I do that.
 8         Q.   Do you remember turning those written
 9    questions over to someone from EEO?
10         A.   I'll quote my friend here and say asked and
11    answered.  No, I don't.
12         Q.   Did you ever call any of the references
13    listed for my client on his application?
14         A.   Did I?
15         Q.   Yes.
16         A.   No.
17         Q.   Did you ever remember looking at his
18    application?
19         A.   No.  I'm not saying I didn't.  I just don't
20    remember.
21         Q.   Do you remember whether or not Bill
22    Sivley --
```

0032

```
 1          A.   Sivley.
 2          Q.   Excuse me. -- Bill Sivley was listed as a
 3     reference for my client for the position?
 4          A.   I don't know.
 5          Q.   For the third position you were the final --
 6     you were the selecting official for the third
 7     position?
 8          A.   I don't know if I was the selecting
 9     official.  Probably not the selecting official.  But I
10     certainly knew what was going on and said that's okay
11     with me if we go ahead and do that.
12          Q.   So to place Mr. Sivley in that position?
13          A.   Or in this case Mr. Sivley in that position,
14     right.
15          Q.   Excuse me.  Mr. Sivley in the position?
16          A.   Right.
17          Q.   Can you tell me how that process worked, how
18     you can place someone in a position that they didn't
19     apply for?
20          A.   I think we've been through this.  I don't
21     remember the exact process.  I'm sure HR said this was
22     a legitimate thing to do.  He was interested in the
```

0033
```
 1    position.  We put him in.  He may have applied.  I
 2    don't remember the mechanism by which he ended up in
 3    that position.
 4         Q.    Who is Michelle Spivak?
 5         A.    Spivak.
 6         Q.    Spivak.  Excuse me.
 7         A.    She's a public affairs person.
 8         Q.    What interaction did you have with
 9    Ms. Spivak?
10         A.    I don't know what you mean.
11         Q.    I mean what is your relationship with her
12    professionally?
13         A.    She is at that time -- well, she is sort of
14    at the same level as the patient advocate person.  She
15    worked at that time for Terry Ross who's no longer in
16    the position, but she worked with Terry Ross.  She now
17    works for another individual as does the lead patient
18    advocate.
19         Q.    Were you the person that brought her into
20    that position at that time?
21         A.    I don't remember whether at that time Terry
22    was here and it was under Terry or under -- or
```

0034

```
 1    independent of Terry.  I don't remember what the
 2    organization was.  It may have been directly under me
 3    at that time or under Terry.  I don't remember
 4    exactly.
 5         Q.    Do you remember whether or not she was
 6    brought in because you were not pleased with
 7    Mr. Sivley's performance?
 8         A.    I don't think so.  She's in a different
 9    position.  She's the Public Affairs person and he was
10    the lead patient advocate.
11         Q.    You don't ever remember saying that?
12         A.    I don't remember saying what?
13         Q.    That Ms. Spivak was brought in because you
14    were not happy with Bill Sivley's performance?
15         A.    No, I don't.
16         Q.    I have nothing further.
17              MR. SHOAIBI:  We'll read.
18              THE COURT REPORTER:  Would you like a copy
19         of this transcript, Mr. Shoaibi?
20              MR. SHOAIBI:  Please.
21              (Signature having not been waived, the
22    deposition of SANFORD GARFUNKEL was concluded at
```

0035

```
 1   12:07 p.m.)
 2
 3
 4                  ACKNOWLEDGMENT OF DEPONENT
 5           I, SANFORD GARFUNKEL, do hereby acknowledge
 6   that I have read and examined the foregoing testimony,
 7   and the same is a true, correct and complete
 8   transcription of the testimony given by me and any
 9   corrections appear on the attached Errata sheet signed
10   by me.
11
12   _____        _____
13          (DATE)                              (SIGNATURE)
14
15
16
17
18
19
20
21
22
```

0036
```
 1        CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
 2              I, Donna Q. Buckhaults, Registered
 3   Professional Reporter, the officer before whom the
 4   foregoing proceedings were taken, do hereby certify
 5   that the foregoing transcript is a true and correct
 6   record of the proceedings; that said proceedings were
 7   taken by me stenographically and thereafter reduced to
 8   typewriting under my supervision; and that I am
 9   neither counsel for, related to, nor employed by any
10   of the parties to this case and have no interest,
11   financial or otherwise, in its outcome.
12              IN WITNESS WHEREOF, I have hereunto set my
13   hand and affixed my notarial seal this 23rd day of
14   January, 2007.
15
16   My commission expires:
17   October 14, 2008
18
19   _____
20   NOTARY PUBLIC IN AND FOR THE
21   DISTRICT OF COLUMBIA
22
```

0037

```
 1                        E R R A T A   S H E E T
 2      IN RE:  Pierce v. .Nicholson
 3   RETURN BY: _____
 4   PAGE      LINE              CORRECTION AND REASON
 5   _____    _____    _____
 6   _____    _____    _____
 7   _____    _____    _____
 8   _____    _____    _____
 9   _____    _____    _____
10   _____    _____    _____
11   _____    _____    _____
12   _____    _____    _____
13   _____    _____    _____
14   _____    _____    _____
15   _____    _____    _____
16   _____    _____    _____
17   _____    _____    _____
18   _____    _____    _____
19   _____    _____    _____
20   _____    _____    _____
21   _____    _____
22      (DATE)                    (SIGNATURE)
```

```
0038
     1                        E R R A T A   S H E E T
     2      IN RE:  Pierce v. .Nicholson
     3    RETURN BY:  _____
     4    PAGE      LINE              CORRECTION AND REASON
     5    _____    _____    _____
     6    _____    _____    _____
     7    _____    _____    _____
     8    _____    _____    _____
     9    _____    _____    _____
    10    _____    _____    _____
    11    _____    _____    _____
    12    _____    _____    _____
    13    _____    _____    _____
    14    _____    _____    _____
    15    _____    _____    _____
    16    _____    _____    _____
    17    _____    _____    _____
    18    _____    _____    _____
    19    _____    _____    _____
    20    _____    _____    _____
    21    _____    _____
    22      (DATE)                      (SIGNATURE)
```