**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **KEITH PIERCE** | : | |
| | : | |
| | : | |
| Plaintiff | : | **Civil Action No.** 05-01989 (RMU) |
| v. | : | |
| | : | |
| | : | |
| **R. JAMES NICHOLSON, Secretary, )** | | |
| **U.S. Department. of Veterans' Affairs, .,** | : | |
| | : | |
| | : | |
| Defendants | : | |

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

COMES NOW, the Plaintiff, by and through his undersigned counsel, Jimmy A. Bell, Esq. and the Law Office of Jimmy A. Bell, P.C., and respectfully moves in opposition to Defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56(b), to deny Defendant's Motion for Summary Judgment on all counts of Plaintiffs Complaint. In support thereof, the Plaintiff states as follows:

**PLAINTIF'S STATEMENT OF FACTS**

1. Plaintiff is an African American citizen of the United States who resides at the address set forth in the caption above at all times material to this complaint.

2. Plaintiff is a member of a protected class (African American) and (disability).

3. Plaintiff is a is am employee of Department of Veterans Affairs. Plaintiff engaged in protected conduct by filing a discrimination complaint against his immediate supervisors (the defendant).

4. Plaintiff's immediate supervisors knew of plaintiff's protected conduct (filing a complaint against his immediate supervisors).

5.      Plaintiff suffered adverse employment actions after engaging in protected conduct.

6.      There is a causal link between the protected conduct that the plaintiff engaged in and the defendant's adverse action against plaintiff.

7.      Plaintiff has been subjected to retaliation and malicious acts as a result of filing a discrimination complaint against his immediate supervisors.

8.      The Defendant failed to select plaintiff for the Lead Patient Advocate position even though he was qualified for the position and had applied for the position under the special hiring authority (10 point preference veteran) and disabled veteran preference. Defendant knew of plaintiff's disability.

9.      Plaintiff has been subjected to discrimination and malicious acts as a result of filing a discrimination suit against her immediate supervisors.

10.     Plaintiff was treated differently than similarly situated individuals not in the plaintiff's protected class.

11.      There is a causal link between the disparate treatment of those who had not engaged in protected activity, or who had engaged in similar activity to the plaintiff, albeit non-protected, but who were not similarly treated by the defendant.

12.     Plaintiff exhausted all of his administrative remedies because defendant accepted plaintiff's claims for investigation and over 180 days has passed since the formal investigation began.

13.     Defendant's action had a significant effect on plaintiff and his family.

## STATEMENT OF MATERIAL FACTS IN DISPUTE

1.      Defendant was aware of  Plaintiff had participated in EEO activity.  Plaintiff's

supervisors knew about Plaintiff's prior EEO activity. (Exhibit 2, page 18)

2.      On January 23, 2004, Plaintiff requested, through Terry Ross ("Ross"), Executive Officer

to the Medical Director, to be detailed into the Lead Patient Advocate position (GS-

12/13) in the absence of Bill Sivley who was away on extended military duty (see Exhibit

Deposition of Terry Ross.)  In the request letter, Plaintiff listed his extensive credentials

and accomplishments.  In addition, since Mr. Sivley was a GS-13 and Plaintiff was a GS-

11, Plaintiff enclosed a copy of the of the regulation which stated that, as an over 30%

disability service connected veteran, Plaintiff had no time-in grade restrictions.  (See

Exhibit 3, annexed hereto).

3.      In response to Plaintiff's request described in paragraph 2, Ross sent correspondence to

Plaintiff stating, "Management had made a decision to abolish the Lead Patient Advocate

position" and that they were instead recruiting for the position of "Director, Office of

Patient Advocacy at the GS-13 level."  (See Depo  of Terry Ross and Exhibit 3, annexed

hereto).  Ross's correspondence also denied Plaintiff's request described in paragraph 2.

(See Exhibit 3, annexed hereto).

4.      On March 8, 2004, Plaintiff asked Ross why Management had decided to make the

position GS-13 rather than GS-12/13.  In response, Ross denied that Management made

any such decision and claimed that it was her decision.  (See Exhibit 3, annexed hereto).

5.      In her correspondence described in paragraph 3, Ross also indicated that the new hiring

criteria included skills and experience in analyzing and strategizing major medical center

programs. (See Exhibit 3, annexed hereto)  In response, Plaintiff contrasted the previous

position description of Lead Patient Advocate (See Exhibit 3, annexed hereto) with the

new position description for Director, Office of Patient Advocacy (See Exhibit 3,

annexed hereto).  Plaintiff also indicated to Ross that he had extensive major medical

center experience.  Plaintiff had experience and had been detailed in this position

previously. (See Exhibit 3, annexed hereto)

6.      At the conclusion of interviews, the position of Lead Patient Advocate was re-

established. Bill Sivley was selected to that position without applying for the positon so

her could get experience in graphs and charts(See Deposition of Terry Ross),

7.      On March 8, 2004, a new position was posted for an in-house job for a Program

Specialist.  (See Exhibit 11, annexed hereto).  Plaintiff was the only person to apply for

this position.  Since the position was GS-13, Plaintiff applied using his special hiring

authority as a 30% disabled veteran. (Exhibit 3)  Plaintiff was rejected for this position.

(See Exhibit 3, annexed hereto). Plaintiff was informed that he did not meet the time in-

grade restrictions. (See Exhibit 3, annexed hereto).  However, the announcement

indicated that persons with special hiring authority would be eligible for the position.

4

(See exhibit 10, annexed hereto).  The position was subsequently cancelled.

8.    After the position was cancelled, it was re-established in or about July 2004, announced, and opened to outside candidates.  (See Exhibit 3, annexed hereto)  Plaintiff was eligible and applied for this position.  (See Exhibit 3, annexed hereto).

9.    After he submitted his application, Ross approached Plaintiff and told him "you made the list [of eligible candidates], but I must be honest with you – the other five candidates are very well qualified and I feel it will be difficult for you."  Plaintiff believed that Ross was trying to discourage him from seeking the position.  (See Exhibit 3 and Ms. Ross does not deny it,  Depo of Terry Ross, annexed hereto). Ross made a similar remark on July 12, 2004 in front of Michelle Spivak.  (See Exhibit 3, annexed hereto).

10.    When Plaintiff was selected as one of the top two (2) candidates for the position described in paragraph 8, Ross scheduled a second interview with Plaintiff and the Medical Center Director. (See Exhibit 3, annexed hereto).  Plaintiff continued to follow up on the position.  (See Exhibit3, annexed hereto).

11.    In the meantime, Ross lobbied to have the position re-announced to a larger candidate pool, (See Exhibit 3, annexed hereto) notwithstanding the fact that Ross had sent out correspondence five (5) months earlier to all the Patient Advocates, Social Workers, and Public Affairs employees in the Department of Veterans Affairs nationwide for the purposes of soliciting applications. (See Exhibit 3, annexed hereto).  Garfunkel retaliated

5

against plaintiff because plaintiff had filed EEO complaints (Garfunkel  Affidavit Exhibit 2) Garfunkel and Ross intentionally and purposefully did not want to select Plaintiff for this position because of discriminatory. (Deposition for Garfunkel and Deposition of Ross and Exhibit 3 and Exhibit 2)

12.    Plaintiff was well-qualified for the positions described in paragraphs 2, 7-8.  Not only did Plaintiff have extensive experience in the required fields and meet all of the criteria, he was also elected to the Board of Directors of the Society for Healthcare Consumer Advocacy of the American Hospital Association where he represented Patient Advocates and Directors of Patient Advocacy. ( See Exhibit 3 and Depo of Terry Ross)

13.    It its Answer to the Complaint, Defendant claims that it did not have knowledge of Plaintiff's disability and denies that Plaintiff had any disability whatsoever.  (Answer ¶ 5, 12.).  However, Plaintiff submitted proof of his 80% disability with his applications for the positions described in paragraphs 2 and 7, *supra*.  As a result, Defendant can deny neither Plaintiff's disability nor Defendant's actual knowledge of Plaintiff's disability.

14.    Defendant admittedly has insufficient knowledge as to whether Plaintiff's supervisors had actual knowledge of Plaintiff's prior EEOC activity.  (Answer ¶ 8-10).  Plaintiff can show that Plaintiff's supervisors had actual knowledge of Plaintiff's prior EEOC activity. (Exhitit #3)

15.    Defendant states that the vacancy announcements under which Plaintiff applied were withdrawn and an employee who had previously held the position prior to going on active

duty with the military was placed back in the position upon his return and indication that

he was amenable to the placement.  (Answer ¶ 8-10).  Plaintiff can show that Defendant's

characterization of the Lead Patient Advocate described in paragraph 2 as one held open

for a person on military duty until his return is pretext.  Plaintiff can show that the

position was vacant and open to any applicant.  Plaintiff can also show that the position

was thereafter abolished in favor of the position of Director, Office of Patient Advocacy.

Plaintiff can finally show that, after conducting interviews for the position of Director,

Office of Patient Advocacy, that position was suddenly cancelled in favor of the original

Lead Patient Advocate position, to which Bill Sivley was appointed without any

interview process or open application period. (Depo of Terry Ross and Depo of Standford

Garfunkel) (Exhibits 2, 3, 4)

16.    Defendant can not deny that Plaintiff was well qualified for all of the positions described

in paragraphs 2, 7-8. (Exhibits 2, 3, 4)

17.    Mr. Garfunkel made the file approval to place the white male in the lead advocate

position. And cancel the position that plaintiff applied for. So he made the final decision.

He was the responding official to Plaintiffs prior EEO Complaint.


**ARGUMENT**

**STANDARD OF REVIEW FOR SUMMARY JUDGMENT**

It is well known that summary judgment is granted by this court "if pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Diamond v, Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). The nonmoving party cannot merely rest upon the allegations included in the complaint, and instead, must identify the specific facts which demonstrate that there is a genuine issue for trial. *Anderson*, 477 U.S. at 248. The burden is upon the nonmoving party to demonstrate that there are material facts in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). There is a genuine issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Material facts are in dispute if they are capable of affecting the outcome of the suit under governing law. *Id*. In considering a motion for summary judgment, all evidence and inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962). The "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson*, 477 U.S. at 255; *see also Bayer v. United States Dept. of Treasury*, 956 F.2d 330, 333 (D.C. Cir. 1992).

　　　The court has also held that because proof of discrimination may be difficult for a plaintiff to establish, "the court should view summary judgment motions in such cases with special caution." *Childers v. Slater*, 44 F. Supp. 2d 8, 15 (D.D.C. 1999) (citing *Aka v. Washington Hosp. Ctr.,* 116 F.3d 876, 879 (D.C. Cir. 1997)); *Johnson v. Digital Equip. Corp.,* 836 F. Supp. 14, 18 (D.D.C. 1993). Nevertheless the nonmoving party "must do more than simply show that there is some metaphysical doubt as to he material acts." *Matsushita*, 475 U.S. at 586. Rather, she must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587; Fed. R. Civ. P. 56(e).

8

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny established the tripartite framework, which governs the allocation of the burden of production in cases in which discrimination is based on disparate treatment. To satisfy the first element of the *McDonnell Douglas* framework, the plaintiff must prove a *prima facie* case by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802. Generally, to establish a prima facie case of disparate treatment discrimination, a plaintiff must show that he or she (1) belongs to a protected class; (2) suffered an adverse employment action; and (3) that the unfavorable action gives rise to an interference of discrimination. *E.g., Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999) (citing *McKenna*, 729 F.2d at 789). To raise an inference of disparate treatment in a Title VII case, the plaintiff "must prove that all the relevant aspects of [his] employment situation are 'nearly identical' to those of the employees who [he] alleges were treated more favorably." *Childers v. Slater*, 44 F.Supp. 2d at 24; *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995).

If plaintiff succeeds in proving his or her *prima facie* case, a presumption that the employer unlawfully discriminated against the employer arises, *e.g., Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981), and the burden shifts to the defendant "to articulate some legitimate nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802.

Finally, if the defendant successfully carries this burden, then the presumption of discrimination disappears, and the plaintiff "must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination." *Burdine*, 450 U.S. at 253 (citing *McDonell Douglas, 411 U.S. at 804); see also St. Mary's Honor Ctr. V. Hicks,* 509 U.S. 502, 511 (1993).

9

At this point, plaintiff's ultimate burden of proving intentional discrimination merges with her burden of demonstrating pretext. *Burdine*, 450 U.S. at 256. At all times plaintiff retains the ultimate burden of persuading the trier of fact that defendant intentionally discriminated against the plaintiff. *Id.* at 253.

## AS A MATTER OF LAW, THE DEFENDANT CANNOT OFFER A LEGITIMATE NONDISCRIMINATORY REASON FOR ITS CONDUCT

Once a plaintiff has established a *prima facie* case of discrimination, the defendant is afforded the opportunity to articulate a legitimated, non-discriminatory reason for its conduct. *Price Waterhouses, 490 U.S. at 239-41; Mcdonnell-Douglas, 411 U.S. at 802; Milliner, 932 F. Supp. At 351.* If the defendant satisfies this "burden of production," the burden shifts to the plaintiff to prove that the employer's alleged non-discriminatory reason was merely a pretext, and that the true reason for the conduct was pregnancy discrimination. *Id.*

To prove that the District's conduct was a pretext, the Supreme Court that the plaintiff must prove the following: (1) the articulated justification is pretextual, and (2) the real reason for the action was unlawful discrimination. *St. Mary's Honor Ctr. V. Hicks*, 509 U.S. 502, 515 (1993) ("[A] reason be proved to be a discrimination" unless it is shown both that the reason was false and that the discrimination was the real reason."); *Stewart v. Ashcroft*, 211 F. Supp. 2d 166, 177 (D.C.C. 2002).

The Exhibits 2, 3, 4; Depositions of Sandford Garfunkel and Terry Ross show that a reasonable Trier of fact could make a finding of discrimination.

### Deposition of Sanford Garfunkel

```
    16      Can you state your name for the record?
17      A.  Sanford M. Garfunkel.
18      Q.  Can you state your job title?
19      A.  Medical Center Director, VA Medical Center,
```

10

20  Washington, D.C.
21    Q.  How long have you been in that position?
22    A.  1995.  I want to say April 1995. (p. 5)
 1    Q.  What position did you hold prior to that?
 2    A.  I was the Associate Chief Medical Director
 3  for Operations for the VA.
 4    Q.  And how long were you in that position?
 5    A.  Four years.
 6    Q.  What position did you hold before that?
 7    A.  I was the Medical Center Director at the VA
 8  in New York City.
 9    Q.  How long have you known my client,
10  Mr. Pierce?
11    A.  I guess as long as I'm here.  I can't swear
12  he was here when I got here, but whenever he got here.
13  It's been years.
14    Q.  Prior to this EEO case that we're here to
15  deal with today, did you ever become aware of any
16  prior EEO complaints that he had made?
17    A.  Yes.  I'm aware that he had won a case, a
18  settlement.  I don't even know how it was resolved,
19  but I'm aware he had filed and won a case.
20    Q.  How did you become aware of that?
21    A.  I'm the director.  I know what goes on in
22  the Medical Center.  It's my job. (p. 6)

Mr. Garfunkel admits that he has knowledge about Plaintiff wining an EEO case. However his

admission must be looked at by the totality of the circumstances. Defendant admits that in their

motion that Plaintiff's prior protected activity consists of two EEO filings against Defendant

VAMC. In fact they state that:

>Plaintiff filed his first EEO complaint with ORM on August 31, 1999. He alleged
>that he was discriminated against on the basis of race and color (African
>American) in violation of Title VII when he applied for the position of Health
>System Specialist (GS 12/13) in the Radiology Department and was not selected.
>DSMF at ¶ 86. After failing to prevail at the administrative level, Plaintiff filed
>suit against the Defendant in U.S. District Court for the District of Columbia. Id.
>Ultimately, Plaintiff and Defendant settled the case for $75,000 in May,
>2002.DSMF at ¶ 87.Plaintiff's second EEO filing involved a consolidated
>complaint concerning discrimination and retaliation based on prior EEO activity.
>DSMF at ¶ 88. Plaintiff had filed two complaints – one on October 26, 2001 and

11

> another on April 5, 2002. Id. The consolidated claims involved Plaintiff's non-selections for Health Systems Specialist and Acting Lead Patient Advocate. DSMF at ¶ 89. On April 28, 2003, this case was dismissed due to Plaintiff's failure to prosecute his case at the hearing stage. DSMF at ¶ 90. Plaintiff fails to show a causal connection between his non-selection and his prior EEO claims.

Mr. Garfunkel gave a sworn Affidavit on May 24, 2002 in the previous EEO case where he stated talked negatively about the about the Plaintiff engaging in protected activity. Mr. Garfunkel Stated, "he seemed to be unhappy and he's always filing complaints." (Exhibit 2 at P.18)

Mr. Garfunkel gave a deposition in this case on June 1, 2005, taken by the EEO Investigator. Mr. Garfunkel stated that, "His name showed up as **best** on the list, I remember on the cert the first time. He was the only candidate…." He then stated, " I don't remember specifically what happened. I imagine that Terry or who ever came to me and said we only have one candidate, it is Keith, so we'd really like to go back out and see if we can get more candidates because Keith probably is not the guy we want and we certainly want more choices and so we went out."(Exhibit 1, Page 10)

Mr. Garfunkel stated further, "I am not sure even if I was involved with that tell you the truth; I may have been. But again, he was the only name and being the only name we felt, they felt they wanted more choices, that he was not the guy we really wanted for the job because of-- his record has not been an outstanding record. So we went back out." (Exhibit 1, Page 10)

The evidence shows that there were only two ratings on the Performance Appraisal during that time period at the Plaintiff's Place of employment, successful and unacceptable and plaintiff submitted the performance appraisals form 1998 – 2003 with his application. Plaintiff received successful in every category for every appraisal from 1999 - 2003. (Exhibit 3, P. 27, 28, 30). In fact, even though the form did not have an "outstanding" box to check, his supervisor still

wrote in the comments section that his work was outstanding and that he served as Acting Lead

Patient Advocate. In the summary of his April 4, 2000 performance appraisal is states:

> Mr. Pierce has performed his duties of patient Advocate in an outstanding
> manner. He utilized his knowledge of the operation of the medical Center and his
> patient/veteran status in a manner that proved to be a winning combination. He
> was able to sort through the myriad of situation presented by our patients in a
> professional and caring manner. He ensured that the correct support was supplied
> at the correct time. For a brief period during the rating period, he served as the
> Acting Lead Patient Advocate. He maintained the effectiveness of the operations
> of the office during the period of change. (Exhibit 3, P 30)

Additionally, in the summary of his June 6, 2002 performance appraisal is states:
> He also serves on the medial center Ethics Committee and Attends ward team
> meetings, as necessary. He has written numerous policies for customer service
> programs and assisted with their implementation. He also serves trainer for the
> Hospitable and CARE. (Exhibit 3, P. 28)

Additionally, in the summary of his 2003 performance appraisal is states:

> Mr. Pierce continues to demonstrate professionalism in his duties as a Patient
> Advocate. He now manages the Greeters Program, supervising 12 IT/volunteer
> workers. In this role, he has expanded the program placing greeters in the
> Pharmacy Service. This staff support has been a great asset to Pharmacy Service.
> Mr. Pierce is a committee member with the Society for Healthcare Consumer
> Advocacy (SHCA) of the American Hospital Association. Mr. Pierce was a key
> player in coordinating the annual SHAC conference including serving as a
> facilitator for customer service training. He recently received the APEX (actions
> for Professional Excellence) award from SHCA. He serves as a trainer of "general
> Hospitable" for new employees and the customer service training program
> Care.(Exhibit 3, P.27)

Additionally, on December 12, 2003 Plaintiff was elected as a 2004 Board member of the

Society for Healthcare Consumer Advocacy (SCHA). Plaintiff submitted all of the above the

same documents for each of the three positions he applied which include copies of his awards

and letter of commendation (Exhibit 3, p. 35-45)

As you can see, from the beginning with the first open position, Managements' decision

not to select Plaintiff was not based on objective criteria such as documents he submitted with

his application, performance appraisals or an interview because Plaintiff was not interviewed. He was rejected before they even heard what his plans would be if he were selected. Their actions and their reasons for not selecting plaintiff are pretextual.

### Deposition of Sanford Garfunkel

9     MR. BELL:  Can you read back the question?
10     (Record read by reporter as follows:
11  Question:  Did you take any role whatsoever in the
12  selection of the positions that my client applied
13  for?)
14     A.  I did at some point interview Mr. Pierce.
15     Q.  And why was Mr. Pierce interviewed?
16     A.  He was a candidate for the job.
17     Q.  Did you ask Mr. Pierce the same questions
18  that you asked the other interviewees?
19     A.  I'm sure I did.  I don't recall.  You know,
20  I don't recall.  I generally do because it's good form
21  to do that.  In Mr. Pierce's case he was an inside
22  candidate, the other was an outside candidate,

0009
1  might have asked a little bit different because he was
2  familiar with how that section worked and how the
3  hospital worked.  But I generally try to ask the same
4  questions.
5     Q.  You said he was more familiar with how the
6  hospital worked.  Can you explain what you mean by
7  that?
8     A.  Well, if I'm interviewing -- take this case.
9  I'm interviewing somebody from outside the Medical
10  Center, so I'm not going to say to them -- and I don't
11  remember what I asked Mr. Pierce, but I'm not going to
12  say to them how do you think our patient advocacy
13  program is working because they would have no idea if
14  they don't work here.  I might say to Mr. Pierce how
15  do you think our patient advocacy program is working
16  because he's a patient advocate at that time.
17     Q.  How could you evaluate them both equally if
18  you're not asking them the same questions?
19     A.  When I interview somebody, I'm trying to get

14

20  an idea of what they would do if they were in the
21  position, how they would function, whether I think
22  they would be successful or not.  When somebody has a (p 9)

0010
1  working knowledge of the organization as opposed to
2  somebody who doesn't work here, I'd never get to that
3  result if I said, Well, I won't ask -- I mean I don't
4  know how I could ask exactly the same questions.  I
5  mean I try to ask -- if they all -- I try to ask
6  the same questions, but I'm sure I need to modify them
7  a little bit when someone's an inside candidate and
8  knows how it works.  I still can evaluate whether I
9  think they'll be successful or not.
10      Q.   How can you evaluate the answers if they're
11  not given the same questions?
12      A.   That's why I get paid.  Because I can.
                                                    (page 10)

----------
3   Q.   This person was from the outside.  Am I
4   correct?
5       A.   Outside this hospital, yes.
6       Q.   So tell me how she was a better qualified --
7       A.   Oh, I don't remember.  I don't remember.
8   What I do remember is, to be honest with you, that
9   after interviewing Mr. Pierce, I did not think he was
10  the candidate that I would want in that job.
11      Q.   Why not?
12      A.   Because I didn't think his answers to the
13  questions really showed insight into the program or
14  how the program could grow or how he would be a
15  successful leader in the program.
16      Q.   Did you ask her those questions, the outside
17  candidate?
18      A.   I'm sure I did.
19      Q.   But how could she know about a program that
20  she never worked at?
21      A.   Well, she would know in general about a
22  patient advocacy program.  So I could certainly say if
1   you took over the program next month, how would you
2   approach it, the same question I asked Mr. Pierce.
3       Q.   Hadn't Mr. Pierce served in an acting
4   capacity in that position?
5       A.   I don't remember if he had, to tell you the
6   truth.  I don't remember.

15

7    Q.  Wouldn't the best way to judge whether or
8  not he could be successful in that program would be to
9  look at how he did in the program when he was in the
10  acting position?
11    A.  Well, that wasn't -- again, I wasn't the
12  selecting official.  I was interviewing the candidates
13  and I was asking them questions and getting their
14  answers.
15    Q.  Did you even consider the fact that he had
16  been in the acting position in that capacity?
17    A.  I wasn't the selecting official.
18    Q.  But you stated under oath already that you
19  believe this other person was the best candidate --
20    A.  Right.
21    Q.  -- based on what she told you and how she
22  answered your questions; is that correct?
0014
1    A.  Yes.  But again, number one, I wasn't the
2  selecting official.
3      Number two, the person who oversaw that
4  program felt that Mr. Pierce in his acting role maybe
5  wasn't the best candidate for the program, so she made
6  the selection.

17    Q.  What I'm asking you, and I'm trying to be
18  real specific about this, in your evaluation of the
19  candidates, did you consider his tenure in the acting
20  position?
21    A.  I don't remember. (p. 14)

1    Q.  What conversation did you have with Ms. Ross
2  about the two candidates, my client and the outside
3  candidate?
4    A.  After the interviews I discussed the
5  interviews with her.
6    Q.  You stated earlier in part of your answer
7  that the selecting official who you've now identified
8  as Ms. Ross considered his tenure in the acting
9  capacity; is that correct?
10    A.  I'm not sure I said that.  I said I'm sure
11  she did, but I mean I know -- and I'm just trying to
12  think from memory.  I know that she was not happy with
13  Mr. Pierce's performance or did not feel that he would
14  make a successful lead advocate director, whatever
15  position title it was, and after the interview I

16

16  chatted with her about my interviews.
17     Q.   What exactly did she tell you as it relates
18  to the evaluation of my client?
19     A.   I don't remember exactly.  I know she had
20  concern that he was -- that he would be the right
21  person for the position.  I don't remember any details

22  about it.

             Q.   Did he apply for the position?
6     A.   I don't remember how it was done.
7     Q.   If there's a vacancy announcement, doesn't a
8  person have to apply for the position in order to be
9  considered?
10     A.   I'm sure it was done legally.  I don't
11  remember whether we reannounced and he applied or we
12  just moved him back in or he was at that grade and had
13  been in there.  I think under those circumstances we
14  probably have authority to just move him back in, but
15  I honestly don't remember how it was.
16     Q.   Who was the person who actually moved him
17  back in?  Were you the person that made that decision?
18     A.   I made the ultimate decision to move him
19  back in, yeah, but it was at the recommendation of,
20  I'm sure, Terry and David West, my associate, and
21  people felt this would be a good move now. P. 20


   Q.   For the third position you were the final --
6  you were the selecting official for the third
7  position?
8     A.   I don't know if I was the selecting
9  official.  Probably not the selecting official.  But I
10  certainly knew what was going on and said that's okay
11  with me if we go ahead and do that.
12     Q.   So to place Mr. Sivley in that position?
13     A.   Or in this case Mr. Sivley in that position,
14  right.
15     Q.   Excuse me.  Mr. Sivley in the position?
16     A.   Right.
(P. 32)

---

**Deposition of Terry Ross**

17

2    Q.   What happened when Bill Sivley came back
3  from the military?
4    A.   He requested to go on detail in fiscal
5  service.
6    Q.   Now, when he left, was his position as lead
7  patient advocate, was it terminated?
8    A.   No.
9    Q.   When you say that he came back and he
10  requested to go on a detail, was that request in
11  writing?
12    A.   I don't recall.
13    Q.   Was there paperwork that had to happen in
14  order for him to be detailed?
15    A.   I don't recall.
16    Q.   Do you remember signing any paperwork for
17  him to be detailed?
18    A.   I don't recall.
19    Q.   Is it your understanding as a manager that
20  in order to detail one of your subordinate employees,
21  that you have to sign paperwork to have them detailed?
22    A.   I don't know.

                                    (p.10)

0011
1    Q.   Then how do you know he was detailed?
2    A.   Because he did request it.
3    Q.   Did you ever see any paperwork?
4    A.   I don't recall.
5    Q.   So if you don't recall seeing paperwork, how
6  do you know for a fact that he was, in fact, detailed?
7    A.   Because when he came back from military
8  leave, he was detailed to fiscal service.
9    Q.   Who detailed him?
10    A.   The Medical Center.  He was detailed.
11    Q.   Who was his supervisor?
12    A.   I was his supervisor.
13    Q.   And you don't remember signing any paperwork
14  to detail him?
15    A.   I don't recall.
16    Q.   How long was the detail supposed to be for?
17    A.   I don't recall.
18    Q.   At some point that lead advocate position,
19  it changed, didn't it?
20    A.   No, not that I'm aware of.
21    Q.   They didn't call it something else?
22    A.   No.

18

0012
     1     Q.   Was there a job announcement?
     2     A.   For?
     3     Q.   For the lead advocate position.
     4     A.   No.
     5     Q.   Did you ever send an e-mail stating
     6   management had made a decision to abolish the lead
     7   advocate patient position?
     8     A.   I don't recall.
     9     Q.   Do you ever remember that position being
    10   changed from lead advocate patient position to a
    11   director of Office of Patient Advocacy?
    12     A.   No.
    13     Q.   Do you remember sending an e-mail regarding
    14   that?
    15     A.   Regarding what?
    16     Q.   That management had made a decision to
    17   abolish the lead patient advocate position and you
    18   were to recruit for director of patient office
    19   advocacy at the GS-13 level?
    20     A.   Yes, I do recall that.
    21     Q.   Who did you mean by management?
    22     A.   The Medical Center leadership.
0013
     1     Q.   So that position of lead patient advocate
     2   was abolished?
     3     A.   No, it was not.
     4     Q.   Was the director of Office of Patient
     5   Advocacy, was there a position opened up for that
     6   position?
     7     A.   We did establish a position for that.  Yes,
     8   it was classified.
     9     Q.   Okay.  Now, let's talk about the first time
    10   that it was advertised.  What involvement did you have
    11   in the first time that that position was advertised?
    12     A.   What position?
    13     Q.   The director of Office of Patient Advocacy.
    14     A.   I requested that it be advertised.
    15     Q.   Did anyone apply for it?
    16     A.   I was told by Human Resources that they did
    17   receive an application and the person who applied did
    18   not qualify.  I never received a certification on it,
    19   a cert, whatever you call it.
    20     Q.   Did they tell you why he didn't qualify?

19

21    A.  They didn't tell me who it was or why the
22  person didn't qualify.

------------------

8    Q.  Okay.  So after you were told that the
9  person didn't qualify, what happened then?  Did you
10  readvertise the position?
11    A.  We readvertised the position.
12    Q.  Okay.  Did you get applications for that
13  second position?
14    A.  There were six qualified applicants and I
15  received the cert for those six qualified applicants.
16    Q.  Did my client make the cert?
17    A.  Yes.
18    Q.  And was there an interview process that took
19  place for those six applicants?
20    A.  There was a rating and ranking panel that
21  was devised, and they did do an interviewing process
22  and made recommendations for a second interview.

0015

1    Q.  Were you on that panel?
2    A.  No.
3    Q.  Were you the selecting official?
4    A.  Yes.
5    Q.  So how many people made it to the second
6  interview phase?
7    A.  Two.
8    Q.  And who were those persons?
9    A.  One was Keith Pierce and the other one was a
10  woman from the Buffalo VA Medical Center.
11    Q.  Did you interview both those individuals?
12    A.  I did.

---

0016

1    Q.  What did you write it on?
2    A.  On the piece of paper that I had the
3  questions.
4    Q.  Did you also use a notepad?
5    A.  No.
6    Q.  Did you have a conversation with the
7  candidates -- about your thoughts of the candidates
8  with anyone after the interview process?
9    A.  I don't recall.
10    Q.  Did you ever speak with Mr. Garfunkel?

20

11    A.  About what?
12    Q.  About the candidates and your thoughts.
13    A.  Yes.
14    Q.  Tell me about that conversation.
15    A.  He asked me what I thought about the
16  interviews during my interviews, and I told him that I
17  felt that Keith Pierce did not show any evidence of
18  running a major program, nor did he show any evidence
19  to me of using any kind of graphs and charts, and I
20  also explained that the other person who we
21  interviewed showed evidence of both.
22    Q.  Did you read his application?
0017
1    A.  His application for?
2    Q.  His application for the position.
3    A.  Absolutely.
4    Q.  Were you aware that he held this position
5  before?
6    A.  What position is that?
7    Q.  That he held an acting lead advocate
8  position before?
9    A.  This wasn't a position for an acting lead
10  patient advocate.
11    Q.  My question is simple.  Were you aware that
12  he had held an acting lead advocate position before?
13    A.  No.
14    Q.  So you don't remember reading that in his
15  application?
16    A.  I don't recall.

19    Q.  Do you ever remember seeing any
20  documentation that my client was entitled to veteran's
21  preference?
22    A.  Yes.
0023
1    Q.  10-point veteran preference?
2    A.  I don't remember what the point is.
3    Q.  Was the other person a veteran?
4    A.  I don't recall.
5    Q.  At some point you were given a certificate
6  of eligible candidates for the position.  Do you
7  remember receiving that?
8    A.  The second time that it was posted, yes.
9    Q.  Did you ever notice my client's name on that
10  list?

21

11    A.  It was.
12    Q.  Did you ever make any comments to him
13  regarding him being on the list?
14    A.  I don't recall.
15    Q.  Do you recall whether or not you told him
16  that it would be very difficult for him to get the
17  position because of the other candidates?
18    A.  I don't recall.
19    Q.  Does that mean you might have said it, you
20  just don't remember at this time?
21    A.  It means I don't recall.

22    Q.  What happened when the other person was

0024
1  selected?  Did they take the position?
2    A.  Tell me when you're talking about.  When are
3  you talking about?
4    Q.  You said that you selected the person --
5  there were two people that were interviewed.
6    A.  You're talking about for the second posting.
7    Q.  That's correct.
8    A.  Okay.
9    Q.  We haven't got to the third yet.
10    A.  Okay.
11    Q.  You selected that other person over my
12  client; is that correct?
13    A.  That's correct.
14    Q.  Did that person take the position?
15    A.  No.
16    Q.  Was that position then offered to my client?
17    A.  No.
18    Q.  Why not?
19    A.  He was not qualified in my mind because of
20  the fact that he did not show any evidence at all of
21  running a major program, nor did he show any evidence
22  of being able to use graphs and charts.

5    Q.  Were you aware that he was on the national
6  board of patient advocates that's a national
7  organization?  Were you aware of that?
8    A.  Yes.
9    Q.  Were you aware that he was a national
10  speaker regarding patient advocacy across the country
11  during this same time period?

22

12      A.  I was aware that he made a speech at a
13  conference, yes.
14      Q.  You stated earlier that there was a list of
15  eligible candidates and they got whittled down to two
16  people; correct?
17      A.   There was a cert that was provided to me.
18  It was six candidates, qualified candidates, and a
19  rating and ranking panel evaluated them and
20  recommended two people.
21      Q.   Okay.  So let me make sure I've got this
22  straight in layman's terms.  A person, a group of

0026
1  individuals applies for this second position.
2  Personnel or Human Resources made an evaluation of who
3  made the certification list to say they were qualified
4  for the position.  Am I correct so far?
5      A.  Yes.
6      Q.  You were given a list of the six people who
7  made the certification list.  Am I correct?
8      A.  Correct.
9      Q.  Some other panel that you didn't sit on
10  looked at these individuals and made a recommendation
11  for two candidates from that list to be interviewed;
12  is that correct?
13      A.   They did evaluate the six candidates and
14  they recommended two candidates for second interviews,
15  yes.
16      Q.  You chose one of these two candidates who
17  was not my client; correct?
18      A.  Yes.
19      Q.  This person turned down the position?
20      A.  Yes.
21      Q.   And you didn't hire my client for the
22  position because he wasn't qualified?

0027
1      A.  Correct.
2      Q.  Did the Human Resources office miss
3  something about him not being qualified?  Did they
4  miss something?
5          MR. SHOAIBI:  Objection, speculative.
6      A.  I don't know.
7      Q.  When you sent down the vacancy announcement,
8  was there some -- let me ask it this way.
9          When you sent down the vacancy announcement,

23

10  did you have a criteria of what the people needed in
11  order to be qualified for the position?
12      A.  I provided to Human Resources criteria, yes.
13      Q.  And based on the criteria you provided, my
14  client made that certification list; correct?
15      A.  Yes, that's correct.
16      Q.  Who provided the criteria for this panel?
17  Did you impanel the people?
18      A.  I had the -- I appointed the chair of the
19  rating and ranking panel and she chose the panelists.
20      Q.  And did you give them criteria on what they
21  needed to look for?
22      A.  They established their own criteria.  I mean

0028
1  they based it off of the position description and what
2  is just the -- I don't remember what they're called,
3  whatever, I guess functional statements or something
4  like that for HR.  They did read the position
5  description.
6      Q.  Okay.  And the information that you provided
7  initially to --
8      A.  HR.
9      Q.  -- HR.
10     A.  Correct.

p.28

4      Q.  Were you aware of my client's prior
5  performance evaluations?
6      A.  No.
7      Q.  You didn't look at them in the packet?
8      A.  His --
9      Q.  His performance evaluations.
10     A.  Whatever was in his packet I was familiar
11  with.
12     Q.  Were you familiar with whether or not he had
13  an outstanding?
14     A.  I don't recall.
15     Q.  Would it surprise you that he had an
16  outstanding performance evaluation?
17     A.  No, it would not surprise me.
18     Q.  Let's go to the third position.  So you
19  didn't want my client, you didn't believe he was
20  qualified, so you readvertised the position again.  Is

24

21  that correct?
22      A.  That's correct.

P 29

1   Q.  Okay.  And how many people applied for this
2   position?
3       A.  We cancelled the position before any
4   applicants that I know of submitted any.  And if there
5   were any, HR did not inform me about it.
6       Q.  Why did you cancel the position?
7       A.  Because the person who was in the lead
8   patient advocate position decided that he no longer
9   wanted to be detailed to fiscal service and wanted to
10  come back and work full-time in the patient advocate
11  office and wanted to broaden his horizons and start
12  doing some graphs and charts that we needed to be
13  done.
14      Q.  So start doing some graphs and charts.
15      A.  Right.
16      Q.  So he was going to learn to do them?
17      A.  Correct.  Apply his current knowledge and
18  then go onward and forward.
19      Q.  So it's not something he had done in the
20  past.
21      A.  Correct.
22      Q.  Okay.  Why wasn't my client given this same
0031
1   opportunity to do these more graphs and charts?
2       A.  There wasn't a need for it.
3       Q.  Wait a minute.  I want to make sure I've got
4   this clear on the record.  You stated two things.  Let
5   me make sure I've got it correctly.  You said that the
6   lead patient advocate position didn't have anything to
7   do with this director position.  Do you remember
8   saying that?
9       A.  I do remember saying that they have nothing
10  to do with each other.  That's correct.
11      Q.  Okay.  Do you also remember stating that
12  what you were looking for, for this director position
13  was a person that could do graphs and charts and that
14  was the reason that you selected the other person over
15  my client?
16      A.  That was one of the reasons.  That was one
17  of the reasons that I wanted to have that position

25

18  filled.  That's correct.

19    Q.  Okay.  So you don't select my client.

20  Strike that.  Let me make sure if I've got this

21  correct.

22      You select another person.  They decline the

0032

1  job.  Am I correct?

2    A.  That's correct.

3    Q.  Instead of selecting my client you

4  reannounce the position.

5    A.  That's correct.

17    Q.  Going back to the second position, and by

18  second position I mean the second position that we

19  talked about.  The female candidate that was selected

20  for that position, did you ever speak to her prior to

21  the interview?

22    A.  I don't recall. (p.34)

1    Q.  Did you receive a copy of her packet from

2  her prior to it going to HR?

3    A.  I don't recall. (p.35)

5    Q.  Going back to the second position, what

6  patient advocate experience did the person that you

7  selected for that position, what patient advocacy

8  experience did she have?

9    A.  I don't recall.

10    Q.  Do you ever recall receiving a letter from

11  her stating that she has no patient advocacy

12  experience?

13    A.  No, I don't recall. (p.36)

1  Q.  How did he get that position?

2    A.  Bill was already in an encumbered position

3  called the lead patient advocate position and he just

4  assumed his responsibilities.

5    Q.  Was that position ever abolished?

6  A.  No.

7      MR. BELL:  We can go off for a minute.

8      (Off the record.)

9      (Ross Exhibit Number 1 was marked for

10  identification and was attached to the transcript.)

11  BY MR. BELL:

12    Q.  You've just been handed a copy of what we've

26

13   marked as Ross 1.  Can you take a look at that
14   document and tell me if you've ever seen that document
15   before.
16      A.   Yes, I've seen this document.
17      Q.   Can you tell for the record what that
18   document is?
19      A.   This is an e-mail that I sent to Keith
20   Pierce with a cc to his supervisor, Michelle Spivak,
21   on January 23, 2004, entitled "Request to be Detailed
0038
1      Q.   Can you tell me what you mean in the
2   second -- can you read the second sentence for me?
3      A.   (Reading):  As I mentioned in our patient
4   advocate meeting this week, management has decided to
5   abolish that position and begin recruitment for a
6   Director, Office of Patient Advocacy, at the GS-13
7   level.
8      Q.   So was that position abolished?
9      A.   No, it was not.
10      Q.   Why did you tell my client that management
11   decided to abolish that position?
12      A.   Because that's what we decided to do.
13      Q.   When did you decide?
14      A.   As of January 23rd we made that decision.
15      Q.   To abolish the position?
16      A.   To abolish the position.
17      Q.   Okay.
18      A.   It never occurred.
19      Q.   But you began recruitment for the director
20   of Office of Patient Advocacy.
21      A.   That's correct.


Additionally, if the employer articulates a legitimate, nondiscriminatory reason for the

adverse employment action, then the burden of proof shifts to the plaintiff to prove that

employer's reason was merely pretext for discrimination. *Milliner v. District of Columbia*, 932

F.Supp. 345, 351 (D.D.C.,1996).  If the defendant satisfies this burden of production, the burden

of proof rests on plaintiff to prove that the employer's reason was merely a pretext for

discrimination. *Id.*  However, once if plaintiff produced evidence that the defendant's articulated

non-discriminatory reason is a pretext, discrimination is founded.

It is clear that management went out of their way to avoid selecting plaintiff. The Depositions of Sanford Garfunkel and Terry Ross show that they cannot get their story straight. The hiring criteria, it does not mention graphs and charts. (Exhibit 3) It does say that one of the criteria is , " knowledge of agency program goals and objectives, the sequence and timing of key program events and milestone and methods of evaluating the worth of program accomplishments." The testimony will show that the first white female that was selected over plaintiff could not know have knowledge of agency program goals and objectives, the sequence and timing of key program events because she did not work at the agency and she was not asked those questions, but Plaintiff was asked those questions. He was evaluated on different questions.

Although Mr. Garfunkel states that the person who oversaw that program felt that Mr. Pierce in his acting role maybe wasn't the best candidate for the program, so she made the selection of the white female.. However, Ms. Ross admits that she did not know that Plaintiff served as the Acting Lead Patient Advocate even though the performance appraisals that he submitted clearly stated the he held the position and "maintained the effectiveness of the operations of the office during the period of change."  This is a jury issue.

Finally, it is clear that management cannot remember what if any paperwork was required to be filed out so that they could fill the position with the white male, who did not even apply for the position. It is clear that management reasons are untrue. Keith Pierce applied for the position qualified for it and wand they canceled it because they did not want him to have it because of his race (black), reprisal. Plaintiff concedes disability and age.

## CONCLUSION

For all of the compelling aforementioned reasons and under the controlling precedent governing the causes of action outlined in complaint, Plaintiff respectfully asks this Honorable Court to deny Defendant  Motion for Summary Judgment.

Respectfully Submitted,

_____
Jimmy A. Bell, Esq.
Law Office of Jimmy A. Bell, P.C.
9610 Marlboro Pike
Upper Marlboro, Maryland 20772
Telephone: (301) 599-7620
Fax: (301) 599-7623
Bar # MD 14639

29