```
 1   IN THE MATTER OF:              )
                                          ORIGINAL
 2   KEITH PIERCE,                  )

 3          Complainant,           )Complaint No.

 4             vs.                  )2004-0688-2001300419 &

 5   DEPARTMENT OF VETERANS         )2004-0688-2001300415

 6   AFFAIRS MEDICAL CENTER,        )

 7   WASHINGTON, D.C.,              )

 8          Respondent.            )

 9

10

11                A F F I D A V I T

12

13           TRANSCRIPT OF PROCEEDINGS in the

14   above-entitled cause of the examination of

15   SANFORD GARFUNKEL, before EEO INVESTIGATOR CHERYL

16   CAMPBELL, on the 24th day of May, 2002, at the

17   hour of 2:25 p.m.

18

19

20

21   Reported by:  Kathryn L. Lilly

22
```

1    organization.

2              To be very honest with you, I have

3    spoken to Mr. West about the Complainant saying

4    what can we do for him.  He seems to be unhappy,

5    and he's always filing complaints.  If he's

6    doing a good job as a patient advocate, what can

7    we do for him.  When someone performs well I

8    want to try to do good things and keep them in

9    the organization.  So I'm looking to see what I

10   can do for him as well as I'm going to be

11   looking one day to see what I can do for

12   Ms. Spivak.

13            Q.  The reason I was asking is in the

14   term vacancy announcement, under principal

15   duties, it states that the incumbent would have

16   supervision and oversight for public affairs,

17   patient advocacy, and some other organizations.

18   That's why I was asking.

19            A.  The announcement for --

20            Q.  The announcement when it was

21   re-posted as --

22            A.  Supervisory responsibilities for

1    public affairs?

2            Q.  I'll read the whole paragraph.

3            A.  Please.

4            Q.  It says, principal duties, incumbent

5    reports to the office of the executive officer

6    and provides staffing support to the medical

7    center director and supervision and oversight

8    for public affairs, patient advocacy, marketing

9    and high performance development model training,

10   and then it goes on to discuss major duties.

11           A.  You have me stumped.  She does not

12   supervise those areas that I'm aware of.  And

13   I'm being honest I'm stumped at hearing that

14   paragraph.  I hadn't seen that.  Did you ask

15   Mr. West about that?

16           Q.  I spoke with him later after I had

17   finished taking his testimony and he was saying

18   that he thought that that was an error.

19           A.  It must have been, because I can

20   tell you that I have no intention, and she does

21   not do that.  She does not supervise those

22   people.  Mr. West supervises those people.

```
 1              Q.   Prior to Mr. Sivley leaving, did you

 2     state earlier that he supervised patient

 3     advocacy?

 4              A.   Mr. West supervised Mr. Sivley and

 5     public affairs, who is Karen Fedele, and

 6     marketing, those are Mr. West's

 7     responsibilities, and they continue to be his

 8     responsibility.  Ms. Spivak does not supervise

 9     those people.  If it said that in the

10     announcement it was announced incorrectly.

11     She's not doing it, that's a fact.  I'm stumped.

12     obviously I don't read every announcement.  I'm

13     stumped that that was in there.  It should not

14     have been in there.

15              Q.   Does she have interaction with the

16     patient advocacy group?

17              A.   She has interaction with them, sure.

18              Q.   Were you aware that the Complainant

19     had previous EEO activity?

20              A.   Sure.  He just won a case from us,

21     of course.  We settled the case with him.

22              Q.   Was Mr. Pierce not considered for
```

1    this position because of his previous EEO

2    activity?

3          A.   No, of course not, absolutely not.

4          Q.   Was Mr. Pierce not considered for

5    this vacancy because of his race?

6          A.   No, absolutely not.

7          Q.   Do you know what the Complainant's,

8    Mr. Pierce, current GS rating is?

9          A.   I think it's an 11, and the reason I

10   know it or I think I know is because as I said

11   to you I have been discussing with Mr. West what

12   can we do for Mr. Pierce if he's doing a good

13   job to make him a little happier in his

14   position.  So I think I know he's an 11.  I

15   can't swear to it, but I think I know that.

16         Q.   According to this vacancy

17   announcement the position that Ms. Spivak is in

18   is a 13.  To the best of your knowledge, would

19   the Complainant have been eligible for this

20   position?

21         A.   If he's an 11, no, he would not have

22   been.  That's not a solid 13, or is it?  Is that

1    a 12/13 or a 13?

2            Q.  As far as Ms. Spivak's position?

3            A.  Yes.

4            Q.  The announcement just says GS-13.

5            A.  Okay.

6            Q.  Are you aware if there are any VA

7    regulations that allow service-connected

8    employees to be exempt from having to be in

9    their current grade a year before being eligible

10   for the next higher grade?

11           A.  Not that I am aware of.  I'm not a

12   personnel expert, and I'm not aware of it.  I

13   rely on my personnel people, so I'm not aware of

14   that regulation at all.

15           Q.  Has the Complainant requested a

16   detail to another office?

17           A.  I am not aware of it.

18           Q.  When you were speaking with

19   Mr. Pishioneri in regard to trying to bring

20   Ms. Spivak on, did you ever interview

21   Ms. Spivak?

22           A.  I told you I had interviewed Ms.

1    Spivak about six months earlier.

2         Q.  Prior to bringing her on?

3         A.  Yes.  I can't remember, I may have

4    even had her come in when it looked like

5    something might develop to meet some other

6    people and get their opinion as well.  I think I

7    did in fact.

8         Q.  If the Complainant had actually

9    applied for this position and was referred,

10   since it's a term position, and if the position

11   let's say ended in a year, to the best of your

12   knowledge would you have been obligated to place

13   the Complainant in another position because of

14   tenure?

15        A.  To the best of my knowledge, no.

16        Q.  That's all the questions that have

17   for you today.  Is there anything that you want

18   to add for the record that was not covered?

19        A.  No, nothing else.

20             INVESTIGATOR CAMPBELL:  That

21   concludes the interview.

22                    * * * *

1              CERTIFICATE OF NOTARY PUBLIC

2              COMMONWEALTH OF VIRGINIA

3       I, Kathryn L. Lilly, a Notary Public in

4    and for the Commonwealth of Virginia, before

5    whom the foregoing cause was taken, do hereby

6    certify that the witness whose testimony appears

7    in the foregoing transcript was taken by me

8    in shorthand at the time mentioned in the

9    caption hereof and thereafter transcribed by me;

10   that said transcript is a record of the

11   testimony given by said witness to the best of

12   my ability; that I am neither counsel for,

13   related to, nor employed by any parties to the

14   action; and further, that I am not a relative or

15   employee of any counsel or attorney employed by

16   the parties hereto, nor financially or otherwise

17   interested in the outcome of this action.

18

19                           NOTARY PUBLIC

20

21   My Commission Expires:
     November 30, 2005

22

JABS REPORTING, INC.
1155 Connecticut Avenue, N.W., Suite 400
Washington, D.C. 20036 (202) 296-6102