**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **KEITH PIERCE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | **Civil Action No. 05-1989 (RMU)** |
| ) | |
| **R. JAMES NICHOLSON, Secretary,** ) | |
| **U.S. Department of Veterans Affairs,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS OR, IN THE ALTERNATIVE MOTION FOR**
**SUMMARY JUDGMENT**

**I.      INTRODUCTION**

         In his Motion for Summary Judgment, Defendant noted that Plaintiff was Defendant's best

witness.  Defendant's Motion for Summary Judgment ("DMSJ") at 30.  Plaintiff continues this role

in his Opposition, which is a monument to the fragility of his arguments.  He includes long excerpts

of depositions and declarations with a brief argument of little substance.

         Plaintiff's opposition is insufficient to defeat a grant of summary judgment to Defendant.  His

assertions of fact have no evidentiary basis.  His arguments show nothing more than a man trying

to appeal a decision that even he concedes was fairly decided long ago.  It is Plaintiff whose

arguments are pretextual.  His claims of discrimination and retaliation are a last ditch effort to ascend

to a position he could not secure competitively.

**II.     Defendant's Response to Plaintiff's Statement of Facts**

         1.      Plaintiff is an African American citizen of the United States who resides at the

address set forth in the caption above at all times material to this complaint.

**RESPONSE:** Defendant does not dispute this statement. Defendant assumes that Plaintiff is referring to the address that Plaintiff set forth in previous pleadings because the caption on Plaintiff's Opposition does not contain any addresss.

2.     Plaintiff is a member of a protected class (African American) and (disability).

**RESPONSE:**  Defendant does not dispute that Plaintiff is an African American.  Defendant avers that Plaintiff is an 80% Service Connected Veteran.  Defendant's Statement of Material Facts as to Which There Is No Genuine Dispute ("DSMF") at ¶ 66.  Defendant notes that Plaintiff has conceded that Defendant did not discriminate against him based on disability.  Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Plff. Opp. at 28) ("Plaintiff concedes disability and age.").  Accordingly, Defendant questions the relevance of Plaintiff's statements regarding his disability, and they are not material to deciding Defendant's motion.

3.     Plaintiff is a is am [sic] employee of Department of Veterans Affairs. Plaintiff engaged in protected conduct by filing a discrimination complaint against his immediate supervisors (the defendant).

**RESPONSE:** Defendant does not dispute that Plaintiff is an employee of the Department of Veterans Affairs. Defendant does not dispute that he filed a discrimination complaint against Defendant. However, Defendant asserts that prior to this case, Plaintiff did not file a discrimination complaint against either of his immediate supervisors. William Sivley ("Sivley") was hired as Lead Patient Advocate in 1999 or 2000. DSMF at ¶ 7. He was Plaintiff's direct supervisor. Id. Terry

Ross was Plaintiff's second line supervisor. DSMF at ¶ 8. In March 2003, Ross came to the VA Medical Center in Washington, D.C. Id. Ross was Plaintiff's second line supervisor from the time of her arrival until Plaintiff changed jobs in 2004. DSMF at ¶ 8. There is nothing in the record that even suggests that Plaintiff ever filed a discrimination complaint against either Ross or Sivley. Indeed, both of Plaintiff's discrimination complaints were filed before Ross began working at the VA Medical Center. Plaintiff's first complaint was filed on August 31, 1999 and was settled in May 2002. DSMF at ¶¶ 85-86. Plaintiff's second complaint consisted of two complaints that were consolidated at the administrative level. Id. at ¶ 88. These complaints were filed on October 26, 2001 and April 5, 2002. Id.

4.      Plaintiff's immediate supervisors knew of plaintiff's protected conduct (filing a complaint against his immediate supervisors).

**RESPONSE:** Defendant disputes this assertion. Terry Ross knew nothing about Plaintiff's prior EEO Activity. DSMF at ¶79. Plaintiff testified that he had "no idea" whether Terry Ross was aware of his prior complaints. Id. Plaintiff conjectured that since Garfunkel "was listed as the responsible management official [sic] in my previous case and now one of the final interviewing officials for this job, Ms. Ross could have obtained knowledge at that point." Id. At all times relevant to this case, Garfunkel was Director of the VA Medical Center and so he is not one of Plaintiff's **immediate** supervisors.

5.      Plaintiff suffered adverse employment actions after engaging in protected conduct.

**RESPONSE:** This is not a statement of fact but, rather, a statement of law. Defendant maintains that Plaintiff did not suffer any adverse employment action when Sivley was simply returned to his position of record, Lead Patient Advocate. To the extent that this statement could be

construed as a statement of fact, Defendant disputes it and maintains that it constitutes nothing more than a bald assertion.

6.    There is a causal link between the protected conduct that the plaintiff engaged in and the defendant's adverse action against plaintiff.

**RESPONSE:** As stated in Defendant's Response to Plaintiff's Statement of Facts #5, supra, Defendant maintains that it took no adverse action against Plaintiff.  Furthermore, none of the alleged adverse actions claimed by Plaintiff have any causal link to Plaintiff's protected conduct. Defendant's decision to have Sivley return to his position of record is entirely free of any discriminatory or retaliatory animus.  Defendant selected Sivley over Plaintiff in 2000 when both applied for the position of Lead Patient Advocate.  DSMF at ¶ 7.  Plaintiff agreed that Sivley had superior qualifications then and does not dispute that Sivley remains more qualified than himself. DSMF at ¶81.  The record evidence amply supports Defendant's decision to offer the position of Director of Patient Advocacy to Nancy Benjamin in August 2004. See DSMF at ¶¶ 27, 28, 29, 35, 36, 39, 40.  The record contains no evidence of discriminatory or retaliatory intent vis a vis Plaintiff's non-selection for the Director's position.

7.    Plaintiff has been subjected to retaliation and malicious acts as a result of filing a discrimination complaint against his immediate supervisors.

**RESPONSE:**  Defendant disputes this entire assertion, as it lacks necessary, specific evidence. There is no evidence of retaliation or malicious acts perpetrated upon Plaintiff by Defendant.

8.    The Defendant failed to select plaintiff for the Lead Patient Advocate position even though he was qualified for the position and had applied for the position under the special hiring

authority (10 point preference veteran) and disabled veteran preference.  Defendant knew of plaintiff's disability.

**RESPONSE:** Defendant does not dispute that Plaintiff applied for the position under the special hiring authority (10 point preference veteran) and disabled veteran preference.  Although this would indicate that Defendant was aware that Plaintiff had a disability, it does not indicate the exact details of that knowledge.  See DSMF at ¶ 73.  More importantly, the presence and extent of Defendant's knowledge of Plaintiff's disability is irrelevant and immaterial because Plaintiff has conceded that Defendant did not discriminate against him based on disability.  Plff. Opp. at 29. To the extent that Plaintiff is claiming a ten point Veteran's Preference under 5 USC Section 2108, the addition of these ten points to the score given to him by the rating panel does nothing to advance his case.  The rating panel scored Nancy Benjamin at 174 points while it gave Plaintiff a score of only 150 points.  DSMF at ¶ 28.  Even if Defendant failed to apply the ten point preference, applying this preference to Plaintiff's score only results in a new score of 160 points.  This revised score increase would still be insufficient to overcome the twenty-four (24) point spread between Benjamin's score and Plaintiff's revised score.

9.      Plaintiff has been subjected to discrimination and malicious acts as a result of filing a discrimination suit against her immediate supervisors.

**RESPONSE:** Defendant disputes this bald assertion.  There is no evidence of discrimination or malicious acts perpetrated upon Plaintiff by Defendant.

10.      Plaintiff was treated differently than similarly situated individuals not in the plaintiff's protected class.

**RESPONSE:**  Defendant disputes this assertion to the extent that Plaintiff erroneously maintains that Sivley was selected over him for the position of Lead Patient Advocate in August 2004.  Plaintiff could not apply for the position of Lead Patient Advocate because that position was not open for application.  Sivley held that job during all times relevant to this case.  DSMF at ¶ 51. Sivley and Plaintiff were not similarly situated.  Sivley had been Lead Patient Advocate since 2000. DSMF at ¶ 7. Plaintiff never held that position.

Plaintiff may be referring to his non-selection for the position of Director of Patient Advocacy (Job Announcement# 04-35A).  The selectee, Nancy Benjamin, and Plaintiff were both applicants for the position of Director of Patient Advocacy.  Defendant did treat Benjamin differently than Plaintiff because it selected her for the position while it did not select him.  The evidence shows no causal link between this non-selection and any racially discriminatory or retaliatory animus by Defendant.  Indeed, the record is free of any such animus.  Thus, Plaintiff has failed to establish a prima facie case.  Alternatively, even if Plaintiff proved such a prima facie case, the evidence proves that Defendant had a legitimate business reason for its selection.

11.    There is a causal link between the disparate treatment of those who had not engaged in protected activity, or who had engaged in similar activity to the plaintiff, albeit non-protected, but who were not similarly treated by the defendant.

**RESPONSE:** Defendant disputes this bald assertion of retaliation.  Once again, Plaintiff has failed to provide any names or events or other details to support his allegation.  The record shows no evidence of retaliation by Defendant against Plaintiff.

12.    Plaintiff exhausted all of his administrative remedies because defendant accepted plaintiff's claims for investigation and over 180 days has passed since the formal investigation began.

**RESPONSE:** To the extent that Plaintiff asserts that Defendant accepted Plaintiff's claims for investigation of Plaintiff's non-selection for Job Announcement #04-35A, Defendant does not dispute that Plaintiff had exhausted all of his administrative remedies.  To the extent that Plaintiff asserts that Defendant accepted any of Plaintiff's other claims, Defendant rejects this assertion.  On April 14, 2005, ORM dismissed all of Plaintiff's claims except for his claim regarding non-selection for MCD 04-035A. DSMF at ¶ 62.  Plaintiff's other claims were dismissed under 29 C.F.R. 1614.105(a)(2) because he did not seek counseling for those claims within 45 days of the alleged incident.  Id.  Therefore, the only claim properly before the Court is Plaintiff's non-selection claim for MCD-04-35A.  No one was selected for this position.  This is non-selection case without a selectee.

13.    Defendant's action had a significant effect on plaintiff and his family.

**RESPONSE:** Defendant does not dispute that Plaintiff testified about the effects of his non-selection on himself and his family.  Plaintiff's Deposition (hereinafter "Plff. Depo."), June 7, 2006,139:24-145:9.  Defendant does, however, dispute that these effects were significant.  See Id. at 142:6-14 (no treatment by mental health professional and no medication prescribed because of the nonselections); 145:1-4 (no costs for any treatment regarding physical or mental manifestations resulting from these events).  In any event, Defendant maintains that the extent of Plaintiff's damages are irrelevant to the procedural posture in this case (a motion for summary judgment) and further

denies that effects on Plaintiff, significant or otherwise, were the result of any discrimination or retaliation by Defendant..

III.    **ARGUMENT**

Plaintiff makes the following arguments:  (1) Garfunkel was the selecting official who discriminated and retaliated against Plaintiff when he selected Sivley over Plaintiff for the position of Lead Patient Advocate; (2) Defendant lacked a legitimate business reason for not selecting him; and (3) Any reasons provided by Defendant were not legitimate but rather were pretextual.  These arguments are legally and factually unsupportable.

### A.    GARFUNKEL WAS NOT THE SELECTING OFFICIAL AND HE DID NOT DISCRIMINATE OR RETALIATE AGAINST PLAINTIFF IN ANY WAY.

Because Plaintiff's central argument is so convoluted, he camouflages it in a dense, incoherent narrative.  After carefully deciphering this tale, his argument emerges.  Plaintiff's claims of discrimination (race) and retaliation rest on the motives of VA Medical Director Sanford Garfunkel ("Garfunkel").  The record, however, shows no evidence that Garfunkel was the selecting official for any position in question or that he discriminated or retaliated against Plaintiff.  Plaintiff asserts that Sanford Garfunkel retaliated against him when he selected William Sivley for the position of Lead Patient Advocate.  PSMF at ¶ 17.  He  notes that Garfunkel had knowledge that Plaintiff had settled a prior EEO case with Defendant.  Plff. Opp. at 11.  He cites Garfunkel's comments concerning his prior filings in a 2002 deposition as evidence of his discriminatory and retaliatory motives.  Plff. Opp. at 12.  Every part of Plaintiff's argument is baseless.

Plaintiff has cast Sivley as the selectee for the position of Lead Patient Advocate and Garfunkel as the selecting official.  See PSMF at ¶ 17.  Neither had these roles at the times relevant

to this case because there was no open Lead Advocate position in which Garfunkel could place Sivley. In order to shoehorn Garfunkel and Sivley into their respective roles as selecting official and selectee, Plaintiff alleges that the Lead Patient Advocate position was abolished and reestablished. PSMF at ¶ 17 ("[T]he position [Lead Patient Advocate] was thereafter abolished in favor of the position of Director, Office of Patient Advocacy"); PSMF at ¶ 6 ("[T]he position of Lead Patient Advocate was reestablished"). Plaintiff adds further pathos to this drama when he states Sivley was selected without going through the application process. PSMF at ¶¶ 6, 15.

The evidence unmasks Plaintiff's pleading as fiction. Plaintiff provides no evidence that the position held by William Sivley was abolished. The evidence shows only plans to abolish that position. See DSMF at ¶ 51. Lawyer and layman alike will readily concur that there is a wide gulf between thinking (or planning) and doing. Defendant was exercising utmost prudence in preserving the Lead Patient Advocate position until a Director, Office of Patient Advocacy, was hired. As part of Defendant's plan, Michelle Spivak was to serve as Acting Lead Patient Advocate until the Director's position was filled. DSMF at ¶ 11.

Indeed, 20/20 hindsight shows that this was the prudent course of action since no qualified candidate accepted the Director's position. See DSMF at ¶¶ 42, 43, 44, 46, 50 (Ross readvertised the Director's position as MCD-04-35A because no qualified candidates, who would accept the position were found under MCD-04-35). If the Lead Patient Advocate's position had been abolished before the Director's position was filled, Defendant's vital operations could have been handicapped during the time between the cancellation of the Director's position and the selection of the Lead Patient Advocate. Thus, the evidence shows the logic and genuineness of Defendant's actions. Defendant planned to abolish one position and substitute it with another once the latter position was

filled.  See DSMF at ¶ 51.  These plans were never acted upon because the Director's position was never filled.  Id.

Plaintiff's assertion that Garfunkel selected Sivley for the Lead Patient Advocate position depends on the existence of evidence showing that position had been abolished.  Because the evidence shows that the position was never abolished, Plaintiff cannot assert that Garfunkel selected Sivley for the Lead Patient Advocate position in 2004 when Sivley already held that position. Documentary evidence (SF-50, dated June 20, 2004) shows that Sivley returned to duty around late June 2004. See Defendant's Reply Exhibit 1(Sivley's SF-50, dated June 20, 2004).  The position to which Sivley returned to duty was the Lead Patient Advocate Position, not the Director's position. See Defendant's Reply Exhibit 2 (Four of Sivley's SF-50 forms with effective dates, March 9, 2003, May 4, 2003, November 2, 2003, and January 1, 2004 all show that Sivley held the same positon when returned to the VA Medical from military duty on June 20, 2004).

Plaintiff's attempt to characterize Sivley as the selectee for a reestablished position of Lead Patient Advocate is part of his convoluted attempt to show discrimination and retaliation where none exists.  Plaintiff recognizes that Terry Ross knew nothing about his prior EEO activity.  Thus, in order to construct a case of retaliation.  Plaintiff makes Bill Sivley the selectee so that he can make Sanford Garfunkel the selecting official.  See DSMF at ¶ 79 (Plaintiff fails to refute Ross'denial of knowledge of his prior EEO activity with evidence, but, rather, offers only conjecture.).

Plaintiff needs Garfunkel to be the selecting official because Garfunkel, unlike Ross, knew of Plaintiff' prior EEO activity.  While Garfunkel admits that he was aware that Plaintiff settled his prior case, his knowledge is very general.  See Garfunkel 2007 Depo. at 6 ("I'm aware that he had won a case, a settlement.  I don't even know how it was resolved but I'm aware he had filed and won

a case."). This general statement reveals no negative emotions towards Plaintiff's prior EEO activity.

In order to manufacture the appearance of negative emotions, Plaintiff reaches back in time and quotes Garfunkel out of context. Plaintiff asserts that Garfunkel spoke "negatively" about his protected activities. Plff. Opp. at 12. He quotes Garfunkel's 2002 Deposition (Affidavit) in which Garfunkel states that Plaintiff "seemed to unhappy and he's always filing complaints." Id. (quoting Garfunkel 2002 Deposition at 18) (Plaintiff's Opposition Exhibit 2). This deposition was taken as part of the EEO investigation into Plaintiff's second EEO Complaint in which he challenged the selection of Michelle Spivak as Acting Lead Patient Advocate. See DSMF at ¶ 89 (the subject of the second EEO Complaint). Garfunkel's aforementioned observation of Plaintiff was part of a larger statement in which he voiced a genuine concern for Plaintiff's well being and an interest in helping him advance in the VA Medical Center. See Garfunkel 2002 Deposition at 18 (Plaintiff's Opposition Exhibit 2) ("I have spoken to Mr. West about the Complainant saying what can we do for him. He seems to be unhappy, and he's always filing complaints. If he's doing a good job as a patient advocate, what can we do for him. When someone performs well I want to try to do good things and keep them in the organization. So I'm looking to see what I can do for him . . ."). The entirety of Garfunkel's comments make it apparent that his words were not of derision or hostility but, rather, of concern and compassion. In addition, Plaintiff ascribes negative motives to a statement that was made more than two years before the date of the incident in question (October 2004).

The date of Plaintiff's protected activity takes place in April 2003, at the latest. But the alleged adverse action at issue here took place in October 2004 – eighteen months later. This

eighteen month gap in time raises no inference of retaliation whatsoever. <u>Mayers v. Laborers' Health</u> <u>& Safety Fund of North America</u>, --- F.3d ----, 2007 WL 623641 (D.C. Cir. 2007) (holding that "an eight- or nine-month gap" between the final protected activity and the alleged adverse action is far too long to be evidence of causation). <u>See also</u> <u>Clark County School Dist. v. Breeden</u>, 532 U.S. 268, 273-74, 121 S.Ct. 1508, 1511 (noting that "cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close'" and citing e.g., <u>Richmond v. ONEOK, Inc.</u>, 120 F.3d 205, 209 (C.A.10 1997) (3-month period insufficient)). Once again, Plaintiff is straining the facts and the law to create issues of material fact where none exist.

Plaintiff also uses exerpts from Garfunkel's 2005 deposition in a further effort to concoct Garfunkel's discriminatory and retaliatory animus. Garfunkel's quoted testimony provides no evidence that he engaged in discrimination or retaliation because his actions involved readvertisement of the position, not selection. <u>See</u> Plff. Opp. at 12 (quoting Garfunkel 2005 Depo. at 10:23-15, 11:1-5) (Plff. Opp. Exhibit 1) ("I am not sure even if I was involved with that tell you the truth; I may have been. But again, he was the only name and being the only name we felt, they felt they wanted more choices, that he was not the guy we really wanted for the job because of-- his record has not been an outstanding record. So we went back out."). In this statement, Garfunkel merely discusses the process by which he approved the third announcement of the Director's Position (Job Announcement # 04-35A).

To the extent that Plaintiff asserts that Garfunkel's approval of the readvertisement of the Director's position reveals any discriminatory animus towards him, Plaintiff has provided no

evidence of this animus. Garfunkel's testimony concerning Plaintiff's record only shows that Garfunkel acted on the advice of pertinent actors in the selection process (i.e., Terry Ross, the selecting official). He approved readvertising the Director's position, because those involved in the selection process for the Director's position advised him that the probability of locating the optimal candidate would be increased if the position were readvertised. Garfunkel 2005 Deposition at 11; Plff. Opp. at 12 (quoting Garfunkel 2005 Depo. at 10:13-15, 17-22("I don't remember specifically what happened. I imagine that Terry or whoever came to me and said we only have one candidate, it is Keith, so we'd really like to go back out and see if we can get more candidates because Keith probably is not the guy we want and we certainly want more choices and so we went out."). Plaintiff does not appear to dispute that Ross had to consult with Garfunkel because the Medical Director had to authorize advertising that position again. See DSMF at ¶ 9 (Garfunkel initially approved the establishment of the Director's position per Ross' request). As Medical Center Director, Garfunkel was not obligated to probe the "nuts and bolts" of the transaction. He acted more than reasonably when he relied on Ross' advice in making the determination to readvertise the position. Instead of supporting Plaintiff's assertion that Garfunkel was the selecting official, Garfunkel's testimony only provides further evidence that Ross, not Garfunkel, was the selecting official. Garfunkel 2007 Depo. at 11:19, 13:17, 14:2 (Garfunkel states that he was not the selecting official); 15:21 (Garfunkel testifies that Ross was the selecting official).

Plaintiff piles on one irrelevant argument after another when he attempts to refute Garfunkel's (the non-selecting officials's) testimony regarding his record with his performance appraisals from 1998 through 2003. Plff. Opp. at 12-13. In addition to quoting from these appraisals, Plaintiff also cites his awards, letter of commendation, and his Board membership in the

13

Society for Healthcare Consumer Advocacy ("SHCA").  Id. at 13.  Plaintiff attacks Garfunkel's description of his record in order to transform this Court into a super personnel board that will make selection decisions based on his self-serving hiring criteria.  See Id. at 13 ("Managements' [sic] decision not to select Plaintiff was not based on objective criteria such as documents he submitted with his application, performance appraisals or an interview . . .").  Plaintiff subjectively interprets his own record and assumes that his performance ratings as a Patient Advocate translate into his entitlement to the position of Lead Patient Advocate.  This assertion is flawed and legally unsound. Indeed, employers may (and do) evaluate performance records differently when considering an applicant for a new position with added responsibilities as opposed to evaluating a person in his or her present position.  Such a practice is both standard and logical.  Despite Plaintiff's contrary assertion, any deviation from Plaintiff's opinion of his qualifications for the position(s) at issue is not per se discrimination or retaliation.

## B. DEFENDANT HAD A LEGITIMATE BUSINESS REASON FOR NOT SELECTING PLAINTIFF

Plaintiff's assertion that Defendant did not have a legitimate business reason for not selecting him easily collapses because it is built on a legally unsound foundation.  Plaintiff only provides immaterial and self-serving evaluations of his job qualifications, while his own deposition testimony supports Defendant's actions.

Plaintiff asserts "Managements' [sic] decision not to select Plaintiff was not based on objective criteria such as documents he submitted with his application, performance appraisals or an interview because Plaintiff was not interviewed."  Plff. Opp. at 13-14.  This statement is false. On the contrary, management did consider both Plaintiff's application packet and his interview performance.  See Ross Depo. 28:7-11 ("Whatever was in the packet I was familiar with."); Ross

14

Declaration Response to Question 17 at 5 ("I spoke with the Medical Director and expressed my concerns about the limited experience of Mr. Pierce **portrayed both in his interview with me and in his application package**, and he agreed that the other applicant was far more qualified for the position.") (emphasis added). Plaintiff's allegation that he was not interviewed is preposterous. Defendant interviewed Plaintiff for the positions of Director, Office of Patient Advocacy and Lead Patient Advocate. A rating and ranking panel interviewed Plaintiff in July 2004. DSMF at ¶¶ 27-28. Ross and Garfunkel interviewed Plaintiff in August 2004. DSMF at ¶¶ 32, 38. The position of Lead Patient Advocate was not open in 2004 and had not been open since Sivley was hired in 2000. DSMF at ¶¶ 7, 51; Deft. Opp. Exhibit (showing Sivley returning to his job as Lead Patient Advocate, following his military duty, effective June 20, 2004). In his deposition testimony, Plaintiff stated that he had no problems with the selection process for that position. DSMF at ¶56.

 Plaintiff's interview for the Director's position was a significant factor in his non-selection for that position. Eight people (the five members of the rating and ranking panel, Ross, and Garfunkel) all opined that his interview revealed a significant weakness in his credentials: a lack of team leadership skills. The panel noted that they "could not ascertain his [Plaintiff's] management potential, due to his tendency to concentrate on his personal roles and achievements. It was also unclear as to whether he recognized his tendency to reflect more on the 'me' as opposed to the 'we'". DMSJ Exhibit 12 at 1. The panel gave Pierce a score of 150. In contrast, the panel had very favorable comments about the answers that selectee Nancy Benjamin provided in her interview. See Id. at 2. In addition to noting her management experience, the panel stated that "She gave very specific, detailed, relevant answers to questions explaining her experience and how it would apply to the position. . . . She was able to describe program and team development, evaluation, and the

resulting changes based on team input."). <u>Id.</u> The panel gave Nancy Benjamin a score of 174 (twenty-four points higher than Plaintiff). <u>Id.</u> They recommended second interviews for both Plaintiff and Benjamin. <u>Id.</u>

Plaintiff's poor performance in interviews continued. Garfunkel and Ross interviewed Plaintiff separately. Ross 2007 Depo. at 18:7-8. Garfunkel was "looking to have a positive interview with Keith and hopefully see if it would work out." Garfunkel 2005 Depo. at 8:6-7. Garfunkel's hopes were dashed once the interview took place. <u>Id.</u> at 8:8-13 ("I have to tell you very honestly it was not a good interview at all. From what he would do if he got the job to what issues there are with the program to what he would do to make it better for patients, he really did not have a satisfactory answer to me to any question or to most questions."). Therefore, the record clearly contradicts Plaintiff's claim that "He was rejected before they even heard what his plans would be if he were selected."

Ross also found Plaintiff's performance to be unimpressive. <u>See</u> Ross Declaration, Response to Question 17 at 5 ("After the interviews, it became apparent to me that Mr. Pierce was unable to show that he had significant experience specifically in leading a program, nor was he able to portray that he had specific experience using graphs and charts to present data which was imperative to this position."). <u>See also</u> Garfunkel 2005 Depo. at 8:18-19 ("[T]he interview with Keith did not go well and I think neither did his interview with Terry.").

While Garfunkel and Ross concluded that Plaintiff performed poorly in the interview, each of them interviewed Benjamin separately and determined that she was outstanding. Garfunkel noted how Benjamin's management skills shined through during her interview. Garfunkel 2005 Depo. at 14:12-18 ("When I spoke to her about how she would approach the job and what she has

accomplished in her career in the job and how flexible is she and all going through the core competencies and things, she had wonderful answers about following up on issues and about supervising people and et cetera, et cetera."). After interviewing Benjamin, Ross concluded that Benjamin had the skills (running a program and experience in using charts and graphs to present data) that were needed for a Director (skills that Pierce lacked). Ross Declaration, Response to Question 17 at 5("Whereas, Ms. Benjamin was clearly able to demonstrate how she has run a program, and provided detailed explanations of her experience with presenting data through graphs and charts.").

Contrary to Plaintiff's assertion, Ross did not select him and instead selected Benjamin based on objective criteria. After considering Plaintiff's application packet and his interview, Ross determined that Plaintiff was not qualified to be Director, but that Benjamin was qualified. Ross Declaration, Response to Question 17 at 5. Ross selected Benjamin to be Director, Office of Patient Advocacy, but she declined the offer. Id. ("I then asked Human Resource Service to offer the position to the other applicant however, she declined the offer."). After Benjamin declined the offer, Ross had no other qualified candidates to fill the position. Id. ("At that point, since we had no other viable applicants (it was already decided that Mr. Pierce was not adequately qualified for the position), I asked Human Resources to post the position for the third time."). The Director's position was posted for the third time as announcement number MCD-04-035A on September 7, 2004. Id. at Response to Question 19 at 5. "No one was hired or selected for this position as the announcement no. MCD-04-035A was canceled on October 28, 2004." Id.

While it is undisputed that the Director's position was never filled, the Lead Patient position was never abolished. At all times relevant to this case, Sivley held the latter position. There was

no selection made either for the Director's position or Lead Patient Advocate in 2004.  There is no evidence that the Lead Patient Advocate position, as constituted in October 2004, was markedly different from Sivley's position of record so as to render it the functional equivalent of a new position.  Defendant's decision to abolish the position of Director and have Sivley resume his position of record was clearly legitimate.

Plaintiff's suggestion that the positions of Director and Lead Patient Advocate are identical is incorrect.  Because of several key differences between these positions the Position Description for Vacancy Announcement MCD 04-35A differed significantly from the Position Description for the Lead Patient Advocate Position.  DSMF at ¶ 47; DMSJ Exhibit 15 (Position Description of Lead Advocate Position, Position 74820-0).  The Lead Patient Advocate Position listed Special Projects as 100% of the duties.  Id.  In contrast, the Director, Office of Patient Advocacy Position lists four major duties (each comprises 25%): (1) Development of Programs, Policies, and Procedures, (2) Development of Criteria, (3) Program Implementation, and (4) Studies and Special Projects.  DSMF at ¶ 47;  DMSJ Exhibit 16 (Vacancy Announcement MCD 04-35A with attached Position Description of Director, Patient Advocacy).  The Lead Patient Advocate did not run a major program.  Ross Depo. at 18:20-19:3.  The lead advocate was not involved in charts and graphs and providing analysis for patient satisfaction.  Id. at 18:20-19:8.  Even Plaintiff acknowledges that the duties described in the Director, Office of Patient Advocacy "put more weight on certain things." Plff. Depo. at 167:1-3, 169:19-22 ("[T]hey're weighted different.").

The sole basis for Plaintiff's argument on this point may be that Sivley is working with graphs and charts and he had not done that as Lead Patient Advocate until October 2004.  Although skills with graphs and charts were a key factor in the selection for the Director's position, it was not the

only factor because Defendant envisioned a much greater leadership role for the Director. There is no evidence showing Sivley has undertaken such a vibrant leadership role. DSMF at ¶ 35. Defendant merely assigned Sivley an additional duty to his position of record (Lead Patient Advocate), without altering the fundamental duties of that position. This assignment of work by no means constituted the de facto establishment of a new position.

Defendant needed charts and graphs to be completed so it assigned this work to Sivley in his present position of Lead Patient Advocate. The record shows this to be the quintessential legitimate business decision. Defendant had initially thought that the Director, Office of Patient Advocacy, would construct graphs and charts in addition to the several other unique duties of that new position, Director. See DSMF at 34-36. Sivley, the existing Lead Patient Advocate, did have prior experience with graphs and statistics, however. DSMF at ¶ 54. As Plaintiff himself noted, Sivley's skill with graphs is unique among Lead Patient Advocates. DSMF at ¶ 55. Defendant saw a need (graphs and charts) and a qualified individual (Sivley). Defendant determined that that need could be met by adding it as a duty to a currently held position instead of having it as part of a vacant position for which no qualified candidate had applied. Although Defendant could not find someone to perform all the duties of the Director's position, its assignment of a small portion of these duties to their undisputedly well-qualified Lead Patient Advocate of record was a prudent use of resources (legitimate business reason).

Plaintiff's efforts to cast Garfunkel as the alleged discriminating official fail because both the law and the facts are contrary to this position. Garfunkel committed no discriminatory or retaliatory act because he made no selection. Garfunkel and Ross merely agreed to return an employee to his position of record, giving him one additional duty. Garfunkel did not chose among multiple

candidates for an open position. He merely assigned certain necessary work to Sivley, a current employee and a long time occupant of the existing position of Lead Patient Advocate. Garfunkel took this action because it was prudent to do so.

### C.    PLAINTIFF FAILED TO SHOW THAT ANY OF DEFENDANT'S REASONS OR ACTIONS WERE PRETEXTUAL.

The very style of Plaintiff's argument that Defendant's legitimate business reasons are pretextual belies the desperate nature of his attempt to make a case where no case exists. Pages 14 through 27 of Plaintiff's Memorandum contains only large selected excerpts from the 2007 depositions of Garfunkel and Ross, without analysis or argument. Plff. Opp. at 14-27. Although Plaintiff relies on these transcripts to prove that Defendant's "actions and their reasons for selecting plaintiff are pretextual," Plff. Opp. at 14, they actually strengthen Defendant's position that Plaintiff has made no prima facie case of discrimination, and alternatively that Defendant had a legitimate business purpose for its decision.

In one page of argument following the deposition excerpts, Plaintiff throws a series of wild punches, all of which fail to connect. Even though he is challenging Defendant's decision to allow Sivley to resume his position of record (Lead Patient Advocate), Plaintiff continues to argue about the unfairness of Nancy Benjamin's selection for an entirely different position (Director, Office of Patient Advocacy). First, he attacks Defendant's hiring criteria and process. Then, he maintains that his own subjective assessment of his qualifications should take precedence over management's criteria. Finally, he argues that the management's imperfect memory regarding some unspecified paperwork provides clear evidence that Defendant retaliated against him and discriminated against him based on race. The record evidence handily refutes each of these arguments.

Plaintiff alleges that Defendant's hiring process and criteria are evidence that "management went out of their way to avoid selecting plaintiff." Plff. Opp. at 28. He argues two points in support of this assertion. First, Defendant did not abide by its own hiring criteria because it selected Benjamin, who was not qualified for the Director's position under that criteria. Id. Second, Benjamin and Plaintiff were not subjected to the same hiring process. Id. Both of these allegations have no merit.

Plaintiff's argument that Benjamin did not satisfy Defendant's hiring criteria is contrary to the record evidence. Plaintiff states that the hiring criteria did not mention charts and graphs but rather had as one of its criteria: " knowledge of agency program goals and objectives, the sequence and timing of key program events and milestone and methods of evaluating the worth of program accomplishments." Plff. Opp. at 28. He asserts that "first white female [Benjamin] that was selected over plaintiff could not have knowledge of agency program goals and objectives, the sequence and timing of key program events because she did not work at the agency." Id. The record contradicts this argument.

As previously noted, the candidates for the Director's position were evaluated under several hiring criteria. While experience with graphs and charts was an important criteria, there were other significant criteria. See DMSJ Exhibit 16 (Job Announcement 04-35A Position Description). These other criteria included the very team leadership skills that Plaintiff lacked. Id. (Major duties of the Director's Position included: (1) Develops leadership councils, team activities, and motivational approaches and (2) Coordinates with managers and technical specialists from key installation elements to develop quality program plans to resolve serious business situations.). Plaintiff ignored the major duties of the Position Description Section and cherry picked one of nine evaluation factors

(Factor 1-8 Knowledge Required by the Position).  His argument is not only incomplete, it is also inaccurate.  Plaintiff's assertion that Benjamin "did not work at the **agency** is incorrect." (emphasis added).  The **agency** at issue in this case is the Department of Veterans Affairs.  When  Benjamin was an applicant for the Director's position, she was an employee of the Department of Veterans Affairs, Western New York HealthCare System Medical Center, and had been since 1992.  DMSJ Exhibit 25 at 2.  From this false assertion, Plaintiff assumes facts that are contrary to the evidence.  The rating panel said of Benjamin "She was able to describe program and team development, evaluation, and resulting changes based on team input.  She had a clear understanding of the responsibilities of the role of VA policies." DMSJ Exhibit 12 at 2.  The rating panel interviewed Benjamin.  DSMF at ¶ 28.  Plaintiff did not.  The panel has direct knowledge of Benjamin's responses to their questions.  Plaintiff only speculates.  A motion for summary judgment cannot be defeated on speculation.

Plaintiff continues his campaign of distortion and inaccuracy when he alleges the invalidity of Defendant's hiring process.  He states that he was "evaluated on different questions" than Benjamin.  Plff. Opp. at 28.  The non-selecting official (Garfunkel) only guessed that he **may have** asked Pierce questions that differed somewhat from those that he asked of the other applicant because of Pierce's status as a present employee of the VA Medical Center in Washington, D.C.  See Garfunkel 2007 Depo. at 8:20-22, 9:1-4.  ("In Mr. Pierce's case he was an inside candidate, the other was an outside candidate, so I might have asked a little bit different because he was  familiar with how that section worked and how the hospital worked.  But I generally try to ask the same questions.").  Plaintiff inflates the non-selecting official's uncertain recollection of the interview into a monumental injustice while ignoring the solid testimonial and documentary evidence concerning

the selecting official's questions during the interview.  Ross stated that she asked the same questions of the applicants (DSMF at ¶ 32) and the question sheets that she used during the interviews of Plaintiff and Benjamin fully support her testimony on this point (DMSJ Exhibit 13).  Plaintiff has once again resorted to telling half the story in order to support his collapsing case.  Regardless, because Plaintiff was an insider, Defendant would have a legitimate basis for asking him slightly different questions.  There is no evidence that such slight differences, to the extent it occurred, had anything to do with Plaintiff's race or protected activity.

After criticizing the hiring criteria and process, he then moves on to attack the basis of Defendant's decision not to select him for the Director's position.  See Plff. Opp. at 28.  He argues that Ross' present lack of knowledge about Plaintiff 's past role as Acting Lead Patient Advocate tainted her ultimate selection.  Plff. Opp. at 28 ("Ms. Ross admits that she did not know that Plaintiff served as the Acting Lead Patient Advocate even though the performance appraisals that he submitted clearly stated that he had held the position . . .").  Plaintiff, therefore, asserts that Ross must have known of his prior role  because he submitted performance appraisals with his application packet.  Id. Plaintiff, however, had not been Acting Lead Patient Advocate since Ross arrived at the Medical Center.  Ross Depo. at 8:15-22 (Ross noted that a female (probably Spivak) had been Acting Lead Patient Advocate since she arrived.).  Ross was deposed on January 7, 2007, more than two and half years after the alleged date of non-selection in this case (October 2004).  Ross's testimony that she did not recall this aspect of Plaintiff's application is neither incredulous nor relevant.  See Ross Deposition 17:11-16 (Ross answered that she did not recall reading that Plaintiff had been Lead Patient Advocate in his performance appraisal.).  Plaintiff once again is stamping his feet and

demanding that his past experience as Acting Lead Patient Advocate entitled him to be Director, Office of Patient Advocacy.

Plaintiff's final argument is consistent with the remainder of his Opposition: unclear, and unsupported. He states "[I]t is clear that management cannot remember what if any paperwork was required to be filed [sic] out so that they could fill the position with a white male, who did not even apply for the position." Plff. Opp. at 28. Plaintiff provides no specific reference to management's lack of recollection of the necessary paperwork. Based on his selected deposition excerpts, it appears that he is referring to Ross' inability to recall whether any paperwork was required for Sivley to go on the detail. See Plff. Opp. at 18 (quoting Ross Depo. at 10:9-11:15). This is a red herring. Sivley returned to duty as Lead Patient Advocate on the effective date of June 20, 2006. Deft. Reply Exhibit 1. Thus, as previously noted, his assertion that Sivley filled a position that he did not apply for is simply untrue.

While Plaintiff clumsily seeks to prove pretext through the deposition excerpts of Garfunkel and Ross, he conveniently ignores his own deposition testimony which serves as a virtual admission that Defendant acted legitimately, and its actions and the reasons for those actions were not pretextual. Plaintiff maintains that Sivley was selected over him for the position of Lead Patient Advocate and that the reasons for his non-selection are pretext for discrimination and retaliation. Assuming arguendo that Sivley is in fact the selectee in this case, Plaintiff has supplied more than enough legitimate reasons for Defendant to select Sivley over him. Plaintiff explicitly states that he has never maintained that he was more qualified than Sivley. DSMF at ¶ 81. Plaintiff competed with Sivley for the Lead Patient Advocate's position in 2000. Id. at ¶ 7. Sivley was selected over Plaintiff. Id. Plaintiff believed that that selection process was fair and free of discrimination. Id.

at ¶ 56.  In addition to his explicit endorsement of the result of the selection process in 2000, Plaintiff also implicitly confirms the logic of Defendant's decision to have Sivley resume the duties of his position of record while also assigning him to work with graphs and charts.  In his deposition, Plaintiff underscored Sivley's unique skills with graphs and charts. Id. at ¶ 55.  Once again, the evidence shows that Defendant made a decision which made optimal use of its resources.  Plaintiff's own testimony thus confirms that Defendant's decision was legitimate and that discrimination and retaliation played no role in its decision.

It is not Defendant but rather Plaintiff who has presented pretextual reasons in this suit. Plaintiff's allegations of discrimination and retaliation are pretext for his ultimate goal: requiring the Court to employ his criteria for selecting job candidates.  This case goes beyond the ordinary non-selection case.  There is no selectee in this case.  Plaintiff does not merely ask the Court to revisit the wisdom of a hiring decision but instead he seeks review of Defendant's decision to allow an employee to resume the duties of his record position.  This would be micromanagement at its most extreme and thus, an extreme example of attempting to transform the Court into a superpersonnel board.

## CONCLUSION

For the above reasons, and those which Defendant presented in his Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, the Defendant's motion should be granted and this matter should be dismissed with prejudice.

25

Respectfully submitted,


               /s/
_____
JEFFREY A. TAYLOR, DC Bar #489610
United States Attorney


               /s/
_____
RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney


               /s/
_____
ALEXANDER D. SHOAIBI,   Bar #423587
Assistant United States Attorney
Judiciary Center Building – Civil Division
555 Fourth Street, N.W. – Room E-4218
Washington, D.C. 20530
(202) 514-7236

Counsel for the Defendant


June 8, 2007