COPY

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - x

KEITH PIERCE,                       :

    Plaintiff,                     :

vs.                                 : Case No: 1:05CV019989

HON. B. JAMES NICHOLSON,            :

    Defendant                      :

- - - - - - - - - - - - - x

                          Washington, D.C.

                          Wednesday, June 7, 2006

Whereupon,

                    KEITH PIERCE

the Witness, called for examination by counsel for the Defendant, pursuant to notice and agreement of counsel as to time and place, at 501 Third Street, N.W., Washington, DC, before Heather Kilbourne, a Notary Public in and for the District of Columbia.

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1      Q     Okay. Well, that was actually going to be my
2  question, because if you didn't file claims in these three
3  positions, why this one?
4      A     Well, this one I put more effort and energy. The
5  others --
6      Q     Into applying?
7      A     In not only applying but making myself best
8  qualified.
9      Q     Okay.
10     A     I feel I was one of the best candidates and the
11 others -- even probably the best candidate for the one in
12 Supply, but this one, it's very hard to say here's a person
13 that is on the Board of Directors over patient advocacy and
14 then you say that a social worker with no patient advocate
15 experience is best qualified. Only looking at it from a
16 logical standpoint, that's stressful, and the years it took me
17 to get to where I am, you can't give me those back. I'm
18 closer to retirement than I am to starting over again.
19     Q     You mean the years working in the Patient Advocacy
20 Office?
21     A     Yes, and building my experience and credibility for
22 a position like that. It's no dollar amount, really, you can
23 put on that. Nobody can give me my years back.
24     Q     Okay. Let's -- going through these, there are four
25 things that you indicate, mental strain, defamation of

1  character on the job, public humiliation and loss of pay and
2  time in grade.  The mental strain, you've indicated that going
3  through the process of the complaint is mentally straining but
4  can you explain what your -- what the mental frame has been in
5  regard to your failure to get this position?
6       A    Well, part of that is to go to work every day and to
7  have to be positive, knowing that I was dealt unfairly and to
8  be professional.  That, that's stressful when you have to
9  smile -- and I've been working with Ms. Ross on other
10 projects.
11      Q    Okay.
12      A    Knowing that I've got to keep a positive attitude
13 and still work for the person that I feel did me unfair
14 justice.
15      Q    All right.  What does defamation of character on the
16 job mean to you in this context?
17      A    In this context, I think it reflects negative that I
18 am qualified or that I was qualified to actually hold that
19 position.  That sends a message.  By not getting selected, by
20 going through the entire process, and by having all the people
21 like the Vice President of the American Hospital Association
22 involved with this and not get it, when asked, I can't give an
23 answer.  What answer do I give?
24      Q    All right.
25      A    So they look upon me, I'm assuming, that they're

1  looking upon me as here's a person that if he can't be trusted
2  to be the Director in his medical center, even though he's
3  exhibited all kinds of leadership skills and abilities at the
4  national level, how could they put me over a national
5  organization like that?
6      Q   Okay. And is public humiliation the same?
7      A   Yes.
8      Q   Okay. Can you explain to me any physical
9  manifestations that you have as a result of these things?
10     A   Other than the stress. When I -- like I said, I've
11 had -- I've spoken at least maybe a couple of times to the EAP
12 because I just need someone to talk to because when I sit back
13 and I look at this and I look where I should have been or
14 where I thought I should have been, then it's stressful.
15     Q   Okay. And that's Chaplain Cross that you were
16 talking about?
17     A   Yes, I've spoken to Chaplain Cross a couple of
18 times.
19     Q   Okay. Any impact on your daily life or your ability
20 to have relationships with people, anything like that as a
21 result of failing to have this position?
22     A   I would say -- I would like to say no. I try not to
23 take my work home. Do I still think about it? Yes, I do.
24 Every time I go into the Patient Advocates Office and see Bill
25 Sivley sitting there, yes, I do. When I look at the -- like

1   the letter from Secretary Nicholson saying what a great job he
2   thought I did when he -- about being on the Board of Directors
3   for this organization, yes, I do.
4        Q    Okay.  Do you think about it?
5        A    Yes.
6        Q    Okay.  Have you been treated -- I know you told me
7   about EAP.  Have you been treated by any medical professionals
8   --
9        A    No.
10       Q    -- in regard to any of these impacts?  Are you on
11  any medication for these impacts?
12       A    No.
13       Q    Not because of your physical --
14       A    No.
15       Q    All right.  Other than Lakesha that you've already
16  told us about, is there anyone else who can testify about the
17  emotional impact that this has had on you?
18       A    Well, if she'll be -- I've got -- I've shared this
19  with all of my kids but she was the closest, and like I said,
20  because we drove to work every day and not only as a parent
21  because my issue was not with the U.S. Department of Veterans
22  Affairs.  It was with the VA Medical Center where we -- where
23  I currently work and where she worked.
24       Q    Uh-huh.
25       A    And I don't know if that gave her an overall bad

1  impact or bad taste for the VA as a whole but what happened to
2  me at that medical center only affected her while, I think, at
3  that medical center.  I don't think she's having any problems
4  where she's at down at HEC.
5      Q    Okay.
6           COURT REPORTER:  I'm sorry, where is she at?
7           THE WITNESS:  It's HEC.  It's the Eligibility and I
8  think it's the HEC, but it's the Eligibility Department --
9           COURT REPORTER:  But the acronym is HEC?
10          THE WITNESS:  I think that's it, HEC.
11          COURT REPORTER:  Thank you.
12          BY MS. KONOPKA:
13     Q    Were you or your family members ever hospitalized
14 because of this event?
15     A    No.
16     Q    Okay.  Other than still thinking about this, do you
17 have any current manifestations?
18     A    Times when I get angry when I think about it, no,
19 that's about it.  Just when I think about it I get -- it
20 bothers me.
21     Q    Okay.  All right.  And now, you said that the
22 problem you have is with this particular VA medical center but
23 is it only with -- you've indicated Ms. Ross and Mr.
24 Garfunkel.  Is it with any officials other than those two or
25 just those two?

```
 1    A    Well, initially Mr. West was involved.
 2    Q    Okay.
 3    A    A couple of times.
 4    Q    In some of your prior things?
 5    A    Yes.
 6    Q    Okay.  Any healthcare professional told you that
 7  your condition is -- that your mental impact is caused by the
 8  agency's actions?
 9    A    No.
10    Q    Okay.  Any treatment for any kind of mental or
11  emotional stress issues previously, prior to your not getting
12  this position?
13    A    No.
14    Q    Okay.  Any events going on in your personal life in
15  2004 when this non-selection took place and subsequent to that
16  that also caused you stress?
17    A    No.
18    Q    Okay.  No deaths in the family?
19    A    No.
20    Q    Marital family problems?
21    A    No.
22    Q    Financial problems?
23    A    No.
24    Q    Illnesses, accidents?
25    A    No.
```

```
 1       Q     Okay.  Any costs for any treatment at all in regard
 2  to physical or mental manifestations?
 3       A     No, and if there were, as a 80% vet, I'm seen free
 4  right there at the VA.
 5       Q     Okay.  Have you needed at any point to take sick or
 6  annual leave as a result of physical or mental manifestations
 7  of not getting this job?
 8       A     I may have taken a day or two when I was upset about
 9  hearing about the job, but not on a regular basis, no.
10             MS. KONOPKA:  Why don't we go off the record for a
11  minute.
12             COURT REPORTER:  Okay.  Off the record at 3:53.
13             (Off the record; on the record.)
14             BY MS. KONOPKA:
15       Q     I just wanted to clarify one or some more things and
16  then I think we're finished.  You had talked to me briefly
17  about these three other job that you said that you had applied
18  for between '99 and 2004.
19       A     Yes.
20       Q     That you hadn't gotten, you thought it was
21  questionable but you didn't file complaints.  Did any of these
22  have Ms. Ross as the selecting official?
23       A     No.
24       Q     Okay.  Was Mr. Garfunkel involved in any of them?
25       A     I think he was with the one with the Chief of
```